**Nos. 24-2788, 24-3057**

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

### PG PUBLISHING CO., INC.  d/b/a PITTSBURGH POST-GAZETTE

**Petitioner/Cross-Respondent**

v.

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

and

### NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061

**Intervenor**

---

### ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

---

### BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

---

**MILAKSHMI RAJAPAKSE**
*Supervisory Attorney*

**DAVID A. SEID**
*Senior Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-4231**
**(202) 273-2941**

**WILLAM B. COWEN**
 *Acting General Counsel*
**STEPHANIE CAHN**
 *Acting Deputy General Counsel*
**RUTH E. BURDICK**
 *Deputy Associate General Counsel*
**MEREDITH JASON**
 *Assistant General Counsel*

# **TABLE OF CONTENTS**

**Headings**                                                                                       **Page(s)**

Statement of jurisdiction ....................................................................... 1

Statement of the issues presented ....................................................... 2

Statement of related cases ................................................................... 3

Statement of the case ........................................................................... 3

I.   The Board's findings of fact ......................................................... 3

   A.   Background; the Parties' bargaining history ............................. 3

   B.   The Company proposes a dramatically re-written collective-bargaining agreement that would give it unilateral control over many terms and conditions of employment ........................................................ 4

   C.   At bargaining sessions held between April 2017 and July 2019, the Company continues to seek drastic concessions ........................ 8

   D.   Between August 2019 and February 2020, the Company presents its "Best Offer," the Union presents a counter-proposal, and the Parties discuss parts of those proposals ............................................... 10

   E.   In March 2020, the Parties pause bargaining due to the COVID-19 pandemic; two months later, as the pandemic continues, the Company urges the Union to accept its "Best Offer" .............................. 12

   F.   In June 2020, the Company sends the Union its "Final Offer" ............... 13

   G.   In June and July 2020, the Union seeks additional negotiations; the Company indicates that the Parties are at impasse .................. 14

   H.   On Jul 27, 2020, the Company declares impasse and unilaterally implements employment terms .............................................. 15

   I.   In October 2020, the Company surveilles Employees' union activity ..... 16

## <u>TABLE OF CONTENTS (cont'd)</u>

**Headings**                                                                 **Page(s)**

II.  The Board's Conclusions and Order ...............................................16

Summary of argument.......................................................................18

Standard of review ...........................................................................20

Argument..........................................................................................22

I.   Substantial evidence supports the Board's finding that the Company
     violated Section 8(a)(5) and (1) of the Act by unilaterally implementing
     terms and conditions of employment without bargaining to a lawful
     impasse .....................................................................................22

     A.  The Company failed to prove that the Parties reached a good-faith
         impasse that privileged unilateral implementation. ....................................23

         1.  The Board considers multiple factors to determine the existence
             of an impasse .....................................................................23

         2.  The Parties did not have a contemporaneous understanding that
             they were at impasse .........................................................25

         3.  The Company's bad-faith bargaining supports a finding that it
             failed to bargain to a lawful impasse ..................................29

     B.  The Company's arguments in support of its impasse claim lack
         merit...........................................................................................30

II.  Substantial evidence supports the Board's finding that the Company
     violated Section 8(a)(5) and (1) of the Act by failing to bargain in good
     faith. ..........................................................................................34

     A.  The duty to bargain in good faith requires an employer to sincerely
         endeavor to reach a contract – not try to frustrate agreement ....................34

ii

## TABLE OF CONTENTS (cont'd)

**Headings**                                                                    **Page(s)**

B. Substantial evidence supports the Board's finding that the Company's proposals, taken as a whole, evidenced an intent to frustrate agreement ...............................................................37

C. The Company's purported explanations for its proposals do not undermine the Board's finding that it lacked a serious intent to reach agreement .........................................................................43

D. The Court lacks jurisdiction to consider the Company's claim that the Board erred as a matter of law in finding that the Company bargained in bad faith ..............................................................47

III. Substantial evidence supports the Board's finding that the Company violated Section 8(a)(1) of the Act by creating the impression that employees' union activities were under surveillance ......................................50

IV. The Court lacks jurisdiction to consider the Company's challenge to the Board's remedy ...........................................................................52

Conclusion....................................................................................56

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*10 Roads Express, LLC*,
   372 NLRB No. 105 (2023) ...............................................................47, 49

*Allentown Mack Sales v. NLRB*,
   522 U.S. 359 (1998).........................................................................21

*Altura Commc'n Sols., LLC*,
   369 NLRB No. 85 (2020), *enforced*,
   848 F. App'x 344 (9th Cir. 2021).......................34, 35, 37, 38, 39, 40, 41, 42, 49

*Altura Commc'n Sols., LLC v. NLRB*,
   848 F. App'x 344 (9th Cir. 2021)....................................................42

*Am. Fed'n of Television & Radio Artists v. NLRB*,
   395 F.2d 622 (D.C. Cir. 1968)..........................................................24

*Am. Sec. Programs, Inc.*,
   368 NLRB No. 151 (2019), *enforced*,
   842 F. App'x 648 (D.C. Cir. 2021)..................................................24

*Amalgamated Clothing Workers of Am. v. NLRB*,
   432 F.2d 1341 (1970).......................................................................45

*American Meat Packing Corp.*,
   301 NLRB 835 (1991) .....................................................................45

*Ampersand Publ'g, LLC*,
   358 NLRB 1415 (2012), *incorporated by reference*,
   362 NLRB 252 (2015), *enforced*,
   No. 15-1074, 2017 WL 1314946 (D.C. Cir. 2017)...........................37

*Atl. City Elec. Co. v. NLRB*,
   5 F.4th 298 (3d Cir. 2021) ........................................................20, 54

*Auto Fast Freight, Inc. v. NLRB*,
   793 F.2d 1126 (9th Cir. 1986) .........................................................32

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                   **Page(s)**

*Blue Jeans Corp.*,
   177 NLRB 198 (1969), *enforced sub nom.*,
   *Amalgamated Clothing Workers of Am. v. NLRB*,
   432 F.2d 1341 (1970) ........................................................45

*Boch Imports, Inc. v. NLRB*,
   826 F.3d 558 (1st Cir. 2016)..............................................21

*Brown v. Pro Football*,
   518 U.S. 231 (1996).............................................................29

*Camelot Terrace, Inc. v. NLRB*,
   824 F.3d 1085 (D.C. Cir. 2016)..........................................53

*Ceridian Corp. v. NLRB*,
   435 F.3d 352 (D.C. Cir. 2006).............................................21

*Charles D. Bonnano Linen Serv., Inc. v. NLRB*,
   454 U.S. 404 (1982)............................................................21

*Chevron U.S.A. v. Natural Resources Defense Council*,
   467 U.S. 837 (1984)............................................................21

*Cincinnati Newspaper Guild, Local 9 v. NLRB*,
   938 F.2d 284 (D.C. Cir. 1991).......................................47, 49

*Citizens Publ'g & Printing Co. v. NLRB*,
   263 F.3d 224 (3d Cir. 2001) ........................................20, 22

*Coral Harbor Rehab. & Nursing Ctr. v. NLRB*,
   945 F.3d 763 (3d Cir. 2019) ...............................................20

*Dallas General Driver, W. & H. Local No. 745 v. NLRB*,
   355 F.2d 842 (D.C. Cir. 1996)............................................25

*Daycon Prods. Co.*,
   357 NLRB 1071 (2011), *enforced*,
   494 F. App'x 97 (D.C. Cir. 2012)........................................23

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                             **Page(s)**

*Ead Motors Eastern Air Devices, Inc.*,
   346 NLRB 1060 (2006) ...................................................28

*Endurance Environmental Solutions, LLC*,
   373 NLRB No. 141 (2024) ...............................................50

*F.W. Woolworth Co.*,
   310 NLRB 1197 (1992) ...................................................52

*Fibreboard Paper Prods. Corp. v. NLRB*,
   379 U.S. 203 (1964)........................................................38

*First Nat'l Maint. Corp. v. NLRB*,
   452 U.S. 666 (1981)...................................................46, 49

*Ford Motor Co. v. NLRB*,
   441 U.S. 488 (1979)........................................................21

*Grinnell Fire Protection Sys. v. NLRB*,
   236 F.3d 187 (4th Cir. 2000) ..........................................23

*H.K. Porter Co. v. NLRB*,
   397 U.S. 99 (1970).........................................................49

*Hanlon & Wilson Co. v. NLRB*,
   738 F.2d 606 (3d Cir. 1984) ...........................................51

*Hayward Dodge, Inc.*,
   292 NLRB 434 (1989) ....................................................27

*Hydrotherm, Inc.*,
   302 NLRB 990 (1991) ....................................................35

*Industrial Union of Marine & Shipbuilding Wkrs. v. NLRB*,
   320 F.2d 615 (3d Cir. 1963) ...........................................29

vi

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                       **Page(s)**

*John Ascuaga's Nugget*,
  298 NLRB 524 (1990), *enforced in relevant part sub nom.*,
  *Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir. 1992) ......................................51

*Kitsap Tenant Support Services, Inc.*,
  366 NLRB No. 98 (2018), *enforced*,
  2019 WL 12276113 (D.C. Cir. 2019) ..................................................................42

*Liquor Indus. Bargaining Grp.*,
  333 NLRB 1219 (2001), *enforced*,
  50 F. App'x 444 (D.C. Cir. 2002) ...............................................................36, 49

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ...........................................................................................21

*May Dep't Stores Co. v NLRB*,
  326 U.S. 376 (1945) ...........................................................................................22

*Monmouth Care Ctr. v. NLRB*,
  672 F.3d 1085 (D.C. Cir. 2012) ....................................................................23, 25

*N.J. Bell Tel. Co. v. NLRB*,
  720 F.2d 789 (3d Cir. 1983) ..............................................................................22

*New Concepts for Living, Inc v. NLRB*,
  94 F.4th 272 (2024) .....................................................................................43, 44

*NLRB v. A-1 King Size Sandwiches, Inc.*,
  732 F.2d 872 (11th Cir. 1984) ...........................................................................35

*NLRB v. American National Insurance Co.*,
  343 U.S. 395 (1952) ....................................................................................47, 49

*NLRB v. Ampersand Publishing, LLC*,
  43 F.4th 1233 (9th Cir. 2022) ...........................................................................53

*NLRB v. Blevins Popcorn Co.*,
  659 F.2d 1173 (D.C. Cir. 1981) .........................................................................34

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                             **Page(s)**

*NLRB v. Colonial Haven Nursing Home, Inc.*,
   542 F.2d 691 (7th Cir. 1976) ...................................................................52

*NLRB v. Curtin Matheson Sci.*,
   494 U.S. 775 (1990) ...............................................................................22

*NLRB v. FES*,
   301 F.3d 83 (3d Cir. 2002) .....................................................................54

*NLRB v. Holmes Tuttle Broadway Ford, Inc.*,
   465 F.2d 717 (9th Cir. 1972) ..................................................................37

*NLRB v. Ins. Agents' Int'l Union*,
   361 U.S. 477 (1960) ..................................................................34, 35, 37

*NLRB v. Noah's Ark Processors, LLC*,
   98 F.4th 896 (8th Cir. 2024) ...................................................................54

*NLRB v. Ochoa Fertilizer Corp.*,
   368 U.S. 318 (1961) ...............................................................................47

*NLRB v. Stanislaus Implement & Hardware Co.*,
   226 F.2d 377 (9th Cir. 1955) ..................................................................34

*NLRB v. Starbucks Corp.*,
   125 F.4th 78 (3d Cir. 2024) ..............................................................54, 55

*NLRB v. United Mineworkers*,
   355 U.S. 453 (1958) ...............................................................................48

*NLRB v. Wright Motors, Inc.*,
   603 F.2d 604 (7th Cir. 1979) ..................................................................35

*Noah's Ark Processors, LLC*,
   372 NLRB No. 80 (2023),
   *enforced NLRB v. Noah's Ark Processors, LLC*,
   98 F.4th 896 (8th Cir. 2024) ...................................................................53

*Oak Harbor Freight Lines, Inc. v. NLRB*,
   855 F.3d 436 (D.C. Cir. 2017) ...............................................................24

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                          **Page(s)**

*Oldwick Materials, Inc. v. NLRB*,
   732 F.2d 339 (3d Cir. 1984) ...............................................................47

*Phillips 66*,
   369 NLRB No. 13 (2020) ..................................................................31

*Powell Elec. Mfg. Co.*,
   287 NLRB 969 (1987) ......................................................................23

*PRC Recording Co.*,
   280 NLRB 615 (1986), *enforced*,
   836 F.2d 289 (7th Cir. 1987) .....................................................24, 30

*Prime Healthcare Servs.–Encino LLC v. NLRB*,
   890 F.3d 286 (D.C. Cir. 2018)...........................................................39

*Pub. Serv. Co. of Okla. v. NLRB*,
   318 F.3d 1173 (10th Cir. 2003), ...............................................35, 42

*Pub. Serv. Co. of Okla.*,
   334 NLRB 487 (2001), *enforced*,
   318 F.3d 1173 (10th Cir. 2003)................................................36, 37

*Quick v. NLRB*,
   245 F.3d 231 (3d Cir. 2001) ..............................................................20

*Radisson Plaza Minneapolis*,
   307 NLRB 94 (1992), *enforced*,
   987 F.2d 1376 (8th Cir. 1993)..........................................................38

*Regency Serv. Carts*,
   345 NLRB 671 (2005) ......................................................................38

*Road Sprinkler Fitters Local 669 v. NLRB*,
   681 F.2d 11 (D.C. Cir. 1982)............................................................51

*Road Sprinkler Fitters Local Union No. 669 v. NLRB*,
   676 F.2d 826 (D.C. Cir. 1982)..........................................................38

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*Royal Motor Sales*,
  329 NLRB 760 (1999), *enforced*,
  2 F. App'x 1 (D.C. Cir. 2001)...................................................................29

*Saunders House v. NLRB*,
  719 F.2d 683 (3d Cir. 1983) ....................................................24, 25, 27, 31

*Serramonte Oldsmobile, Inc. v. NLRB*,
  86 F.3d 227 (D.C. Cir. 1996)....................................................................31

*Sparks Nugget, Inc. v. NLRB*,
  968 F.2d 991 (9th Cir. 1992) ....................................................................36

*Struthers Wells Corp. v. NLRB*,
  721 F.2d 465 (3d Cir. 1983) ........................................................35, 47, 49

*Summa Health Sys.*,
  330 NLRB 1379 (2000) .............................................................................45

*Sweeney & Co.*,
  176 NLRB 208 (1969), *enforced in pertinent part*,
  437 F.2d 1127 (5th Cir. 1971) ..................................................................44

*Taft Broad. Co.*,
  163 NLRB 475 (1967) ...............................................................................24

*Teamsters Loc. Union No. 515 v. NLRB*,
  906 F.2d 719 (D.C. Cir. 1990)...................................................................36

*Teamsters Local Union No. 639 v. NLRB*,
  924 F.2d 1078 (D.C. Cir. 1991)............................................................24, 28

*Thryv, Inc.*,
  372 NLRB No. 22 (2022), *enforcement denied in part*,
  102 F.4th 727 (5th Cir. 2024) ...................................................................55

*United States Steel Corp. v. NLRB*,
  682 F.2d 98 (3d Cir. 1982) ...................................................................51, 52

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                              **Page(s)**

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951)..................................................................20

*Wayneview Care Ctr. v. NLRB,*
    664 F.3d 341 (D.C. Cir. 2011)..............................................23, 25

*Woelke & Romero Framing, Inc. v. NLRB,*
    456 U.S. 645 (1982)..................................................................48


**Statutes**                                                           **Page(s)**

National Labor Relations Act, as amended
    (29 U.S.C. § 151 et seq.)

29 U.S.C. § 157 ..................................................................17, 50
29 U.S.C. § 158(a)(1).....................................................17, 22, 50
29 U.S.C. § 158(a)(5).....................................................17, 22, 34
29 U.S.C. § 158(d).....................................................................34
29 U.S.C. § 160(a) ...................................................................... 2
29 U.S.C. § 160(b).....................................................................38
29 U.S.C. § 160(e) .....................................................2, 3, 20, 47, 53
29 U.S.C. § 160(f)........................................................................ 2

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

### Nos. 24-2788 and 24-3057

_____

### PG PUBLISHING CO., INC.
### d/b/a PITTSBURGH POST-GAZETTE

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

**and**

### NEWSPAPER GUILD OF PITTSBURGH/
### CWA LOCAL 38061

**Intervenor**

_____

### ON PETITION FOR REVIEW AND CROSS-APPLICATION
### FOR ENFORCEMENT OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD

_____

### BRIEF FOR
### THE NATIONAL LABOR RELATIONS BOARD

_____

### STATEMENT OF JURISDICTION

This case is before the Court on the petition of PG Publishing Co., Inc. d/b/a

Pittsburgh Post-Gazette ("the Company") to review, and the cross-application of

the National Labor Relations Board ("the Board") to enforce, a Board Order issued

against the Company on September 20, 2024, and reported at 373 NLRB No. 93.

(A. 51-78.)[1]  The Board had jurisdiction over the unfair-labor-practice proceeding

below under Section 10(a) of the National Labor Relations Act ("the Act"), as

amended, 29 U.S.C. § 160(a), which empowers the Board to prevent unfair labor

practices affecting commerce.  The Court has jurisdiction to review the Board's

final Order under Section 10(e) and (f) of the Act, 29 U.S.C. §160(e) and (f).

Venue is proper because the unfair labor practices occurred in Pennsylvania.  Both

the Company's petition for review and the Board's cross-application for

enforcement were timely, as the Act imposes no time limits on such filings.  The

Union, which was the charging party before the Board, has intervened here.

## STATEMENT OF THE ISSUES PRESENTED

1.     Whether substantial evidence supports the Board's finding that the

Company violated Section 8(a)(5) and (1) of the Act by unilaterally implementing

terms and conditions of employment without bargaining to a lawful impasse.

---

[1] "A" refers to the joint appendix filed by the Company.  References preceding a
semicolon are to the Board's findings; those following are to the supporting
evidence.

2

2.      Whether substantial evidence supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by failing to bargain in good faith.

3.      Whether substantial evidence supports the Board's finding that the Company violated Section 8(a)(1) of the Act by creating the impression that employees' union activities were under surveillance.

4.      Whether the Company's remedial challenge is jurisdictionally barred.

## STATEMENT OF RELATED CASES

This case has not been before the Court previously.  Pending resolution of this case, the Board has filed a motion for injunctive relief under Section 10(e) of the Act, 29 U.S.C. § 160(e).  The Board is unaware of any related case under L.A.R. 28.1(a)(2).

## STATEMENT OF THE CASE

## I.     THE BOARD'S FINDINGS OF FACT

### A.     Background; the Parties' Bargaining History

The Company publishes a print and electronic newspaper in Pittsburgh, Pennsylvania.  (A. 56; 167, 202.)  For several years, the Company has recognized the Union as the exclusive collective-bargaining representative of a unit of editorial employees.  Between about 1992 and 2014, the Company bargained wages and healthcare jointly with the Union and several other unions that represented

company employees.  After resolving those terms, each union negotiated for its own collective-bargaining agreement that incorporated the jointly negotiated wage and healthcare provisions.  (A. 56 and n.3; 264-67, 345-47, 371-72, 1538.)

The most recent collective-bargaining agreement between the Company and the Union was effective from October 15, 2014, through March 31, 2017.  (A. 56; 261-64, 540-601.)  In early 2017, the Company notified the Union that it would no longer engage in joint bargaining with its employees' unions over wages and healthcare.  (A. 56; 266-67, 333, 856, 1679.)

> **B.**   **The Company Proposes a Dramatically Re-Written Collective-Bargaining Agreement that Would Give It Unilateral Control Over Many Terms and Conditions of Employment**

The parties began bargaining for a successor to the 2014-2017 agreement on March 10, 2017.  At the March 10 bargaining session, the parties expressed overall positions and reviewed contract proposals exchanged before the meeting.  (A. 56-57; 268-72, 440-41, 602-778.)

The Company, for its part, did not claim an inability to pay for increases in wages or benefits, but nevertheless sought significant concessions, citing competition from internet-based media and the resulting decline in print newspaper circulation and advertising revenue.  Addressing healthcare, the Company complained that the current negotiated healthcare plan was "too rich."  (A. 56; 280, 301, 496-97.)  The Company also expressed the need for flexibility to use more

4

freelance reporters and to have managers perform bargaining-unit work based on the expectation that it would be moving towards a digital-media business model in the future.  (A. 56-57; 277-79, 301, 375-77, 441 489, 496, 501-02, 3151-52.)

The concessions sought in the Company's initial contract affected many terms and conditions of employment, including:

**Assignment of bargaining-unit work:**  The Company's proposal gave it the exclusive and unrestricted right to assign bargaining-unit work to managers and supervisors, and to subcontract work to non-company employees such as "stringers" (journalists working as independent contractors).  (A. 57-58; 652.)  The parties' 2014-2017 collective-bargaining agreement, by contrast, had recognized that certain identified work was within the Union's jurisdiction and that performance of such work should be assigned to unit employees.  The agreement had also capped the use of stringers at 15% of the total bargaining-unit payroll.  (A. 57-58; 290, 651-52.)

**Work hours:**  The Company's proposal changed the past practice of a 40-hour work week for full-time employees and explicitly stated there would be no guarantee of any specific hours of work per day or week, and that the Company had "the right to enlarge or shorten the workday or workweek depending on business needs."  (A. 57-61; 291-93, 662.)

**Layoffs**:  While the parties' 2014-2017 collective-bargaining agreement had required that any lay off of unit employees be based on inverse seniority and with 30 days' notice to the Union, the Company's March 2017 proposal empowered the Company to consider performance, attendance, and qualifications when selecting employees for layoff, and provided for only 10 days' notice to the Union before a layoff.  (A. 57, 61; 294-96, 666.)

**No-strike clause**:  The Company's proposal expanded the no-strike language in the 2014-2017 agreement to prohibit not only any "strike, slowdown, work stoppage or any other interference or interruption of work," but also any "sympathy strike[s], bannering, boycotts against the Company, boycotts against the Company's advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations."  (A. 61; 680.)

**Sick leave and short-term disability:**  The Company's proposal eliminated employees' ability to "bank" unused sick leave and obtain additional sick leave for a short-term disability.  It instead placed employees under the Company's short-term disability policy, which provided fewer benefits than under the 2014-2017 agreement.  Notably, "[t]he Company reserve[d] the right to modify or change [the policy] . . . in any way."  (A. 58, 61; 302-03, 496-97, 664.)

**Healthcare**:  The Company's proposal eliminated the employees' existing healthcare plan run by the Teamsters Union, and placed employees under the healthcare plan that the Company provided to its non-unit employees, with the Company having the right to "amend[], change[], replace[] or terminate[ ] [the plan]  . . . at the Company's sole discretion."  (A. 57-58; 684.)

**Grievances:**  The Company's proposal required grievances be filed in writing within 10 days of the underlying event, while the 2014-2017 agreement had no deadline.  (A. 61; 678.)

**Wages:**  The Company's proposal maintained the wage rates set forth in the 2014-2017 agreement and left open the Company's right to divert 10% of the employees' wages—ostensibly to pay for employees' benefits.  The proposal removed the $4,000 cap on such diversions, and the language in the 2014-2017 agreement that had precluded the Company from decreasing wages during the term of the agreement.  (A. 57 and n.4, 58 and n.7; 304-06, 342-43, 491-92, 656-58.)

**Part-time work**:  The Company's proposal eliminated a provision in the 2014-2017 agreement that had prohibited the Company from using part time and temporary employees "where, in effect, such employment would eliminate or displace a regular full[-]time employee."  (A. 663.)

Responding to the Company's proposal at the March 10 bargaining session, the Union stated it was not inclined to make additional concessions because it had

7

made numerous concessions in prior years and, as a result, unit employees had not received a wage increase in 11 years. (A. 57-58; 258-62, 278-79, 303-04, 329, 361-62, 376, 394-95.) The Union's initial contract proposal sought wage increases of 7 percent each year. The Union also proposed keeping the Teamsters healthcare plan, the no-strike clause from the 2014-2017 agreement, seniority-based layoffs, and the guarantee of a 40-hour work week. In addition, the Union proposed eliminating the approximately 10-percent diversion of wages, the use of stringers, and the latitude for non-unit employees to perform bargaining-unit work. (A. 57-58, 61; 708-78.)

### C. At Bargaining Sessions Held Between April 2017 and July 2019, the Company Continues To Seek Drastic Concessions

After the initial bargaining session, the parties met on 19 occasions between April 6, 2017, and July 15, 2019. (A. 57 and n.5; 279, 2434-35, 2816-69, 2975-95.) During that time, the parties exchanged proposals on a variety of terms and conditions of employment, and the Company continued to seek significant concessions. (A. 57-61; 779-1131.)

Thus, the Company consistently refused to guarantee any specified daily or weekly work hours, eventually offering only to give the Union 10 days' notice before unilaterally altering work hours. (A. 61; 789, 872, 968, 1004, 1057.) In addition, the Company eventually proposed a less expansive, but still broad, no-strike clause that would add sympathy strikes, picketing, boycotts, and bannering

8

to the expired contract's no-strike clause.  (A. 61; 841, 894, 976, 1026, 1079.)

Similarly, the Company continued to insist on a layoff and recall policy that would

consider a variety of factors besides seniority, while refusing to provide any

specifics.  Rather, the Company stated only that "[t]here is no formula for applying

[the] factors," and characterized the Union's questions regarding methodology as

"hypotheticals" and "conjecture."  (A. 297-98, 794-95, 1008-09, 1061, 1729.)  The

Company eventually proposed limiting the use of stringers to 20% of the unit's

payroll.  (A. 58-60; 966, 1048, 1168.)

Although the Union continued to propose using the Teamsters healthcare

plan, it suggested a way to lower the Company's costs by using tiered rates, i.e.

different rates for individuals, individuals plus one, or a family.  The Company

responded that it was not interested in continuing to use the Teamsters plan in any

form, regardless of whether it saved the Company money.  (A. 58 and n.8; 301-02,

327-28, 941-42, 1648.)

At a bargaining session on January 31, 2019, the Company proposed

deleting a 2-percent wage diversion to the pension plan and increasing the

minimum wage schedule by 2 percent, on the condition that the Union accept the

Company's healthcare plan.  (A. 461, 1126.)

### D.    Between August 2019 and February 2020, the Company Presents Its "Best Offer," the Union Presents a Counter-Proposal, and the Parties Discuss Parts of Those Proposals

At a bargaining session held on August 6, 2019, the Company presented the Union with a position statement that, among other things, characterized the Union's proposal to continue using a seniority-based layoff order as "specious." (A. 1137, 1150.)  The Company also provided a "Best Offer" contract proposal that made only a few changes to its prior offers.  (A. 62; 1165-1212.)  Specifically, the Company proposed small wage increases to senior employees for each year of the three-year contract but based those increases on post-diversion wage rates.[2] (A. 62 and nn. 12, 13, 63; 309, 467-68, 467-68, 489-90, 1135, 1142, 1172-74.) Regarding healthcare, the Company added language that employees would pay 30 percent of the premium costs for its health, dental, and vision insurance plans.  The Company also set forth the specific premiums that employees would pay toward their healthcare.  (A. 62; 423, 466-68, 1162, 1203.)

The Union stated that it needed time to review the Company's proposal, particularly given that the Company had refused to provide a version that showed what had been deleted from the 2014-2017 agreement, and what had been added. (A. 62; 274-75, 326.)

---

[2] In other words, if an employee's wage rate was $1000 under the old contract and $901.60 after subtracting diversions, the Company used the $901.60 amount as the base wage for purposes of calculating the wage increase.  (A. 67.)

At the next bargaining session, on September 6, 2019, the Union presented a counter-proposal that, among other things, allowed managers to perform bargaining-unit work in certain situations, permitted the Company's use of stringers up to 15 percent of annual bargaining-unit payroll, provided wage increases retroactive to 2017 while eliminating wage diversions, and provided employees up to 20 days of disability coverage with the ability to bank unused sick leave up to a maximum of 90 days. (A. 62, 63 and n.14; 1216-24, 1229-31.) In discussions that followed, the parties disagreed on various issues including wages and when managers could perform bargaining-unit work. The parties did not fully review the entire union proposal. (A. 63; 310, 312-13, 3110-17.)

The parties did not communicate again until mid-January 2020, when the Company accepted the Union's offer to resume bargaining on February 24, 2020. A. 63; 154-55, 1277, 1280.) At the February 24 bargaining session, the parties resumed discussing aspects of the Company's August 6, 2019 "Best Offer" and the Union's September 6, 2019 counter-proposal. The parties agreed to three changes to the Company's "Best Offer," but disagreed on several other points, including: whether employees should be guaranteed 40 hours of work per week; the amount of sick leave that employees should earn each year; and whether employees should be able to bank unused sick leave. (A. 63; 311, 1280, 3120-32.) There is no

evidence that the parties bargained in any detail over other disputed topics such as wages, healthcare, or bargaining-unit jurisdiction.  (A. 63.)

**E.    In March 2020, the Parties Pause Bargaining Due to the COVID-19 Pandemic; Two Months Later, As the Pandemic Continues, the Company Urges the Union to Accept Its "Best Offer"**

In a March 22, 2020 email to the Company, the Union's chief negotiator, Attorney Joseph Pass, canceled a bargaining session scheduled for March 25, citing the COVID-19 pandemic that had led both the Federal and Pennsylvania State government to shutter all non-essential services.  Pass further stated that bargaining should pause until the pandemic was resolved.  (A. 63; 1283-90.)  The Company's chief negotiator, Attorney Richard Lowe, responded by wishing that Pass stay safe, and Lowe lodged no objection to a halt in bargaining because of the COVID-19 pandemic.  (A. 63, 70; 277, 371, 1291-96.)  The Union later learned that the Company had informed one of the other unions representing company employees that it would not be available to meet for bargaining until "we are all released from confinement."  (A. 1446.)

Nevertheless, on May 22, 2020, the Company sent the Union a letter urging it to accept the Company's August 6, 2019 "Best Offer" (incorporating subsequent modifications presented in early 2020).  The Company also attached a written response to the Union's September 6, 2019 contract proposal, which summarized

the parties' positions on various issues that remained unresolved in bargaining.  (A. 63-64; 282-83, 1298-1327.)

**F.    In June 2020, the Company Sends the Union Its "Final Offer"**

On June 12, 2020, the Company sent a letter to the Union conveying its "Final Offer."  (A. 64, 67; 284-85, 470, 1328-31.)  That offer was similar in many respects to its prior offers.  For example, the Company retained discretion to select employees for layoffs and recalls.  (A. 64, 67; 1349-50.)  Likewise, the Company continued to cover bargaining-unit employees under its short-term disability policy, but the Company reserved the right to modify or change the policy on the same basis as for the Company's nonrepresented employees.  (A. 67; 1348.)  Similarly, it included the narrowed no-strike proposal.  (A. 67-68; 1367.)

In addition, although the Company retained for itself the right to assign bargaining-unit work to supervisors and managers, and to subcontract work, it limited stringers to no more than 20 percent of the annual bargaining-unit payroll. (A. 67; 1336.)  And while continuing to refuse to "guarantee any specified hours of work per day or per week," the Company provided that the Union would receive "at least" 10 days' notice of any work-hours change.  (A. 67; 1340-42.)  The Company again offered to increase wages, but only for those with the highest level of experience, and the Company's proposal specified that increases would be

applied to reduced base wages remaining after applicable pension and wage diversions called for under the expired contract.  (A. 67; 1340-42.)

Finally, although the Company continued to retain the discretion to "amend, change, replace, or terminate" the Company's healthcare plan at its "sole discretion," it added language committing to provide a health, dental, vision and life insurance plan during the length of the contract—apparently to address the Union's concern that the Company might, if the new contract allowed it the discretion to do so, stop providing health and welfare benefits altogether.  And employee premiums were higher than in the Company's August 2019 "Best Offer."  (A. 64, 68; 423-24, 1371.)

### G.     In June and July 2020, the Union Seeks Additional Negotiations; the Company Indicates that the Parties Are at Impasse

After the Union received the Company's "Final Offer," the parties communicated via email and regular mail.  On June 22, 2020, the Union expressed puzzlement at receiving the Company's "Final Offer" because the COVID-19 pandemic had led to the cancellation of the scheduled late-March 2020 meeting, and the parties had yet to discuss two-thirds of the Union's September 6, 2019 counter-proposal.  The Union also asked the Company to clarify if it was taking the "position that negotiations are terminated and will not meet in further contract negotiations."  (A. 64; 1432.)  The Company responded on July 14, stating its "belie[f]" that negotiations were "at impasse" and asking the Union to explain why

14

it "believe[d] further bargaining will be fruitful." (A. 64; 1435.)  That same day, the Union replied, "[s]ince we have not heard any reasons as to why the remaining two-thirds of the Union's last proposal are or are not acceptable[,] we are at a loss as to how you believe we are at an impasse!" (A. 64; 1438.)  On July 16, the Company repeated its "belie[f]" that the negotiations were at impasse. (A. 64; 1441-42.)

On July 20, the Union reiterated that "further bargaining would be fruitful" because the parties had not fully discussed the Union's last offer, and bargaining was needed to discuss that offer and the Company's "Final Offer." (A. 64; 1445-46.)  The Union further stated it was "ready, willing and able to meet to go through" those offers "and make suggested changes in an attempt to reach mutual agreement." (A. 64; 1446.)  The Union concluded by asking the Company if it was willing to meet, and, if so, to provide available bargaining dates. (A. 64; 1447.)

### H.  On July 27, 2020, the Company Declares Impasse and Unilaterally Implements Employment Terms

On July 27, the Company notified the Union that the "parties are at impasse," that negotiations were "terminated," and that it was unilaterally implementing various terms and conditions of employment for bargaining-unit employees. (A. 64-65; 285, 1450-52.)  Most of the unilaterally implemented terms and conditions were the same as those set forth in the Company's June 12 "Final Offer" and earlier offers.  The Company, however, made several modifications to

15

its "Final Offer," including no longer giving itself the unfettered right to change its short-term disability and healthcare programs.  (A. 65; 1459, 1461, 1473.)

In a letter dated July 30, the Union again denied that the parties were at impasse, requested continued bargaining, and asked the Company to provide available dates.  (A. 65; 1480-81.)

## I.     In October 2020, the Company Surveilles Employees' Union Activity

On October 24 and October 31, 2020, the Union held rallies and picketed outside the home of John Block, the Company's publisher, to call attention to the Company's bargaining conduct and pressure it to resume negotiations.  For the most part, rally participants stood on the sidewalk in front of the home, on or across the street, on the driveway entrance (between the street and sidewalk), or on a strip of grass between the street and the sidewalk.  (A. 66; 230-33, 236-39, 242, 248-50, 253-57, 365-69, 1498, 1501, 1504, 1510.)

At each rally, two security guards hired by the Company appeared to take photographs of rally participants, including bargaining-unit members, when they were located across the street from Block's home.  (A. 66; 231-32, 234, 249-58, 505-08, 515-16, 1495, 1507, 1513, 3171-76.)

## II.    THE BOARD'S CONCLUSIONS AND ORDER

On the foregoing credited facts, the Board (then-Chairman McFerran and Members Prouty and Wilcox) found, in agreement with the administrative law

judge, that the Company violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by unilaterally implementing portions of its "Final Offer" absent a lawful bargaining impasse, and by failing and refusing to bargain in good faith. The Board also found, in agreement with the judge, that the Company violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by creating the impression that employees' union activity was under surveillance.  (A. 51-52, 75.)

The Board's Order requires the Company to cease and desist from the unfair labor practices found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C. § 157.  Affirmatively, the Order requires the Company to, among other actions:  bargain with the Union, on request, before making changes to employees' terms and conditions of employment; make employees whole for the loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to their terms and conditions of employment; make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time that the Company engaged in bad-faith bargaining; compensate the Union for all bargaining expenses it incurred during the time that the Company engaged in bad-faith bargaining; make delinquent contributions to the applicable benefit funds; and post a remedial notice to employees.  (A. 52-53.)

## SUMMARY OF ARGUMENT

1.     Substantial evidence supports the Board's finding that the Company violated the Act by unilaterally implementing terms and conditions of employment without bargaining to a lawful impasse.  As the Board found and the record shows, the Company prematurely declared impasse on July 27, 2020, when neither party could assume that further bargaining would be futile.  Indeed, at that time, the parties had not completed bargaining over the Union's September 6, 2019 proposal, nor had they engaged in any bargaining over the Company's June 12, 2020 "Final Offer," or the somewhat different contract terms implemented on July 27, 2020.  As the Board explained, ample additional evidence—including the fact that the parties' proposals during this time reflected movement, that the Union tried to schedule additional bargaining, that the Company implemented terms that differed from its "Final Offer," and that it bargained in overall bad faith—confirms that the parties had not reached a valid impasse.  Contrary to the Company's claim, and as the Board reasonably found, the Union's conduct in bargaining in no way excused the Company's unlawful unilateral action.

2.     Substantial evidence also supports the Board's finding that the Company violated the Act by bargaining in overall bad faith during the parties' contract negotiations.  As the Board found and the record shows, the Company, by its proposals, sought to transfer to itself unilateral control over the allocation of

18

bargaining-unit work, work hours, layoffs and recalls, and benefits—virtually all significant terms and conditions of employment. Moreover, the proposals would have foreclosed any avenue for the Union to challenge or protest the Company's exercise of its unilateral authority in these critical areas. The Board accordingly concluded that the Company's proposals effectively called upon the Union to cede its bargaining rights and representational function. Consistent with settled law, the Board found that such a combination of proposals warranted an inference of bad faith, because the Company could not seriously have expected meaningful collective bargaining given the damage it proposed to the Union's ability to represent bargaining-unit employees. That finding is only bolstered by the Company's unlawful implementation of terms and conditions of employment without bargaining to lawful impasse. And the Company's main challenge that the Board's finding is contrary to law, is not properly before the Court because that claim was never raised to the Board.

3.      Substantial evidence supports the Board's further finding that the Company violated the Act by creating the impression that employees' union activities were under surveillance. As the Board found and the record shows, during peaceful union rallies held across the street from the home of the Company's publisher, security guards hired by the Company appeared to take photographs of rally participants. Consistent with settled law, such conduct would

lead a reasonable employee to conclude that their union activities were under surveillance.

4.    The Court lacks jurisdiction to consider the Company's challenges to the Board's remedy because the arguments raised to the Court were never raised to the Board.  In any event, those challenges are meritless.

## STANDARD OF REVIEW

The Court's "review of orders of the Board is highly deferential." *Coral Harbor Rehab. & Nursing Ctr. v. NLRB*, 945 F.3d 763, 767 (3d Cir. 2019) (internal quotation omitted).  Under the Act, the Board's factual findings "shall be conclusive" if they are "supported by substantial evidence on the record considered as a whole."  29 U.S.C. § 160(e).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001) (internal quotation omitted).  If so supported, the Court will "accept the Board's factual findings and the reasonable inferences derived from those findings." *Atl. City Elec. Co. v. NLRB*, 5 F.4th 298, 305 (3d Cir. 2021) (internal quotation omitted).  It "may [not] displace the [Board's] choice between two fairly conflicting views." *Quick v. NLRB*, 245 F.3d 231, 240 (3d Cir. 2001) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

20

That is particularly true in the bargaining context, because, as the Supreme Court has stated, "assessing . . . the dynamics of collective bargaining is precisely the kind of judgment that . . . should be left to the Board." *Charles D. Bonnano Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 413 (1982). Indeed, Congress made a "delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496 (1979). Similarly, the Board's "interpretation of its own precedent is entitled to deference." *Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006) (internal quotation omitted); *see also Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 568-69 (1st Cir. 2016) (Board possesses a "not inconsiderable realm of reasonable discretion . . . to determine how to apply its own past precedents").[3]

---

[3] The Company is mistaken in its claim (Br. 19) that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), necessitates closer judicial scrutiny of Board decisions. In *Loper Bright*, the Supreme Court overruled the deference framework of *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Nonetheless, the Supreme Court left substantial-evidence review intact, 603 U.S. at 391-92, and reaffirmed that Congress may enact statutes granting discretionary authority to expert agencies tasked with "prescrib[ing] rules to 'fill up the details' of a statutory scheme." *Id.* at 395. When reviewing the decisions of such agencies, courts satisfy their own assigned role by ensuring the agency acted within the "boundaries of the delegated authority" and "engaged in 'reasoned decisionmaking.'" *Id.* (citing, inter alia, *Allentown Mack Sales v. NLRB*, 522 U.S. 359 (1998)). That acknowledgment of agency discretion applies with particular force with respect to the National Labor Relations Act, given the Supreme Court's longstanding recognition—since the earliest years of the Act— that Congress entrusted the Board with discretion to "formulate rules to fill the

# ARGUMENT

**I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY UNILATERALLY IMPLEMENTING TERMS AND CONDITIONS OF EMPLOYMENT WITHOUT BARGAINING TO A LAWFUL IMPASSE**

An employer violates Section 8(a)(5) and (1) of the Act by unilaterally implementing its contract proposals without first bargaining to a good-faith impasse for a successor collective-bargaining agreement. *See Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 233 (3d Cir. 2001)).[4] As the Court has held, "[b]y unilaterally changing the employees' terms and conditions of employment" in such circumstances, "an employer 'minimizes the influence of organized bargaining' and "emphasiz[es] to the employees that there is no necessity for a collective bargaining agent.'" *Id*. at 233 (quoting *May Dep't Stores Co. v NLRB*, 326 U.S. 376, 385 (1945)).

As before the Board, the Company admits (Br. 20) that it unilaterally implemented terms and conditions of employment on July 27, 2020. Those unilaterally implemented terms included provisions substituting a company-sponsored healthcare plan for the Teamsters plan, which had been a longstanding

---

interstices of the broad statutory provisions." *NLRB v. Curtin Matheson Sci.*, 494 U.S. 775, 786-87 (1990) (citing cases).

[4] A violation of Section 8(a)(5) constitutes a derivative violation of Section 8(a)(1). *N.J. Bell Tel. Co. v. NLRB*, 720 F.2d 789, 791 n.2 (3d Cir. 1983).

feature of the parties' collective-bargaining agreements.  In its defense, the

Company argues (Br. 34-39) it was privileged to act unilaterally because the parties

had reached an impasse in negotiations for a successor agreement.  However, as

shown below, substantial evidence supports the Board's finding that the Company

failed to meet its burden of proving that defense.  Accordingly, the Company's

unilateral action violated Section 8(a)(5) and (1) of the Act.

> **A.    The Company Failed To Prove that the Parties Reached a Good-Faith Impasse that Privileged Unilateral Implementation**
>
> > **1.    The Board considers multiple factors to determine the existence of an impasse**

The "burden of establishing impasse lies with the party asserting it."

*Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 (D.C. Cir. 2011); *accord Grinnell*

*Fire Protection Sys. v. NLRB*, 236 F.3d 187, 196 (4th Cir. 2000).  That burden is

not met by evidence of "frustration, discouragement, or apparent gamesmanship."

*Daycon Prods. Co.*, 357 NLRB 1071, 1081 (2011) (quoting *Powell Elec. Mfg. Co.*,

287 NLRB 969, 973 (1987)), *enforced*, 494 F. App'x 97 (D.C. Cir. 2012)).  Instead,

the record must demonstrate that the parties "reached that point in negotiations

when [they] are warranted in assuming that further bargaining would be futile," *id.*

(quotation marks omitted), because "good-faith negotiations have exhausted the

prospects of concluding an agreement, and there is no realistic possibility that

continuation of discussion would be fruitful," *Monmouth Care Ctr. v. NLRB*, 672

F.3d 1085, 1088 (D.C. Cir. 2012) (citations, brackets, and ellipses omitted).

Accordingly, there can be no impasse unless "[b]oth parties . . . believe that they

are at the end of their rope." *PRC Recording Co.*, 280 NLRB 615, 635 (1986),

*enforced*, 836 F.2d 289 (7th Cir. 1987). *Accord Oak Harbor Freight Lines, Inc. v.

NLRB*, 855 F.3d 436, 444 (D.C. Cir. 2017).

In evaluating a claim of impasse, the Board examines the totality of the

circumstances. *Am. Sec. Programs, Inc.*, 368 NLRB No. 151 (2019), slip op. 12,

*enforced*, 842 F. App'x 648 (D.C. Cir. 2021). Specifically, the Board considers: (1)

the parties' bargaining history; (2) their good faith in negotiations; (3) the length of

negotiations; (4) the importance of the issue(s) over which there was disagreement;

and (5) the parties' contemporaneous understanding as to the state of negotiations.

*See Taft Broad. Co.*, 163 NLRB 475, 478 (1967), *aff'd sub nom. Am. Fed'n of

Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968); *accord

Saunders House v. NLRB*, 719 F.2d 683, 687 (3d Cir. 1983). There is no

requirement that any one of the preceding factors, or any particular number of

them, must support the Board's determination. Thus, "one or two factors alone . . .

may be sufficient to demonstrate the absence of impasse." *Am. Sec. Programs*, 368

NLRB No. 151, slip op. 13; *Accord Teamsters Local Union No. 639 v. NLRB*, 924

F.2d 1078, 1083-84 (D.C. Cir. 1991).

Ultimately, "the existence of impasse is a question of fact," *Wayneview*, 664 F.3d at 348, that involves "multiple, highly fact-dependent considerations," *Monmouth*, 672 F.3d at 1092.  Moreover, as the Court has recognized, "in the complex realm of industrial relations[,] 'few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.'" *Saunders House*, 719 F.2d at 688 (quoting *Dallas General Driver, W. & H. Local No. 745 v. NLRB*, 355 F.2d 842, 844-45 (D.C. Cir. 1996)).  Accordingly, the Court ordinarily accepts the Board's fact finding as to the existence of a bargaining impasse unless it is unsupported by substantial evidence.  *Saunders House*, 719 F.2d at 688.

> **2. The parties did not have a contemporaneous understanding that they were at impasse**

Substantial evidence supports the Board's finding that there was no valid bargaining impasse on July 27, when the Company unilaterally implemented terms and conditions of employment for bargaining-unit employees.  (A. 51 n.1.)  Rather, the Company "prematurely declared impasse" (A. 67), "at a time in negotiations when neither party would have been warranted in assuming that further bargaining would be futile and when neither party could have reasonably believed that they were at the end of their rope" (A. 70).

Specifically, as the Board found and the evidence shows, the parties on July 27 "still needed to bargain about the Union's September 2019 proposal, [the Company's] June 12, 2020 last, best and final offer, and the terms that [the Company] implemented on July 27." (A. 51 n.1, 70.) When the parties concluded their February 24, 2020 bargaining session, they still had not finished discussing the Union's September 2019 proposal. (A. 70-71.) Thereafter, the Company did not object to cancelling the scheduled March 25, 2020 bargaining session—during which the parties presumably would have continued to discuss the Union's September 2019 proposal—nor did it object to placing further bargaining on hold due to the COVID-19 pandemic. (A. 70.)

Nevertheless, without warning, the Company sent a "Final Offer" to the Union in June 2020 that differed in several respects from its prior (August 2019) "Best Offer." Then, changing course again, the Company declared impasse in July 2020 and unilaterally implemented terms of employment that were different in some respects from the "Final Offer." (A. 70 and n.26.) In short, as the Board found (A. 70), the Company declared impasse despite the parties not having a bargaining session to discuss the Company's "Final Offer" or the "additional updated proposals that [the Company] used when it declared impasse." (A. 70.)

The evidence further reflects that the proposals the parties had not fully bargained over included movement on key issues such as the Company finally

committing to provide a healthcare plan for the term of the contract.  (A. 51 n.1, 70.)  As this Court has held, a concession by either party "on a significant issue in dispute precludes a finding of impasse even if a wide gap between the parties remains because under such circumstances there is reason to believe that further bargaining might produce additional movement."  *Saunders House*, 719 F.2d at 688.

Moreover, as the Board found (A. 51 n.1, 70 n.26), the Company's implementation of terms that differed from those set forth in its "Final Offer" provides further evidence "that [the Company] had additional room to move from what it had previously deemed its 'final' negotiating position."  *See Hayward Dodge, Inc.*, 292 NLRB 434, 468 (1989) ("essential question is whether there has been movement sufficient to open a ray of hope with a real potentiality for agreement if explored in good faith in bargaining sessions") (internal quotation marks omitted).[5]

---

[5] Contrary to the Company's claim (Br. 35 n.4), the Board's reliance on the Company's implementation of terms different from those in the "Final Offer" is not a "red herring."  As the Board reasonably found (A. 51 n.1, 70 n.26), by injecting new terms, the Company showed its own willingness to move from prior positions and opened avenues for further bargaining—directly undermining its assertion of a bargaining impasse.  That finding is unaffected by, and indeed logically distinct from, the Board's separate determination (A. 51 n.1, 71) that it did not need to address whether the Company independently violated Section 8(a)(5) of the Act by implementing terms that differed from the "Final Offer."

The fact that the Union tried to schedule additional bargaining sessions, to further discuss the Union's September 2019 proposal and the Company's "Final Offer," provides yet more support for the Board's finding that the parties were not at impasse on July 27.  (A. 51 n.1, 64; 1445-47.)  Indeed, after the Company stated its belief that the parties were at impasse in emails on July 14 and 16, 2020, the Union flatly disagreed in a July 20 letter.  In support of its view, the Union noted that the initial bargaining halt in March 2020 was simply to ensure safety in light of the pandemic—a position that, notably, the Company did not disagree with at the time.  The Union further emphasized that additional bargaining would be fruitful given that the parties had not finished reviewing the Union's September 2019 offer, and that they had not discussed the Company's "Final Offer" at all.  (A. 64; 1445-47.)  In light of the fact that the parties had not fully discussed proposals, and the Union's stated desire to continue negotiations and to "suggest[] changes" (A. 64; 1446), the Board reasonably determined that the parties could not have been at impasse in late July 2020.[6]  *See Ead Motors Eastern Air Devices, Inc.*, 346 NLRB 1060, 1064 (2006) (although not determinative, the union's statements indicating intent to continue bargaining further support a finding of no impasse); *accord  Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1084 (D.C. Cir.

---

[6] The Company does not dispute the Board's finding (A. 71 n.30) that the parties' bargaining history is "neutral" as to whether they were at impasse.

1991) (finding that union protestations "manifest[ed] that one party did not view the negotiations as having reached impasse" and provided substantial evidence to support the Board's no-impasse finding).

In sum, after examining "the dispute as a whole," the Board, based on ample evidence and precedent, found that the "parties had not bargained to a good-faith impasse when [the Company] unilaterally implemented terms and conditions of employment on July 27, 2020." (A. 71.)

### 3. The Company's bad-faith bargaining supports a finding that it failed to bargain to a lawful impasse

As noted above, the *Taft* analysis takes into account the parties' good faith in negotiations as one factor bearing on the existence of an impasse—and with good reason. "[I]t is manifest that there can be no legally cognizable impasse, i.e. a deadlock in negotiations which justifies unilateral action, if a cause of the deadlock is the failure of one of the parties to bargain in good faith." *Industrial Union of Marine & Shipbuilding Wkrs. v. NLRB*, 320 F.2d 615, 621 (3d Cir. 1963); *accord Royal Motor Sales*, 329 NLRB 760, 762, 764 (1999), *enforced*, 2 F. App'x 1 (D.C. Cir. 2001); *see also Brown v. Pro Football*, 518 U.S. 231, 238-39 (1996) (for an employer to implement a unilateral change after bargaining to alleged impasse, "[t]he collective-bargaining proceeding itself must be free of any unfair labor practice, such as an employer's failure to have bargained in good faith").

Here, as the Board found (A. 51 n.1, 57-59) and as fully explained below pp. 34-46, the Company failed to bargain in good faith with the Union in the months and years preceding the declaration of impasse at issue. That conduct in bargaining is a further factor precluding the finding of a lawful impasse.

## B.    The Company's Arguments in Support of Its Impasse Claim Lack Merit

Contrary to the Company's contention (Br. 36-37), the Board reasonably found (A. 71) that the above factors "outweigh the fact" that negotiations were lengthy and that the parties had serious disagreements. The Board's balancing of the relevant evidence accords with the well-established principle that "[i]mpasse should not be mechanically inferred because the parties have failed to reach complete agreement after some specified number of bargaining sessions." *PRC Recording*, 280 NLRB at 635; *see also id.* ("number of negotiating sessions is not controlling"). Whether the length-of-bargaining factor weighs in favor of impasse is not reflexively determined by adding up the number of sessions, but by examining whether the parties adequately discussed the topic—or, as here, the proposal—that prompted the alleged impasse.

The Company's claim (Br. 37-38) that it was privileged to declare impasse because the Union unilaterally "terminated" the negotiations in March 2020, and thereafter never offered to meet, borders on the frivolous. Simply put, the Company did not object to canceling the parties' late-March 2020 bargaining

session due to COVID-19, nor did it signal that it disagreed with the Union's proposed suspension of bargaining until the public-health emergency resolved. On the contrary, in contemporaneous bargaining with another union representing company employees, the Company acknowledged that no negotiations should take place until the "confinement" ends. (A. 1446.) Accordingly, when the Union suddenly received the Company's "Final Offer" without warning, it understandably first sought to understand the Company's position regarding the status of negotiations and what it meant by a "Final Offer." Then, once the Company indicated its belief that impasse existed, the Union equally understandably expressed puzzlement at that declaration, because the parties had never bargained over the Company's "Final Offer" or finished bargaining over the Union's September 2019 proposal. Moreover, the Union repeatedly expressed a desire to continue meaningful bargaining, undermining any suggestion that it had terminated negotiations.

The Company fares no better by relying (Br. 35-38) on *Phillips 66*, 369 NLRB No. 13 (2020), *Saunders House v. NLRB*, 719 F.2d 683 (3d Cir. 1983), and *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227 (D.C. Cir. 1996), to assert that any willingness by the Union to meet "is irrelevant." Those cases are distinguishable on multiple grounds. In none of them did the employer, as here, bargain in bad faith. Nor did the employers in those cases implement terms that

31

differed from their final proposals, thereby indicating a willingness to make further concessions, or fail to completely discuss proposals prior to their declaration of impasse.

The Board (A. 70 and n.27) also reasonably rejected the Company's argument (Br. 38-39) (citing *Auto Fast Freight, Inc. v. NLRB*, 793 F.2d 1126, 1129 (9th Cir. 1986)) that it was privileged to implement terms and conditions of employment even absent impasse because the Union allegedly engaged in bad-faith bargaining.  At the outset, the lawfulness of the Union's bargaining actions is not at issue here.  Indeed, in the proceeding below, no complaint issued on any theory that the Union had violated the Act by its bargaining conduct.  Moreover, the Board (A. 70) reasonably found that none "of the conduct that [the Company] identified"—delaying bargaining, engaging in regressive bargaining, and insisting on permissive subjects of bargaining—"demonstrates that additional bargaining would have been futile."

For instance, although the Company would hold the Union solely responsible for the fact that the parties met only once between September 2019 and June 2020, when the Company made its "Final Offer," the evidence fails to establish any basis for doing so.  As the Board noted (A. 70 and n.28), neither party reached out in the Fall of 2019 to schedule the next bargaining session.  Moreover, when the Company reached out in mid-January 2020, the Union

proposed, and the Company agreed, to meet on February 24, 2020.  (A. 70 n.28.)
And significantly, the Company did not object to the cancelation of the next
planned meeting in late-March 2020 due to the COVID-19 pandemic.  (A. 70
n.28.)

The Company's claim that the Union made regressive proposals and/or
proposals that covered non-mandatory subjects of bargaining similarly falls flat
because it fails to acknowledge the Board's finding (A. 70), and the evidence in the
record, that "the Union corrected or withdrew the majority of those proposals
during bargaining."  For example, although the 2014-2017 collective-bargaining
agreement had a provision to limit the number of company managers to a
percentage of the full-time employees in the bargaining unit, the Union, on
September 6, 2019, agreed to delete any such provision in a successor agreement.
(A. 62; 390-92, 544, 1216.)  Likewise, the Union's suggestion that the Company
should change its bargaining representative (Br. 10) only "arose briefly," early in
bargaining, never to be raised again.  (A. 70 n.29.)  In these circumstances, the
Board was fully warranted to find (A. 70 and n.29) that the Union's alleged
misconduct "had little to no effect on negotiations" and that "none of the Union's
proposals that [the Company] flagged as regressive or permissive was so
problematic that [the Company] could reasonably conclude that further bargaining
would be fruitless."

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY FAILING TO BARGAIN IN GOOD FAITH

### A. The Duty To Bargain in Good Faith Requires an Employer To Sincerely Endeavor To Reach a Contract—Not Try To Frustrate Agreement

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). In turn, Section 8(d) of the Act defines the collective-bargaining duty as the obligation "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d).

Good-faith bargaining "presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract." *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485 (1960). The parties must "make a sincere, serious effort to adjust differences and to reach an acceptable common ground." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1187 (D.C. Cir. 1981). Accordingly, "[a]n unpretending, sincere intention and effort to arrive at an agreement is required by statute; the absence thereof constitutes an unfair labor practice." *NLRB v. Stanislaus Implement & Hardware Co.*, 226 F.2d 377, 380 (9th Cir. 1955); *accord Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 4 (2020) ("[t]he essence of bad-faith bargaining is a purpose to frustrate the possibility of arriving at any

34

agreement" (internal quotation omitted), *enforced*, 848 F. App'x 344 (9th Cir. 2021)).

In determining whether an employer has failed to make a sincere attempt to reach agreement, and thus has engaged in bad-faith bargaining, the Board considers "the entire conduct of the [employer], particularly its conduct at the bargaining table." *Ins. Agents' Int'l Union*, 361 U.S. at 508; *accord Struthers Wells Corp. v. NLRB*, 721 F.2d 465, 469 (3d Cir. 1983) (employer's bargaining conduct both before and after strike considered relevant). That inquiry includes "the substance of the proposals on which the [employer] has insisted." *Hydrotherm, Inc.*, 302 NLRB 990, 993 (1991); *accord Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 4. "Sometimes, especially if the parties are sophisticated, the only indicia of bad faith may be the proposals advanced and adhered to." *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 609-10 (7th Cir. 1979); *accord Pub. Serv. Co. of Okla. v. NLRB*, 318 F.3d 1173, 1177 (10th Cir. 2003). *See, e.g.*, *NLRB v. A-1 King Size Sandwiches, Inc.*, 732 F.2d 872, 874, 877 (11th Cir. 1984) (upholding Board's finding of bad faith based exclusively on employer's bargaining positions that would give it unilateral control over many terms and conditions of employment).

An employer is expected to propose contract terms it finds desirable, and it can lawfully bargain hard to make the union agree to them. Some proposals,

however, can indicate an underlying desire to frustrate bargaining or not reach agreement at all.  Thus, the D.C. Circuit has observed that "[i]f a[n employer] insists on terms that no self-respecting union could brook, it may not be fulfilling its obligation to bargain." *Teamsters Loc. Union No. 515 v. NLRB*, 906 F.2d 719, 726 (D.C. Cir. 1990) (citation and internal quotation omitted).  For example, an employer's "unrealistically harsh or extreme proposals can serve as evidence that [it] lacks a serious intent to adjust differences and reach an acceptable common ground." *Liquor Indus. Bargaining Grp.*, 333 NLRB 1219, 1220 (2001), *enforced*, 50 F. App'x 444 (D.C. Cir. 2002).  *Accord, e.g.*, *Sparks Nugget, Inc. v. NLRB*, 968 F.2d 991, 996 (9th Cir. 1992) (Board may infer "intent to frustrate agreement" if "the entire spectrum of proposals put forward by a party is so consistently and predictably unpalatable to the other party that the proposer should know agreement is impossible") (citation and internal quotation marks omitted).

This case is principally concerned with a particular type of unreasonably harsh proposals:  those that would strip the union of its ability to represent employees, leaving them "with substantially fewer rights and less protection than provided by law without a contract." *Pub. Serv. Co. of Okla.*, 334 NLRB 487, 487-89 (2001) (noting that without a contract, the union would have the statutory right to prior notice and bargaining over changes or modifications in terms and conditions of employment and would retain the right to strike in protest of such

36

actions), *enforced*, 318 F.3d 1173 (10th Cir. 2003).  When an employer proposes a contract that waives the union's right to bargain over matters of fundamental importance to employees, without giving the union any other meaningful say in employees' terms and conditions of employment, the employer knows there will be no agreement, because the employees would be better off with no contract at all. *Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 4; *Ampersand Publ'g, LLC*, 358 NLRB 1415, 1499-1500 (2012), *incorporated by reference*, 362 NLRB 252 (2015), *enforced*, No. 15-1074, 2017 WL 1314946 (D.C. Cir. 2017).

In reviewing the Board's findings as to bad faith, the Court affords the Board particular "flexibility" to "draw [] inferences from the conduct of the parties as a whole" to determine "whether . . . conduct at the bargaining table evidences a real desire to come into agreement."  *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 498 (1960); *accord NLRB v. Holmes Tuttle Broadway Ford, Inc*., 465 F.2d 717, 719 (9th Cir. 1972).

## B.     Substantial Evidence Supports the Board's Finding that the Company's Proposals, Taken as a Whole, Evidenced an Intent To Frustrate Agreement

Substantial evidence supports the Board's finding that "the totality" of the Company's conduct during negotiations demonstrated a failure to bargain in good

faith.[7] (A. 67.) As the Board explained, the Company's "proposals, taken as a whole, would leave the [U]nion and the employees it represents with substantially fewer rights than provided by law without a contract." (A. 68.) In addition, insofar as the Company's proposals authorized it "to make unilateral changes to a broad range of significant terms and conditions of employment," amounting to "a 'perpetual reopener clause' as to those terms during the life of the contract," they "are [] 'at odds with the basic concept of a collective-bargaining agreement.'" (A. 67 (quoting *Altura Commc'n Sols., LLC*, 369 NLRB No. 85 (2020), slip op. at 4 (quoting *Radisson Plaza Minneapolis*, 307 NLRB 94, 95 (1992), *enforced* 987 F.2d 1376 (8th Cir. 1993)).

As the record shows, the Company's proposals sought control over, among other things, the allocation of bargaining-unit work. Under settled law, "[t]he allocation of work to a bargaining unit is a 'term and condition of employment'" over which an employer is required to bargain. *See Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 676 F.2d 826, 831 (D.C. Cir. 1982). Similarly, a union has a statutory right to bargain over subcontracting. *See Fibreboard Paper Prods.*

---

[7] Although the Board's finding is based on company conduct within the statutory limitations period, 29 U.S.C § 160(b)—that is, within 6 months of the filing of the first unfair-labor-practice charge in September 2019—the Company's conduct from the outset of bargaining in 2017 "remains relevant as it sheds light on bargaining conduct" within the limitations period. (A. 69 n.24.) *See Regency Serv. Carts*, 345 NLRB 671, 672 n.3 (2005).

*Corp. v. NLRB*, 379 U.S. 203, 209 (1964).  However, as the Board found, the Company insisted on proposals that "would have enabled it to unilaterally encroach upon the Union's jurisdiction by subcontracting work and by assigning bargaining unit work to employees outside of the bargaining unit."  (A. 68; 652, 782, 863, 995, 1140, 1168, 1336, 1385, 1453.)  And significantly, the Union would have had no recourse if the Company unilaterally "infringed on the Union's jurisdiction and/or reduced the size of the bargaining unit."  (A. 68.)

Similarly, the Company insisted on proposals that gave it unilateral control over work hours.  Indeed, the proposals expressly stated that the Company was not "guarantee[ing] any specified hours or work per day or per week."  (A. 61, 67; 662, 790, 872, 1004, 1177, 1345, 1394, 1459.)  And by "afford[ing the Company] complete discretion over work hours," the Company's proposal "[would] also afford [it] unilateral control over employees' pay."  (A. 68, citing *Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 5 (discussing as evidence of bad faith an employer's proposal that nothing in the agreement should be construed as a guarantee of hours of work per shift, per day, or per week).)

Likewise, although "[h]ealth care benefits are a mandatory subject of bargaining" (*Prime Healthcare Servs.–Encino LLC v. NLRB*, 890 F.3d 286, 295 (D.C. Cir. 2018)), the Company sought to retain for itself the right to unilaterally alter or scale back bargaining-unit employees' healthcare, dental, vision, life

insurance, and disability coverage at any time.  (A. 58, 68; 664, 684, 875, 898, 1030, 1060, 1083, 1180, 1203, 1348, 1371, 1397, 1420, 1461, 1473.)  Such unilateral discretion would, as the Board found, preclude unit employes from "count[ing] on any of these benefits."  (A. 68.)  And, as the Board further found, such power to eliminate contractual benefits altogether is "at odds with the basic concept of a collective-bargaining agreement."  (A. 68, citing *Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 5.)

Finally, the Company's proposed layoff policy—which gave it "the discretion to select employees for layoffs and recalls, with seniority being only one of several factors regarding layoffs, and merely a tiebreaking factor regarding recalls" (A. 61, 67-68; 666, 876-77, 1008-09, 1182-83, 1349-50, 1398-99, 1462-63) — would preclude the Union from in "any meaningful way . . . monitor[ing] or enforce[ing] the layoff/recall provisions in the contract."  (A. 68.)  Rather, as the Board found, the Company would be able to unilaterally "justify its layoff and recall decisions as discretionary decisions about employee skills and qualifications."  (A. 68.)

Considered in their entirety, the Company's proposals meant that during the contract term it would have unfettered discretion to change fundamental aspects of the bargaining unit's operations, including the hours that employees work each week, whether they work at all, whether they have benefits and in what measure,

and how they might be selected for layoff or recall.  The proposals effectively

required the Union "to cede substantially all of its representational function, and

would have so damaged the Union's ability to function as the employees'

bargaining representative that the [Company] could not seriously have expected

meaningful collective bargaining." *Altura Commc'n Sols., LLC*, 369 NLRB No.

85, slip op. at 6.  In such circumstances, the Board reasonably inferred that the

Company did not bargain in good faith with a sincere intent to reach agreement.

(A. 67.)

In drawing an inference of bad faith based on the Company's proposals

taken as a whole, the Board hewed to court-approved Board precedent holding that

"an employer's proposals evidence bad faith bargaining when they would confer

on the employer unilateral control over virtually all significant terms and

conditions of employment." *Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip

op. at 3-4 (internal quotation marks and citations omitted).  The Ninth Circuit's

decision enforcing the Board's order in *Altura* is particularly instructive.  There,

the Court held that the Board reasonably inferred bad faith and a lack of serious

intent to reach agreement where Altura's bargaining proposals granted it unilateral

control over terms and conditions of employment such as subcontracting and

benefits.  The Court identified evidence of bad faith in the fact that the proposals,

taken as a whole, "would exclude the [union] from any effective means of

participation in important decisions affecting the terms and conditions of employment of its members." *Altura Commc'n Sols., LLC v. NLRB*, 848 F. App'x at 344-46.[8] A host of other cases apply a similar analysis. *See Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 8–9 (2018) (employer bargained in bad faith where its proposals sought to deny the union any role in determining wages and benefits during the contract term, and also sought to afford the employer unfettered discretion regarding discipline and discharge), *enforced*, 2019 WL 12276113 (D.C. Cir. 2019); *Public Serv. Co. of Oklahoma v. NLRB*, 318 F.3d 1173, 1177-78 (10th Cir. 2003) (Board reasonably inferred bad faith based on employer's "rigid adherence throughout negotiations to a battery of contract proposals undermining the [u]nion's ability to function as the employees' bargaining representative");[9] *Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1382 (8th Cir. 1993) (characterizing a proposal as made in bad faith because

---

[8] Given the Board's specific finding in *Altura* "that the [employer's] proposals, when considered in combination, evidenced a failure to bargain in good faith" (*Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 4), the Company is in no position to claim (Br. 33) that the Board's decision in that case stands for the proposition that the Board cannot rely on an employer's proposals to find bad faith.

[9] The Company claims (Br. 34) that the Tenth Circuit's holding in *Public Service Company of Oklahoma* was not based primarily on the employer's bargaining proposals made throughout negotiations. But the Company misreads the court's decision, which merely found "further support[]" for the inference of bad faith in the employer's conduct away from the bargaining table. 318 F.3d at 1177 n.3.

it "would have permitted [the employer] to unilaterally change working conditions whenever it pleased").

Finally, the Company's premature declaration of impasse (see above) at a time when the parties had not, in fact, exhausted the opportunities for compromise, only bolsters the Board's finding of overall bad faith in negotiations.  (A. 69.)  As the Board found, the Company "by its overall conduct in negotiations for a successor collective-bargaining agreement (including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the union and the bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract), failed and refused to bargain in good faith with the Union."  (A. 69.)

### C.    The Company's Purported Explanations For Its Proposals do not Undermine the Board's Finding that It Lacked a Serious Intent To Reach Agreement

The Board's finding is not undermined, as the Company claims (Br. 5, 29), by the mere fact that the Company provided an explanation for its proposals—its desire for flexibility due to the changing nature of the newspaper business.  The Company's proffered justification, even if credited, does not mitigate the fact that its proposals would eviscerate the Union's representational role.[10]  Notably, as the

---

[10] The Court's decision in *New Concepts for Living, Inc v. NLRB*, 94 F.4th 272 (2024), is not to the contrary.  (Br. 34.)  Indeed, the Court in *New Concepts* recognized that the Board has long found the content of specific proposals

Board found, there is no evidence that the Company "offered any meaningful economic concessions or benefits to the bargaining unit in exchange for the broad discretion that it proposed in the areas discussed above." (A. 68 n.22, citing *Sweeney & Co.*, 176 NLRB 208, 211-12 (1969) (finding that the employer's rigid refusal to make any meaningful concessions on critical economic issues supported a finding that the employer bargained in bad faith), *enforced in pertinent part*, 437 F.2d 1127 (5th Cir. 1971).)

On the contrary, Company Attorney Lowe conceded that the Company offered benefits that "were less in several respects" and that unit employees would pay more money under its healthcare plan. (A. 493-94, 496-97.) Moreover, he could only identify a wage increase as a possible counterweight to the sweeping discretion the Company sought over terms and conditions of employment (A. 492-94). Yet, as the Board found, any proposed wage increase was "offset by several factors, including but not limited to: the new obligation for bargaining unit employees to pay 30 percent of the premium costs for the Company's health, vision, and dental insurance programs; the removal of the annual $4,000 cap on

---

potentially relevant in determining whether an employer acted in bad faith. *Id*. at 286-87. To be sure, the Court also observed that the Board is more prone to find bad faith when an employer fails to provide any reason, or a dubious reason, for its proposals. *Id*. at 286. But that observation does not, as the Company suggests (Br. 34), amount to a holding that the Board is precluded from finding bad faith whenever an employer has provided reasons for its proposals. *Id*. at 287-88.

pension and wage diversions which were incorporated into wage rates before any wage increases; and the loss of all sick leave that bargaining unit employees banked under the sick leave provisions in the expired contract."  (A. 68 n.22.)  Importantly, moreover, the Company not only required the Union to waive its right to bargain over many changes to terms and conditions of employment, but also required the Union to surrender its right to strike in protest of any such changes.

Contrary to the Company's suggestion (Br. 29), its mere "belie[f] [that] the transition to a digital newspaper would affect future operations" cannot justify an employer's demands for sweeping unilateral control.  Indeed, the "ostensible logic [of that position] would seem to preclude any agreement or contractual understanding between human beings or organizations composed of beings other than those who could foresee and predict the future with certainty."  *Blue Jeans Corp.*, 177 NLRB 198, 206–07 (1969) (inference of bad faith where sole reason offered by employer for refusing to preserve existing rules and practices was that "you never know what is going to happen tomorrow"), *enforced sub nom. Amalgamated Clothing Workers of Am. v. NLRB*, 432 F.2d 1341 (1970).  *See generally Summa Health Sys.*, 330 NLRB 1379, 1379 (2000) (bad faith demonstrated in part by employer's failure to justify "the absolute discretionary powers it demanded which lessened protections for bargaining unit work, other than generalized insistence on some vague concept of 'flexibility'"); *American*

45

*Meat Packing Corp.*, 301 NLRB 835, 836-37 (1991) (employer's poor financial condition "[d]id not explain [its] refusal even to consider changes in proposals that had the potential for totally eliminating unit work by transferring it to nonunit personnel").[11]

Moreover, extant law already provides a mechanism for an employer to act in response to changed circumstances or economic necessity during a contract term.  An employer is permitted to make and enact economically motivated entrepreneurial decisions (i.e., involving a change in the scope and direction of the enterprise), provided it gives the union an opportunity to bargain regarding the impact that such actions would have on the bargaining unit.  *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666 (1981) (requiring an employer to bargain over the effects of, but not the decision to, partially shut down operations).

---

[11] Likewise, the Company proves little by its bare assertion (Br. 25) that other unions, in bargaining with respect to other employees, have accepted proposals "nearly identical" to those here.  The record contains no evidence as to what those unions might have gained in exchange for accepting such proposals.

**D.     The Court Lacks Jurisdiction To Consider the Company's Claim that the Board Erred as a Matter of Law in Finding that the Company Bargained In Bad Faith**

The Company asserts (Br. 17, 22-34) that the finding of bad-faith bargaining cannot stand because cases of the Supreme Court (*NLRB v. American National Insurance Co.*, 343 U.S. 395 (1952)), this Court (*Struthers Wells Corp. v. NLRB*, 721 F.2d 465 (3d Cir. 1983)), the D.C. Circuit (*Cincinnati Newspaper Guild, Local 9 v. NLRB*, 938 F.2d 284 (D.C. Cir. 1991), and the Board (*10 Roads Express, LLC*, 372 NLRB No. 105 (2023)), preclude the Board from finding bargaining proposals *per se* unlawful.  The Court lacks jurisdiction to consider this asserted basis for reversing the Board's bad-faith-bargaining finding.

Under Section 10(e) of the Act "[n]o objection that has not been urged before the Board . . . shall be considered by the court," unless the failure to urge the objection is "excused because of extraordinary circumstances."  29 U.S.C. § 160(e).  Application of Section 10(e) is "mandatory, not discretionary."  *Oldwick Materials, Inc. v. NLRB*, 732 F.2d 339, 341 (3d Cir. 1984) (citing *NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 322 (1961)).  Thus, a "court of appeals has no power, *sua sponte*, to find objectionable a portion of [a Board] order, if no objection was raised before the Board and the failure to object was not excused by any 'extraordinary circumstances.'"  *Oldwick Materials*, 732 F.2d at 342

47

(citing *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982), and

*NLRB v. United Mineworkers*, 355 U.S. 453, 463-64 (1958)).

Here, the Company's filings before the Board never claimed that the

administrative law judge flouted settled law by finding the Company's proposals

*per se* unlawful.  Rather, the Company took exception to the judge's findings that

the Company's "proposals when viewed as a whole evidence an intent not to reach

an agreement," and that its "overall conduct was bad faith."  (A. Vol. V. 159-60.)

In support of its exceptions, moreover, the Company argued that the judge erred on

evidentiary grounds by finding, based on the totality of the circumstances, that the

Company bargained in bad faith.  (A. Vol. V. 233-55.)  Specifically, the Company

disputed that its proposals would leave the Union "with fewer rights" and give it

"unfettered discretion."  (A. Vol. V. 234.)  And, importantly, the Company

conceded that the Board can properly find that a party made proposals designed to

frustrate the bargaining process, and that such proposals can constitute evidence of

bad faith.  (*Id*. at pp. 7-9.)  Accordingly, the Court lacks jurisdiction to consider the

wholly different argument the Company raises for the first time in its opening

brief, that in affirming the administrative law judge's bad-faith-bargaining finding,

the Board affirmatively found the Company's bargaining proposals *per se* unlawful

as specifically prohibited by court and Board precedent.

In any event, nothing in the Board's decision here runs afoul of *American National Insurance*, *Struthers*, *Cincinnati Newspaper*, or *10 Roads*.  Contrary to the Company's claim (Br. 17, 22-34), the Board did not find any bargaining proposal *per se* violative of the Act as prohibited by those cases.  Instead, the Board reasonably found that the Company's "overall conduct in negotiations" indicated bad faith (A. 51 n.1).  And, as set forth above, the Company has conceded the Board can properly rely on employer proposals as an indicium of bad faith.  *See*, *e.g.*, *Liquor Indus. Bargaining Grp.*, 333 NLRB at 1220; *accord Altura Commc'n Sols., LLC*, 369 NLRB No. 85, slip op. at 4 (Board's "examination of the [employer's] proposals is undertaken to determine, not their merits, but whether in combination and by the manner proposed they evidence an intent not to reach agreement" (internal quotation marks and citation omitted)). [12]

---

[12] The Company's claims (Br. 28, 31-32) that the Board acted contrary to the Supreme Court's decisions in *H.K. Porter Co. v. NLRB*, 397 U.S. 99 (1970), and *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981), are likewise jurisdictionally barred.  In any event, *H.K. Porter*'s holding—that the Board cannot impose a specific term or condition of employment as part of a remedy—has no application here because the Order on review does not compel the Company to agree to a specific union proposal.  The holding of *First National Maintenance*—that an employer has no duty to bargain over "an economically motivated decision" relating to the scope or direction of its business, except to the extent that there are effects on employees—similarly has no bearing on the issues in this case.  452 U.S. at 680.  Simply put, the Board did not depart from this principle in finding that some of the Company's proposals pertaining to employees' terms and conditions of employment evidenced overall bad faith in negotiations.

Nor is the Board's recent decision in *Endurance Environmental Solutions, LLC*, 373 NLRB No. 141 (2024), relevant to the totality-of-the-circumstances analysis here, as the Company obliquely suggests (Br. 30-31).  In *Endurance*, the Board held that, during the term of a collective-bargaining agreement, an employer can only make a unilateral change to employees' terms and conditions of employment if it shows that the union "clearly and unmistakably" waived its right to bargain over the change.  373 NLRB No. 141, slip op. at 1, 25.  The Company's purported interest in securing such lawful waivers from the Union does not render its overall conduct in bargaining lawful or undermine the Board's finding that the Company's proposals, considered as a whole, evinced bad faith.

## III.  SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(1) OF THE ACT BY CREATING THE IMPRESSION THAT EMPLOYEES' UNION ACTIVITIES WERE UNDER SURVEILLANCE

Section 7 of the Act (29 U.S.C. § 157) grants employees the "right to self-organization, to form, join, or assist labor organizations . . . and to engage in . . . concerted activities for the purposes of collective bargaining or other mutual aid or protection."  Section 8(a)(1) of the Act implements that right by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their Section 7 rights.  Conduct that gives the impression of surveillance violates Section 8(a)(1) if it reasonably tends to interfere with, restrain, or coerce employees in the exercise of their Section 7

rights. *Hanlon & Wilson Co. v. NLRB*, 738 F.2d 606, 613 (3d Cir. 1984)

(citing *United States Steel Corp. v. NLRB*, 682 F.2d 98, 103 (3d Cir. 1982)).  There

need not be any actual interference or coercion for an employer's actions to cross

the line.  *Id*.

Here, during two union rallies held across the street from the home of the

Company's publisher, security guards hired by the Company appeared to take

photographs of rally participants, including unit employees, who were not doing

anything improper.  Nor has the Company offered any evidence "that it had reason

to anticipate unlawful behavior."  (A. 51 n.1.)  As the Board found (A. 72),

"[u]nder those circumstances, a reasonable employee would conclude that [the

Company] through security guards serving as its agents, had placed employees'

union activities under surveillance."  Accordingly, the Board was fully warranted

to find that the Company's actions violated Section 8(a)(1) of the Act.  (A. 51 n.1,

72.)  Indeed, the Board, with court approval, has made clear that videotaping or

photographing protected activity will typically tend to be coercive, absent unusual

circumstances.  *See Road Sprinkler Fitters Local 669 v. NLRB*, 681 F.2d 11, 19

(D.C. Cir. 1982) (citing cases); *accord John Ascuaga's Nugget*, 298 NLRB 524,

554 (1990) (photographing employees at union press conference unlawful),

*enforced in relevant part sub nom. Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir.

1992)).

In relying (Br. 40) on the public nature of the rallies, the Company merely reiterates the long-rejected contention that an employer is free to photograph any protected activity it may observe. Photographic recording of union activity transcends mere observation and can suggest that the employer may be planning to subject employees to future reprisals. *See NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 702-03 (7th Cir. 1976); *F.W. Woolworth Co.*, 310 NLRB 1197, 1197, 1203-04 (1992).

Contrary to the Company's contention (Br. 40), *United States Steel v. NLRB* did not hold that a "key issue" in surveillance cases is whether "employees were attempting to 'shun identification.'" 682 F.2d 98, 103 n.17 (3d Cir. 1982). Rather, the Court "simply note[d] that the seeking of publicity may be a relevant factor in determining whether, under the circumstances, employees feared future reprisals." *Id*. at 103 n.17. Moreover, in that case, unlike here, "amicable relations existed between [the employer] and the [u]nion[,] . . . [and] no independent unfair labor practice was committed by [the employer,]" all of which, in the Court's view, lessened the tendency of the employer's photographs to coerce employees. *Id*. at 100, 103. None of those mitigating factors is present here.

## IV.   THE COURT LACKS JURISDICTION TO CONSIDER THE COMPANY'S CHALLENGE TO THE BOARD'S REMEDY

Before the Court (Br. 42), the Company asserts that "the Board lacks the authority" to order the Company to "compensate the Union for all bargaining

expenses it incurred," and to "compensate all bargaining unit employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful changes" and during the time it engaged in bad-faith bargaining.  The Court, however, has no jurisdiction to consider these arguments, because the Company failed to comply with 10(e) of the Act, which, as shown above (pp. 47-48), precludes the Court from considering an objection that has not been urged before the Board, absent "extraordinary circumstances."  29 U.S.C. § 160(e).

Here, the Company raised 14 exceptions to the Board's remedy in the proceeding below (A. Vol. V. 210-14), but none of those exceptions pertained to the portion of the Board's Order requiring the Company to reimburse the Union for certain bargaining expenses.  Accordingly, under a plain reading of Section 10(e), the Court simply has no jurisdiction to consider the Company's belated argument. In any event, the Board has required employers to reimburse unions for bargaining expenses in case after case, and courts have routinely upheld such reimbursement orders.  *See*, *e.g.*, *NLRB v. Ampersand Publishing, LLC*, 43 F.4th 1233, 1237-39 (9th Cir. 2022); *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1094-95 (D.C. Cir. 2016); *Noah's Ark Processors, LLC*, 372 No. 80 (2023), slip op. at 9 n.43, 35, *enforced*, *NLRB v. Noah's Ark Processors*, LLC, 98 F.4th 896, 901 (8th Cir. 2024).

Although the Company did except to the portion of the Board's order requiring the Company to make employees whole for direct or foreseeable

pecuniary harms (A. Vol. 5 213), it offered no specific grounds for that exception. Moreover, the Company's supporting brief simply stated that it "did not violate the Act" and "[t]herefore, there is no basis for any Remedy." (A Vol. 5 272). To satisfy Section 10(e), an argument "must be specific enough to place the agency on notice of the party's objections" that will be raised on appeal. *Atl. City Elec. Co. v. NLRB*, 5 F.4th 298, 306 (3d Cir. 2021) (internal quotation omitted). A party does not preserve an issue simply by mentioning it below, especially if the party "now objects to it on different grounds." *Id.*; *accord NLRB v. FES*, 301 F.3d 83, 88-89 (3d Cir. 2002) (factual challenge to Board holding does not preserve legal challenge to same holding); *see also NLRB v. Noah's Ark Processor's*, LLC, 98 F.4th 896, 901 (8th Cir. 2024) (court has no jurisdiction to consider employer's arguments regarding remedy where it "initially challenged certain remedies in its exceptions to the administrative-law judge's order, but not on the same grounds it raises [to the Court]"). Accordingly, the Court has no jurisdiction to consider the Company's new argument specifically taking issue with an aspect of the Board's Order that was not challenged on any specific ground below.

In any event, the Company overreads the Court's decision in *NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024), by arguing it precludes the Board's "direct or foreseeable harm" remedy in the context of this specific case. In *Starbucks*, the Court held that imposing a standardized "direct or foreseeable

harm" remedy in all Board cases, as required by *Thryv, Inc.*, 372 NLRB No. 22 (2022), *enforcement denied in part*, 102 F.4th 727 (5th Cir. 2024), is inconsistent with the Act, as the "relief cannot exceed what the employer unlawfully withheld." 125 F.4th at 97. The Court recognized, however, that on a case-by-case basis, the Board has appropriately made employees whole in a manner that "fell under the umbrella of a backpay award" such as health insurance benefits, medical expenses, and lost retirement benefits—because "[e]ven though those awards included more than wages alone, they were closely tied to the equitable remedy of backpay." *Id*. at 96. The Company offers no argument as to why such remedies, on the facts of this particular case, are inappropriate here.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court deny the Company's petition for review, grant the Board's cross-application for enforcement, and enter a judgment enforcing the Board's Order in full.

Respectfully submitted,

/s/ Milakshmi V. Rajapakse
Milakshmi V. Rajapakse
*Supervisory Attorney*

/s/ David A. Seid
David A. Seid
*Senior Attorney*

National Labor Relations Board
1015 Half St. SE
Washington, DC 20570
(202) 273-4231
(202) 273-2941

WILLAM B. COWEN
*Acting General Counsel*
STEPHANIE CAHN
*Acting Deputy General Counsel*
PETER SUNG OHR
*Associate General Counsel*
RUTH E. BURDICK
*Deputy Associate General Counsel*
MEREDITH JASON
*Assistant General Counsel*

National Labor Relations Board

March 2025

**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. | ) | |
| d/b/a PITTSBURGH POST-GAZETTE | ) | Nos.  24-2788 |
| | ) | 24-3057 |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06-CA-269346 |
| | ) | |
| Respondent/Cross-Petitioner | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWSPAPER GUILD OF PITTSBURGH/ | ) | |
| CWA LOCAL 38061 | ) | |
| | ) | |
| Intervenor | ) | |

**CERTIFICATE OF BAR MEMBERSHIP**

In accordance with Third Circuit L.A.R. 28.3(d) and 46.1(e), Board counsel

David A. Seid certifies that he is a member in good standing of the State Bar of

Maryland.  He is not required to be a member of this Court's bar, as he is

representing the federal government in this case.

                                    s/David A. Seid
                                    David A. Seid
                                    Senior Attorney
                                    National Labor Relations Board
                                    1015 Half Street, SE
                                    Washington, DC 20570
                                    (202) 273-2941

Dated at Washington, DC
this 14th day of March 2025

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

PG PUBLISHING CO., INC.           )
d/b/a PITTSBURGH POST-GAZETTE      )        Nos.  24-2788
                                  )               24-3057
            Petitioner/Cross-Respondent   )
                                  )        Board Case Nos.
        v.                        )        06-CA-248017
                                  )        06-CA-263791
NATIONAL LABOR RELATIONS BOARD    )        06-CA-269346
                                  )
            Respondent/Cross-Petitioner   )
                                  )
        and                       )
                                  )
NEWSPAPER GUILD OF PITTSBURGH/    )
CWA LOCAL 38061                   )
                                  )
            Intervenor            )

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board certifies
that its brief contains 12,874 words of proportionally-spaced, 14-point type, and the
word processing system used was Microsoft Word 365.  Board counsel further
certifies that: the electronic version of the Board's brief filed with the Court in PDF
form is identical to the hard copy of the brief being filed with the Court; and the
PDF file submitted to the Court has been scanned for viruses using Microsoft
Defender Antivirus version 1.321.1678.0 and is virus-free according to that program.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 14th day of March 2025

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. | ) | |
| d/b/a PITTSBURGH POST-GAZETTE | ) | Nos.  24-2788 |
| | ) | 24-3057 |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06-CA-269346 |
| | ) | |
| Respondent/Cross-Petitioner | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWSPAPER GUILD OF PITTSBURGH/ | ) | |
| CWA LOCAL 38061 | ) | |
| | ) | |
| Intervenor | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  I certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 14th day of March 2025