# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## Case Nos. 24-2788 and 24-3057

## PG PUBLISHING CO., INC.,

*Petitioner/Cross-Respondent,*

v.

## NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner,*

**and**

## NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,

*Intervenor.*

## PETITION FOR REHEARING *EN BANC*

Brian M. Hentosz, Bar No. 317176
bhentosz@littler.com
Morgan S. Dull, Bar No. 322712
mdull@littler.com
LITTLER MENDELSON, P.C.
One PPG Place, Suite 2400
Pittsburgh, PA  15222
Telephone:  412.201.7676
Facsimile:  412.291.1241

*Attorneys for Petitioner/Cross-Respondent, PG Publishing Co., Inc.*

## I.     <u>LOCAL RULE 35.1 STATEMENT</u>

I express a belief, based on a reasoned and studied professional judgment, that the motions panel's ("Panel") order granting injunctive relief [ECF No. 57 ("Order")] on March 24, 2025, is contrary to the decisions of (1) this Court in *Adams v. Freedom Forge Corporation*, 204 F.3d 475 (3d Cir. 2000) and *Delaware State Sportsmen's Association v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194 (3d Cir. 2024); and (2) the United States Supreme Court in *Starbucks Corporation v. McKinney*, 602 U.S. 339 (2024), and that consideration by the full Court is necessary to secure and maintain uniformity of decisions.  This appeal also involves a question of exceptional importance: what is the procedural standard applicable to a National Labor Relations Board ("Board" or "NLRB") request for National Labor Relations Act ("Act") Section 10(e) injunctive relief considering *McKinney*?

Date: April 7, 2025

*/s/ Brian M. Hentosz*
Brian M. Hentosz

## I.    <u>INTRODUCTION</u>

On March 24, 2025, the Panel issued its Order, requiring the Petitioner/Cross-Respondent PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette ("Post-Gazette" or the "Company") to bargain with the Intervenor Newspaper Guild of Pittsburgh/CWA Local 38061 ("Guild") and:

> (c)    On request by the Union, rescind the changes in the terms and conditions of employment related to health insurance for its unit employees that were unilaterally implemented on about July 27, 2020.

> (d)    Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit …

[ECF No. 57].  The Panel did not issue an opinion or analysis in support of the Order. [*See Id.*].  Instead, the only analysis of the "extraordinary remedy" is a dissenting footnote written by Judge Phipps.  [*See Id.*].  The Post-Gazette petitions the Court for a rehearing *en banc* of the Order for the following reasons:

*First*, the Order, which apparently found moving employees represented by the Guild from the Western Pennsylvania Teamster and Employers Welfare Fund ("Fund") to the Company's health insurance plan constituted "irreparable harm" is directly contrary to this Court's holding in *Freedom Forge*, which held that switching healthcare plans is not "irreparable harm" because impacted litigants can

be made whole after consideration of the merits (absent exceptional, individualized circumstances).  Also, the Order is contrary to *Freedom Forge's* instruction that the plaintiff establish that the defendant "proximately caused" the alleged harm – here, the alleged harm occurred *two years* before the Guild elected to strike – a decision which barely garnered majority support amongst the Guild's members.

*Second*, the Order is contrary to *Delaware State Sportsmen's*, which instructed that injunctions are appropriate "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."  Here, as noted by Judge Phipps there is no evidence that the Guild could not be made whole by an order on the merits.  Further, the Order fails to demonstrate how injunctive relief is appropriate to counter an action (implementation of the Company's health insurance proposal) that occurred approximately *five years ago* and the Board delayed years in seeking relief.

*Third*, the Order is contrary to the Court's decision in *McKinney*, which held that the Board (like any other litigant) must demonstrate all four elements of the *Winter v. Natural Resources Defense Council, Incorporated*, 555 U.S. 7 (2008) framework and that the NLRB is not entitled to *any* deference on a request for injunctive relief.  Here, the Order provides no analysis.  Indeed, it is not clear how the Court determined the Board satisfied *any* of the *Winter* factors.  Further, oral argument focused *primarily* on "irreparable harm" – not the remaining factors.

2

Thus, the analysis does not meet the standard articulated in *McKinney*.

*Finally*, based on reasonable research, the Order is the first time this Court has addressed a request for Section 10(e) injunctive relief (certainly the first time since *McKinney*). In *McKinney*, the Court instructed that a court must evaluate factual conflicts, analyze questions of law, and make an *independent* assessment of the merits and *Winter* factors. Here, litigants lack guidance on the procedure applicable to such a request. *McKinney* called for an independent analysis of the facts and law and prohibited a court from relying *solely* on the administrative record – no such analysis occurred here.

## II. RELEVANT BACKGROUND

A. Facts.

The Post-Gazette publishes the *Pittsburgh Post-Gazette*, a Pittsburgh, Pennsylvania based newspaper. The Guild represents employees in the editorial department of the Post-Gazette's newsroom. [JA1538]. The Post-Gazette and Guild were parties to a collective bargaining agreement that expired on March 31, 2017. [JA0262, JA0542].

The Post-Gazette and Guild commenced bargaining for a successor agreement on March 10, 2017. [JA0277, 375]. At the first bargaining session, the parties discussed the challenges facing the Post-Gazette and other newspapers around the country – specifically, consumers were moving away from printed products and

demanding more digital content. [JA375-376]. The Post-Gazette informed the Guild that the Company lost $18,900,000.00 the prior year. [JA0376]. The Post-Gazette also informed the Guild that over the term of a successor agreement, the Company was likely to eliminate print days and transition to an "all-digital format." [JA0280, 0376-0377].

The Post-Gazette further explained to the Guild that it needed flexibility to implement its transition to an "all-digital format" and its proposals would reflect this need. [JA0288]. The Post-Gazette also explained that the continuance in the Fund was not sustainable due to the cost and the lack of plan options offered by the Fund. [JA0301-0302, JA0424]. In response, the Guild informed the Post-Gazette that it was "done making concessions" and had no interest in the Company's plan. [JA0303, 0394, 1652].

Negotiations for a successor agreement lasted for 3½ years. [JA1772-JA1777, JA2757-JA3180]. On March 22, 2020, the Guild's attorney sent the Post-Gazette a letter terminating negotiations and stating, in part:

> When weighing the benefits of meeting and simply going through the *worthless* motions that for three plus years have proved the employer has no intention on reaching an amicable resolution to the various CBA's versus saving the lives of those of us involved in these *fruitless meetings*, makes our decision very easy.
>
> The [bargaining session] scheduled for the 25th will not be going forward, nor will there [be] *any* future meetings scheduled for any of the … bargaining units at the Post-

4

>    Gazette until the Coronavirus pandemic is completely
>    arrested.

[JA2455-2456 (emphasis added)].  After the Guild's termination of negotiations, the

Post-Gazette sent the Guild a comprehensive response and position statement to the

union's last proposal (from September 6, 2019).  [JA2457-JA2486].  The Guild

ignored the Post-Gazette's correspondence.

On June 12, 2020, the Post-Gazette sent the Guild its Final Offer and offered

to respond to any questions concerning the same.  [JA2298-JA2399].  The Guild did

not respond for 10 days and, upon responding, did not address any of the substantive

terms of the Final Offer.  [JA2487].  Instead, the Guild asked if the Post-Gazette was

terminating negotiations and refusing to meet.  [*Id*.].  The Guild's nonsensical

response confirmed the futility of continued negotiations.  To recap, at the time of

the Guild's response to the Post-Gazette's final offer, the Guild had agreed to meet

*only* one time in almost ten (10) months.  [JA2298-JA2300].  In fact, between

September 6, 2019, and June 12, 2020, the Guild never requested to bargain with the

Company.  Finally, based on the Guild's March 22, 2020 letter, the Post-Gazette

understood the Guild had terminated contract negotiations.  [JA2455-JA2456,

JA0500].  As such, on July 16, 2020, the Post-Gazette sent the Guild a letter

declaring a bargaining impasse and requesting the Guild explain if it believed future

negotiations would be fruitful.  [JA2496-2498].  The Post-Gazette offered to

consider substantive changes to the Guild's position on the open issues that would

facilitate an agreement.  [*Id*.].

In response, the Guild stated it was willing to compromise its position only if there was a good reason that a change from the expired agreement was needed. [JA2499-JA2502].  The Guild stated it was willing to meet *only if* the Post-Gazette made changes to its Final Offer to the satisfaction of the Guild.  [*Id.*].  The Guild never offered to make any substantive changes to its bargaining position before or after the Post-Gazette declared impasse.  [*Id.*].  The Guild did not agree to the Company's proposals or make a counter proposal.  [*Id.*].  Significantly, the Guild never offered to meet.  [*Id.*].  As such, on July 27, 2020, the Post-Gazette implemented portions of its final offer, including moving the employees from the Fund to the Company's insurance plan and provided wage increases to the employees.  [JA2503-JA2528].

Over two years later, the Guild called its members out on strike on October 24, 2022. [ECF No. 21 at p. 6].  The Guild's membership only voted to approve the strike by a margin of 38-36.  [*Id*. at Ex. B].  On the first day of the strike, approximately half of the Guild members resigned their membership and continued working.  [*Id.*].  The Guild has not made an unconditional offer to return to work. [ECF No. 26-3, p. 7].

B.    The NLRB Proceedings.

On April 27, 2022, close to two years *after* the Post-Gazette implemented

some of its bargaining proposals, the NLRB issued an administrative complaint alleging that the Post-Gazette bargained in bad faith by (1) "insisting upon proposals that are predictably unacceptable to the Union," (2) "failing to provide explanations to the Union regarding the Employer's proposals," and (3) prematurely declaring impasse and implementing some of its bargaining proposals (amongst other non-relevant allegations. [JA0166-JA0181].

On January 26, 2023, Administrative Law Judge ("ALJ") Carter issued his decision, in which he held "I do not find merit to the argument that Respondent failed to explain its proposals to the Union." [JA0001-JA0050]. ALJ Carter also rejected the regional director's allegation that the Post-Gazette's proposals were "predictably unacceptable." [JA0028-0029]. Instead, ALJ Carter found that "[a]n inference of bad faith is appropriate when the employer's proposals, taken a [*sic*] whole, would leave the union … with substantially fewer rights than provided by law without a contract." [*Id.*]. With respect to the impasse allegations, ALJ Carter found that "the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices." [JA0031]. Additionally, ALJ Carter found that the parties had not met to discuss the Post-Gazette's Final Offer before the Company declared an impasse. [*Id.;* JA0032-0033].

Approximately *20 months later,* on September 20, 2024, the Board adopted ALJ Carter's decision in a two-page opinion ("Decision"). The Board agreed that

the Post-Gazette violated the Act because it "insisted on provisions that left the Union with fewer rights and less protection than provided by law without a contract." [JA0051-JA0078]. In essence, the Board held that the Post-Gazette bargained in bad faith based *solely* on the Company's bargaining proposals. The Board also endorsed ALJ Carter's impasse analysis. *[Id.]*.

C.    <u>The Board's 10(e) Petition</u>.

On September 24, 2024, the Post-Gazette commenced this action. [ECF No. 1]. However, the Board waited until December 20, 2024, to file its request for injunctive relief – seeking enforcement of its Order. [ECF No. 21]. In support of its request, the Board argued the alleged "unfair labor practices have severely destabilized the bargaining unit, causing an over-two-year strike and a staggering drop in union membership." [*Id.* at p. 2].

The Panel conducted oral argument on February 26, 2025, but the parties were instructed to focus on the following issue: "Whether the NLRB and the union are likely to suffer irreparable harm in the absence of an injunction compelling PG Publishing to comply with the Boards Decision and Order." [ECF No. 47]. Subsequently, the Panel issued its Order. [ECF No. 57]. The Order is primarily limited to the health insurance element of the Board's Decision. [*See Id.*].

## III.    <u>ARGUMENT</u>

In *Delaware State Sportsmen's*, this Court recently made clear that

"[p]reliminary injunctions are not automatic. Rather, tradition and precedent have long reserved them for extraordinary situations." 108 F.4th at 198. Further, this Court cautioned "[p]reliminary injunctions raise further problems. For one, 'many preliminary injunctions [are] granted hurriedly and on the basis of very limited evidence.' Time pressures limit adversarial testing." *Id.* at 200 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (*en banc*)). The Order fails to demonstrate how the Board's request for injunctive relief constitutes an "extraordinary situation." Indeed, it fails to any guidance to litigants.

A.    <u>The Order Conflicts with *Freedom Forge*</u>.

As Judge Phipps noted in his dissent, "none of the harms associated with the non-enforcement of the Board's order are irreparable." [ECF No. 57 n.1]. That is because this Court has been clear that the Board's complained of conduct – moving the Guild-represented employees from the Fund to the Company's health insurance plan does not constitute "irreparable harm." In *Freedom Forge*, this Court addressed the precise issue – does switching health insurance plans constitute "irreparable harm" because the employees were required to pay more in premiums and care. 204 F.3d at 480-81. This Court answered in the negative, holding:

> We are not prepared to hold, in the absence of a highly particularized and compelling demonstration of hardship, that irreparable harm flows from such a plan change *simpliciter*. There are many rearrangements—not just

9

> scrimping and saving rearrangements—that individuals
> involved in a legal battle must endure pending the
> conclusion of a suit, and very few will be without some
> anguish. As we have stated, injunctions will not be issued
> merely to allay the fears and apprehensions or to soothe
> the anxieties of the parties.

*Id.* at 490 (quotations omitted). Here, the Board admits that non-strikers are receiving health insurance, they simply are spending "more money" for the insurance.[1] Simply put, this is a legal remedy that can be addressed in the event the Board is successful in this litigation. In contradiction of this principle, the Order requires the Post-Gazette to rescind its health insurance plan, without any explanation concerning how "irreparable harm" has been established.

*Freedom Forge* is also instructive because it teaches that a court must demonstrate that the alleged harm sought to be remedied by the injunction was proximately caused by the defendant. *See* 204 F.3d at 488, n.13; [*see also* ECF No. 57 n.1]. Here, the Guild elected to go on strike over two years *after* the Post-Gazette declared impasse and implemented its bargaining proposals. Additionally, the Guild barely had majority support to strike (38-36). [ECF No. 21 at Ex. B]. Thus, insofar as "irreparable harm" occurred it was the result of the Guild's decision to strike and occurred well *after* the Post-Gazette's implementation of its bargaining proposals.

---

[1]    The Board concedes that, under its own settled precedent, striking employees are not entitled to *any* employer-paid health insurance. [ECF No. 21, p. 19] ("Those who remain on strike have lost all benefits because the Company has no obligation to provide benefits for strikers.").

B.    The Order Conflicts with *Delaware State Sportsmen's*.

In *Delaware State Sportsmen's*, this Court established that injunctive relief is only available for "extraordinary" circumstances and "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."  108 F.4th at 201; *see also Freedom Forge*, 204 F.3d at 484-85 ("the irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages.  This is not an easy burden").  At the outset, based on *Freedom Forge*, there is no basis to believe that the Guild could not be made whole in the event the Board is successful in this litigation.

Further, the facts of this matter do not warrant the "extraordinary" remedy contemplated by *Delaware State Sportsmen's*.[2]  Specifically, the harm complained of occurred approximately *five years ago*.  Indeed, the Board had multiple opportunities to seek injunctive relief at earlier times but failed to do so, including at the time the unfair labor practice was filed, when the administrative complaint was issued, when the ALJ issued his opinion, *or* when the Board issued its decision.  Judge Phipps addressed this issue noting it is "improper to issue a Section 10(e)

---

[2]    The Board's own ALJ found that the conduct at issue here did not rise to the level of "extraordinary" circumstances.  Indeed, ALJ Carter opined: "I do not find that Respondent engaged in unusually aggravated misconduct in this case," further "the General Counsel has not maintained (or established) that the Respondent has a history of violating the Act."  [ROA 3827].

injunction as a means of remedying irreparable harms that occurred *before* the Board issued its order." [ECF No. 57 n.1 (emphasis added)]. That is precisely what occurred here – insofar as harm occurred, it occurred *well before* the Board issued its Decision.

      C.    The Order Conflicts with *McKinney*.

Although it addressed the standard for a 10(j) injunction, the Court's decision in *McKinney* is controlling in the instant matter because it set forth the standard applicable to the Board seeking injunctive relief. In *McKinney*, the Court held "because nothing in § 10(j)'s text overcomes the presumption that traditional equitable principles govern, district courts considering the Board's request for a preliminary injunction must apply the *Winter* framework, which embodies those traditional principles." 144 S. Ct. at 1577. As such, the Board must show: (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 24.

Further, the Court rejected any argument in favor of deference to the Board, holding:

> According to the Board, these contextual considerations require district courts evaluating § 10(j) petitions to apply the traditional criteria in a less exacting way, and the Sixth Circuit's reasonable-cause standard appropriately accounts for context. The partial dissent also asserts that 'a district court's preliminary look at the merits' of a

§ 10(j) petition 'should be far less searching than normal' for similar reasons. *Post*, at ⸺ (JACKSON, J., concurring in part, concurring in judgment, and dissenting in part). ***We disagree***.

*McKinney*, 144 S. Ct. at 1578 (emphasis added).   The Court further opined that "deference to what is 'nothing more than an agency's convenient litigating position' is 'entirely inappropriate.'" *Id.* at 1571 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988)).  Instead, in NLRB injunction proceedings, "a district court must evaluate any factual conflicts or difficult questions of law," "conduct[] an independent assessment of the merits and equitable factors," and decide "what evidence [to] consider[] or credit[]." *Id.*

Here, the Order violates *McKinney's* teaching in multiple respects:

➢  *First*, it fails to provide an analysis of *every Winter* factor.  Indeed, it provides no analysis.

➢  *Second*, it fails to demonstrate that it engaged in an "independent assessment of the merits" or the "equitable factors."  Again, there is *no* analysis except for Judge Phipps dissent that found the Board failed to demonstrate "irreparable harm."

➢  *Third*, it fails to "evaluate any factual conflicts or difficult questions of law."  Again, it makes *no* findings except for Judge Phipps' dissent.

➢  *Finally*, it appears to give deference to the Board, which *McKinney* explicitly prohibits.

In short, the Order does not engage in the exacting review required by *McKinney* or *Delaware State Sportsmen's.*

The flaws in the Order are also highlighted by District Judge Cathy Bissoon's

opinion denying the Board's request for 10(j) relief under the *same* facts concerning the Guild's sister-unions (the Advertisers, Mailers, and Pressmen). Specifically, Judge Bissoon found that the Board could not establish a "likelihood of success on the merits." *Wilson for & o/b/o NLRB v. PG Publ'g Co., Inc.*, 2:24-CV-01166-CB, 2025 WL 509305, at *1 (W.D. Pa. Feb. 13, 2025). Judge Bissoon rejected the Board's "bad faith" bargaining and impasse arguments, holding:

> the Court finds that [the Post-Gazette] consistently made overtures to bargain regarding the terms and conditions of employment. … In contrast, the Court finds that the bargaining units thwarted bargaining efforts again and again. Indeed, at one point, Mr. Pass – presumably speaking on behalf of all the relevant unions – indicating that all bargaining would cease until COVID was over. … Mr. Pass somehow decided that the unions here would throw in the towel. It is difficult to reconcile Petitioner's assertions of bad faith with Mr. Pass's wholesale bargaining roadblock.

*Id.* at *3. Judge Bissoon assessed the impact of the very same March 22 letter sent on behalf of the Guild. Judge Bissoon's opinion was delivered after three days of live testimony and the independent assessment demanded by *McKinney*. The Order appears to reach the opposite conclusion without the benefit of live testimony.

D.    *En Banc* Review is Necessary to Determine the Appropriate Procedure Applicable to a Request for 10(e) Relief.

The Post-Gazette agrees with the Board that this Court has not addressed the standard applicable to a request for 10(e) relief. [*See* ECF No. 21 at p. 11]. Indeed, the motion is so rare that it does not appear that this Court has ever addressed a 10(e)

injunction.  Here, the Order requires injunctive relief without ***any*** independent fact finding *or* analysis of the Act.  Indeed, the Panel presumably relied on the procedural record and oral argument (primarily focused on the limited subject of "irreparable harm").

Considering this is a matter of first impression, and the procedural due process requirements handed down in *McKinney*, the circumstances of the Order raise significant issues for this Court and litigants:

> ➤ Pursuant to *McKinney*, a court facing a request for injunctive relief must make an *independent* analysis of the facts and law.  Based on this requirement, should the Court have ordered a fact-finding hearing (like a request for 10(j) injunctive relief)?  Based on *McKinney* the answer is: yes (under *some* circumstances).

> ➤ What (if any) reliance can the Court place on the administrative record and underlying administrative decisions?  Based on *McKinney*, the answer is: none.

*En banc* analysis is particularly important due to the risk of abuse by the Board.  Specifically, based on the lack of a standard in the Order, nothing will stop the Board from running to this Court for injunctive relief on many "run-of-the-mill" alleged violations of the Act.

## IV.   <u>CONCLUSION</u>

The Order is ripe for *en banc* review because it conflicts with Third Circuit and Supreme Court precedent.  The Order is also ripe because the Panel failed to hand down the procedural posture appropriate for such an "extraordinary" remedy.

4930-8927-6208.1 / 105601.1009

Respectfully submitted,

*s/ Brian M. Hentosz*
Brian M. Hentosz, Bar No. 317176
bhentosz@littler.com
Morgan S. Dull, Bar No. 322712
bhentosz@littler.com
LITTLER MENDELSON, P.C.
One PPG Place, Suite 2400
Pittsburgh, PA  15222
Telephone:  412.201.7676
Facsimile:   412.291.1241

*Attorneys for Petitioner/Cross-*
Date: April 7, 2025     *Respondent, PG Publishing Co., Inc.*

16

**CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH
TYPE-VOLUME LIMITATION AND TYPEFACE
REQUIREMENTS, AND VIRUS CHECK**

I, Brian M. Hentosz, counsel for PG Publishing Co., Inc., certify, pursuant to

Local Appellate Rule 28.3(d) that I am a member in good standing of the Bar of the

Court of Appeals for the Third Circuit.  I further certify pursuant to Fed. R. App. P.

32(g) that this document complies with the word limit of Fed. R. App. P. 27(d)(2)

because the foregoing document contains 3,722 words (not counting portions

excluded from the word count by Rule 32(f)), and this document complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements

of Fed. R. App. P. 32(a)(6) because the document is proportionately spaced and has

a typeface of 14-point Times New Roman.  I further certify that the text of the

document is identical to the text of the paper copies.  I further certify, pursuant to

Local Appellate Rule 31.1(c), that Windows Defender has been run on this Motion

before filing and that no virus was detected.


*s/ Brian M. Hentosz*

Date: April 7, 2025                          Brian M. Hentosz

## <u>CERTIFICATE OF SERVICE</u>

I, Brian M. Hentosz, counsel for Petitioner/Cross-Respondent PG Publishing

Co., Inc. certify that on April 7, 2025, I filed the foregoing Petition for Panel

Rehearing and Rehearing *en banc* via the Court's CM/ECF system, causing a Notice

of Docket Activity and a copy of the filing to be served upon the following counsel

of record who are registered CM/ECF users:

Ruth E. Burdick
David A. Seid
Milakshmi V. Rajapakse
Meredith Jason
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
ruth.burdick@nlrb.gov
david.seid@nlrb.gov
milakshmi.rajapakse@nlrb.gov
meredith.jason@nlrb.gov

Joseph J. Pass
Patrick K. Lemon
219 Fort Pitt Boulevard
Pittsburgh, PA 15222
jjp@jpilaw.com
pkl@jpilaw.com

Pursuant to Local R. App. P. 27.2 no paper copies of this motion will be filed

or served unless directed by the Clerk.

*s/ Brian M. Hentosz*

Date: April 7, 2025          Brian M. Hentosz