## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT
### Case Nos. 24-2788 and 24-3057

PG PUBLISHING CO., INC. d/b/a
PITTSBURGH POST-GAZETTE,

         Petitioner/Cross-
Respondent,

    v.

NATIONAL LABOR RELATIONS
BOARD,

         Respondent/Cross-
Petitioner,

    and

NEWSPAPER GUILD OF
PITTSBURGH/CWA LOCAL 38061,

      Intervenor.

## OPPOSITION TO THE
## MOTION FOR CIVIL CONTEMPT

Petitioner/Cross-Respondent PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette ("Post-Gazette" or the "Company"), submits this opposition to Respondent/Cross-Petitioner National Labor Relations Board's ("NLRB" or the "Board") emergency motion for civil contempt [ECF No. 80 ("Motion")].

## I.     INTRODUCTION

In its Motion, the NLRB asserts that the Post-Gazette should be held in civil contempt because the Company has not *restored* healthcare coverage through the Employment Partners Benefits Fund ("Fund") for employees represented by the Intervenor Newspaper Guild of Pittsburgh/CWA Local 38061 ("Guild") since this Court's March 24, 2025 injunction order ("Order").   The Board asserts that the Post-Gazette is required to re-instate the Guild-represented employees to the Fund at: (1) the contribution levels called for under the Guild and Company's collective bargaining agreement that expired in 2017 ("Agreement"), *rather than* the contribution levels in place on July 26, 2020[1], and (2) be bound to the Fund's participation agreement/trust agreement, despite the Company *never* signing the participation agreement or being bound by the trust agreement.   [*See* ECF No. 80 at pp. 7-8; attachments M, O, Q].

The Motion is inappropriate because the Order *does not* require restoration of healthcare coverage through the Fund.   Instead, the Order requires the Post-Gazette to (1) rescind its July 27, 2020 unilateral change concerning "health

---

[1]     The Post-Gazette anticipates that the NLRB may argue that a return to the contribution levels under the Agreement is appropriate because of this Court's decision in *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308 (3d Cir. 2021) concerning an arbitration award.   The case, however, is irrelevant because the arbitration award was not enforced until 16 months *after* the Post-Gazette declared impasse.

insurance," and (2) bargain with the Guild before implementing any changes to terms and conditions of employment.  [ECF No. 57].  There is no language in the Order requiring *restoration* of coverage through the Fund.  [*See Id*.].

Further, the NLRB makes numerous inexcusable omissions and material misrepresentations concerning the Post-Gazette's willingness to bargain over the conditions for re-instatement of coverage through the Fund under the terms and conditions in place on *July 26, 2020*.  Glaringly, the NLRB failed to disclose to the Court that the Fund *refuses* to provide coverage under the "status quo" in effect at the time of the Post-Gazette's implementation of its healthcare bargaining proposal.  The NLRB's argument is also contrary to its *own* decision, which set contribution levels to the Fund.

## II.    RELEVANT BACKGROUND

A.    The Post-Gazette's Historical Contributions to the Fund.

Under the Agreement, represented employees could receive healthcare coverage through the Fund.  [Richard C. Lowe, Esq. Declaration at ¶¶ 6, 9 (Lowe Decl.")].    The Agreement provided specific rates for the Post-Gazette's contributions into the Fund for calendar years 2015, 2016, and 2017.  [*Id.* at ¶ 10].  The Agreement contained no provisions for contribution rate increases after 2017.  [*Id.* at ¶ 11].

In the Fall of 2017, the Fund announced a unilateral 5% contribution rate

increase, effective January 2018. [Lowe Decl. at ¶ 12]. The Post-Gazette refused to pay the increase because the Agreement included no language supporting it. [*Id.* at ¶ 13]. In response, the Guild filed an unfair labor practice charge alleging that the Company's refusal to pay the 5% increase violated the National Labor Relations Act ("Act"). [*Id.* at ¶ 14]. An administrative complaint was issued, which culminated in the Board's decision in *PG Publishing Co., Inc. d/b/a/ Pittsburgh Post-Gazette and Newspaper Guild of Pittsburgh, a/w Communications Workers of America, AFL-CIO, et al.*, 368 NLRB No. 41 (Aug. 22, 2019), which held the Company was not obligated to increase contribution rates stating:

> We first find that the [Post-Gazette] did not abrogate any contractual duty to increase Fund contributions for the Newspaper Guild and Operating Engineers unit employees after 2017. The continuing agreements covering these units established a baseline contribution for 2015 and required the [Post-Gazette] to pay contribution increases for 2016 and 2017 only. They made no provision for any additional increases in subsequent years. Thus, the [Post-Gazette] was not obligated to comply with the Fund's contribution-increase request for 2018.

*Id.* at *4.

Thereafter, the Post-Gazette continued to contribute to the Fund at the rate called for in the Agreement. [Lowe Decl. at ¶ 12]. However, the Fund and the Guild unilaterally agreed that Guild-represented employees would receive different benefit levels *after* 2017. [*Id*. at ¶ 16]. The health plan provided to the Guild-

represented employees in July 2020 was fundamentally different than what was in place during the Agreement in that the deductibles were substantially higher than in 2017. [*Id.*]. The Post-Gazette contributions continued at the 2017 rate and these higher deductibles were in place when the Company declared a bargaining impasse on July 27, 2020, and transitioned the Guild-represented employees from the Fund to the Company's healthcare plan (which covers approximately 73 bargaining unit employees at the Post-Gazette and approximately 2,300 other employees).[2] [*Id.* at ¶¶ 16-17].

 B. <u>The NLRB Proceedings</u>.

On April 27, 2022, the NLRB issued an administrative complaint alleging that the Post-Gazette bargained in bad faith and unlawfully declared a bargaining impasse. On January 26, 2023, ALJ Carter issued his decision finding that the Post-Gazette bargained in bad faith because "[a]n inference of bad faith is appropriate when the employer's proposals, taken a [*sic*] whole, would leave the union … with substantially fewer rights than provided by law without a contract."

---

[2] The NLRB asserts in its Motion that the Post-Gazette "could alter or discontinue [its healthcare plan] at any time." [ECF No. 80 at p. 3]. This is false. The Post-Gazette *only* implemented its healthcare plan, any changes to the plan would trigger a bargaining requirement. In fact, since the transition to the Post-Gazette's healthcare plan after July 27, 2020, the Post-Gazette has not made any unilateral changes to its plan and the Post-Gazette bargained with the Guild anytime there have been changes to the plan. [Lowe Decl. at ¶ 18]. The Guild rejected the proposed changes, and the Company kept the implemented levels at the July 27, 2020 terms. [*Id.*].

4929-6097-5681.1 / 105601.1009

[JA0028-0029]. With respect to the impasse allegations, ALJ Carter found that "the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices." [JA0031]. Additionally, ALJ Carter found that the parties had not met to discuss the Post-Gazette's Final Offer before the Company declared an impasse. [*Id.;* JA0032-0033].

On September 20, 2024, the Board adopted ALJ Carter's decision in a two-page opinion ("Board Order"). The Board agreed that the Post-Gazette violated the Act because it "insisted on provisions that left the Union with fewer rights and less protection than provided by law without a contract." [JA0051-JA0078]. The Board also endorsed ALJ Carter's impasse analysis. *[Id.].* With respect to healthcare coverage, the Board ordered the Post-Gazette to

> (c) On request by the Union, rescind the changes in the terms and conditions of employment for its unit employees that were unilaterally implemented on about July 27, 2020.
>
> (d) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit described above.

[*Id.*]. The Board Order *does not* contain a restoration requirement. [*See Id.*].

C.   This Court's Order.

6

On March 24, 2025, the Court issued its Order granting in part, and denying in part, the Board's request for injunctive relief.  [ECF No. 57].  Specifically, the Court ordered the Post-Gazette to bargain with the Guild and:

> (c)    On request by the Union, rescind the changes in the terms and conditions of employment related to health insurance for its unit employees that were unilaterally implemented on about July 27, 2020.

> (d)    Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit …

[*Id.*].    All other aspects of the NLRB's request for injunctive relief were "DENIED."  [*Id.*].

In response, the Post-Gazette filed a Motion for Clarification [ECF No. 59] and Petition for *En Banc* Review [ECF No. 62].  The Court denied both requests, without explanation.  [*See* ECF No. 69].

D.    <u>The Fund Changes its Trust Agreement</u>.

On January 1, 2022, the Fund amended its trust agreement requirements as follows:

> WHEREAS, each such Local Union, hereinafter called "Union," and each such employer, hereinafter called "Employer," which has notice of the terms of this Trust Agreement and by course of conduct has caused this benefit fund to provide benefit coverage to employees, is deemed to accept and be bound by this Agreement And

7

> Declaration Of Trust, including all rules, procedures, and provisions hereof shall be deemed a party to this Agreement And Declaration Of Trust.

[Lowe Decl. at ¶ 19]. Further:

> All employers who contribute to the EPB Fund pursuant to collective bargaining agreements are considered to be participating employers and are bound by the terms of this Trust Agreement regardless of whether they have executed a Participation Agreement.

[*Id.*].

In essence, any administrative act or other conduct by an employer in processing its employees' healthcare through the Fund would have the same legal effect as signing a participation agreement. The significance of this is that a signatory to a participation agreement relinquishes their control over healthcare costs and benefits to the trustees. Prior to the Post-Gazette's implementation of its healthcare plan in July 2020, the Fund *never* had such authority because the Company *never* signed a participation agreement, trust agreement, or any other agreement with the Fund. [Lowe Decl. at ¶ 20].

In order to preserve the status quo which existed before the Post-Gazette implemented some of its proposals on July 27, 2020, the Post-Gazette informed the Fund on May 9, 2025 that the Post-Gazette was willing to agree to the following language:

> The Fund agrees the employer is not a party to any Participation Agreement, Trust Agreement or any other agreement with the Fund. The employer's notice of the

8

> terms of the Trust Agreement and any course of conduct by the employer that is caused by the Fund to provide benefit coverage to employees, shall not be deemed an acceptance by the employer of any Trust Agreement, including all rules, procedures, and provisions thereof; Participation Agreement; or any other agreement with the Fund.

[Lowe Decl. at ¶ 31].

The NLRB failed to disclose to the Court in its Motion that the Fund rejected the Post-Gazette's proposed language. [Lowe Decl. at ¶ 32]. Because any administrative act or other conduct by an employer in participating in the Fund has the same legal effect as signing a participation agreement, the NLRB deliberately misleads the Court by stating the Fund was not requiring the Post-Gazette to sign any participation agreement to participate in the Fund. The NLRB's assertion that a signed participation agreement was not necessary for participation in the Fund not only misleads the Court into believing there were no legal impediments for the Post-Gazette to again participate in the Fund but also masks the material fact that the 2022 Trust Agreement Amendment would have the same effect on the Post-Gazette as if it signed a participation agreement.

E.    The Parties' Actions Since the Order.

The NLRB's summary of the parties' post-Order conduct contains glaring material omissions and misstatements. The chart below provides the full context of the parties and the Fund's actions:

9

| Date | Action |
|------|--------|
| March 26, 2025 | The Guild demanded the Post-Gazette rescind the Company's healthcare plan and reinstitute the Fund under the plan in place during the Agreement and, implicitly, be bound by the Fund's Participation Agreement. [Lowe Decl. at ¶ 21]. |
| March 27, 2025 | The Post-Gazette invited the Guild to engage in "strike settlement" discussions. [Lowe Decl. at ¶ 22]. In its letter the Post-Gazette noted that the Company "and four (4) other unions at the Newspaper each reached a Labor Dispute Settlement Agreement … which settled its strike against the Company on an amicable basis. … The Agreements are fair to both parties" and were approved by an administrative law judge. [*Id.*]. |
| March 28, 2025 | The Post-Gazette offered to engage in "effects bargaining" over the Order and contract negotiations with the Guild. [Lowe Decl. at ¶ 23]. |
| March 31, 2025 | The Guild responded and refused to engage in (1) "strike settlement" discussions, and (2) effects bargaining. [Lowe Decl. at ¶ 24]. Instead, the Guild stated it would be "seeking sanctions" against the Company.[3] [*Id.*]. |
| April 9, 2025 | The Guild instructed the Post-Gazette that "employees actively employed will remain covered by the inferior benefits unilaterally implemented until the benefits set forth in the [Agreement] which are provided by the [Fund] are reinstituted." [Lowe Decl. at ¶ 25]. The Post-Gazette agreed. [*Id.*].<br><br>The Guild also requested census information for the bargaining unit employees so that premium levels could be established by the Fund and that the Company provided this information to the Guild on April 23, 2025. [Lowe Decl. at ¶ 26]. The Guild provided this information to the Fund. [*Id.*].<br><br>The NLRB failed to disclose this material fact along with falsely representing the Fund received no information from the Post-Gazette to determine employee eligibility for coverage. |

---

[3]    The Post-Gazette and Guild engaged in contract bargaining on June 5, 2025. [Lowe Decl. at ¶ 33]. A summary of the Guild's puzzling behavior is set forth in the Post-Gazette's June 20, 2025 compliance letter. [*Id.* at ¶ 34].

| | |
|---|---|
| April 24, 2025 | The Fund's counsel sent a letter to the Post-Gazette stating: "The Post-Gazette will need to enter into an agreement with the fund, just as all other contributing employers are required to, obligating the Post-Gazette to submit contributions to the Fund at the rates set by the Trustees for the level of coverage provided to the Post-Gazette's Union employees." [Lowe Decl. at ¶ 27]. |
| April 28, 2025 | In response to the Fund's demand that the Post-Gazette enter into a participation agreement, the Post-Gazette again offered to engage in "effects bargaining" with the Guild because:<br><br>As you know, the Company was never obligated to sign a Participation Agreement to participate in the Fund or any other type of agreement with the Fund as a condition of participation as a contributing employer. Moreover, several NLRB Administrative Law Judges have ruled that the Company is not legally required to sign a Participation Agreement in order to participate in a Taft-Hartley health and welfare fund, such as the Fund.<br><br>[Lowe Decl. at ¶ 28]. |
| April 30, 2025 | The Guild responded that "your argument that the Post-Gazette was never obligated to sign a participation agreement or any other type of agreement is of no consequence" and again refused to bargain. [Lowe Decl. at ¶ 29]. |
| May 5, 2025 | The Post-Gazette wrote to the Fund and requested:<br><br>[T]he 9PG 2000/4000 plan design which the Fund had in place immediately before the Guild participants were moved to coverage under the Company's Plan. Also provide the premium costs the Fund is proposing to charge for participation in the Plan design.<br><br>*    *    * |

| | |
|---|---|
| | For your information, the Post-Gazette has never been a signatory to any Participation Agreement or other agreement with the Fund as a condition for participation.<br><br>[Lowe Decl. at ¶ 30] |
| May 9, 2025 | The Post-Gazette wrote to the Fund and again requested the "9PG 2000/4000 plan design which the Fund had in place immediately before the Guild participants were moved to coverage under the Company's Plan." [Lowe Decl. at ¶ 31]. The Post-Gazette also noted again that the Company "has never been a signatory to any Participation Agreement or other agreement with the Fund" and proposed the Company and Fund enter into the following agreement:<br><br>The Fund agrees the employer is not a party to any Participation Agreement, Trust Agreement or any other agreement with the Fund. The employer's notice of the terms of the Trust Agreement and any course of conduct by the employer that is caused by the Fund to provide benefit coverage to employees, shall not be deemed an acceptance by the employer of any Trust Agreement, including all rules, procedures, and provisions thereof; Participation Agreement; or any other agreement with the Fund.<br><br>*    *    *<br><br>This will maintain the status quo which existed prior to the implementation of the Company's healthcare plan in July 2020.<br><br>[Lowe Decl. at ¶ 31]. |

4929-6097-5681.1 / 105601.1009

| | |
|---|---|
| May 28, 2025 | The Fund responded to the Post-Gazette, rejecting its request for the "9PG 2000/4000 plan design" and the Company's proposed language, stating:<br><br>    After receiving your May 9, 2025 letter, Nancy Wilson from the National Labor Relations Board [Regional Director] reached out to me to discuss the coverage to be obtained by the Post-Gazette for the Union members. It was confirmed that the NLRB's position is that the coverage to be offered should match what was set forth in the 2013-2017 CBA. This coverage included deductibles of $850/$1,700.<br><br>           *     *     *<br><br>    The Fund will also not agree to the written understanding you proposed in your May 9, 2025 letter.<br><br>[Lowe Decl. at ¶ 32]. |

To summarize, the NLRB failed to disclose to the Court several material facts including: (1) the Fund's participation agreement requirement and the legal effect of its 2022 Trust Agreement Amendment; (2) the Fund's refusal to provide coverage under the terms in place in July 2020 (and the Regional Director's efforts concerning the same); (3) the Guild's demand that the Post-Gazette continue coverage under the Company's healthcare;   (4) the Post-Gazette's multiple

attempts to obtain coverage through the Fund; and (5) the Guild's refusal to bargain.[4]

### III.    ARGUMENT

"A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009). "Where there is ground to doubt the wrongfulness of the conduct, [the party] should not be adjudged in contempt." *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994). Any "ambiguities must be resolved in favor of the party charged with contempt." *U.S. For Use and Benefit of Salvino Steel & Iron Works, Inc. v. Safeco Ins. Co. of Am.*, 181 Fed.Appx. 247, 251 (3d Cir. 2006). A "contempt decree should not be granted if there is a ground to doubt the wrongfulness of the defendant's conduct." *Id.* at 252.

### A.    The Post-Gazette is in Compliance with the Order.

The Order requires the Post-Gazette to (1) rescind the Company's healthcare plan, and (2) bargain with the Guild. [*See* ECF No. 57]. The Post-Gazette did just

---

[4]    The NLRB complains that the Post-Gazette did not respond to questions from the Regional Director. [ECF No. 80 at p. 8]. The Regional Director, however, is the prosecuting official in this case and a non-lawyer. Communicating directly with her violates the ethical rules for attorneys. The Post-Gazette complied with the Order by submitting the required status reports.

that – the Company (1) offered to bargain with the Guild over healthcare coverage (amongst other topics), and (2) adhered to the Guild's instruction to keep the Company's healthcare plan in place for non-striking bargaining unit employees until an alternative plan is in place.  [Lowe Decl. at ¶¶ 22-25, 28-29].

The NLRB appears to believe the Order requires the Post-Gazette to *restore* coverage through the Fund.  However, the word *restore* is absent from this Court's Order.  [*See* ECF No. 57].  Significantly, the Court's Order specifically lists the paragraphs in the Board's Order applicable to its Order, and in relevant part, it modified paragraph 2(c) to address only healthcare – if the Court intended to Order restoration it would have done so in this modified paragraph. [*See Id.*]. Likewise, the NLRB's proposed order in support of its motion for injunctive relief *did not* request restoration of coverage through the Fund.  [*See* ECF No. 21].  Nor does the Board's Order call for such a remedy.[5]   Therefore, the NLRB's demand for *restoration* is not supported by the Order.

B.    <u>Insofar as the Order Requires More than the Post-Gazette has Done, the Order Fails to Put the Company on Notice of the Conduct Enjoined</u>.

---

[5]    This Court's Order and the Board Order make sense because there is no way to compel the Fund – a third party, to agree to allowing the Post-Gazette to participate in the manner it did on July 26, 2020.  It is logical that the Fund can impose different terms and conditions because approximately five (5) years have passed since the implementation.  As such, there is a recognition that re-creating the "status quo" may be impossible.

"The Supreme Court has held that persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct." *Harris v. City of Philadelphia*, 47 F.3d 1342, 1349 (3d Cir. 1995). This Court holds that:

> In order to cite a person for contempt for violating a court order, two principles, each a corollary of the other, must, among other requirements, be established. The first of these is that it must be proved that the alleged contemnor had knowledge of the order which he is said to have violated. The corollary of this proposition is that the order which is said to have been violated must be specific and definite.

*Id.* at 1350. Further, this Court has explained that: "An order may be so vague or indefinite that, even though the alleged contemnor is chargeable with knowledge of such order, he cannot be punished for doing what he did in view of lack of certainty as to what it prohibited or directed." *Id.* Insofar as the Order requires *restoration*, the term is not set forth in the Order, the NLRB's proposed order, or the Board Order. As such, sanctions or contempt is inappropriate.

C.     The NLRB's Position Does Not Represent the "Status Quo."

The NLRB's asserts that the Post-Gazette must re-instate the contribution levels called for under the Agreement and submit to the Fund's participation agreement/trust agreement. [*See* ECF No. 80 at pp. 7-8; attachments M, O, Q]. However, this was not the "status quo" in place on July 26, 2020, when the Fund provided the "9PG 2000/4000 plan design" and permitted the Post-Gazette to

16

contribute without being subject to the participation agreement or the trust agreement. Indeed, the NLRB's position is contrary to the Board's decision in *PG Publishing Co.,* 368 NLRB No. 41 (Aug. 22, 2019).

D.    Restoration of the "Status Quo" is an Impossibility.

This Circuit recognizes that a party may not be held in contempt where compliance with a court order is an impossibility. *See Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 (3d Cir. 1995) ("a contemnor may assert a present inability to comply with the order in question as a defense in a civil contempt proceeding"); *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 590–91 (3d Cir. 2010) ("a tribunal that concludes that contempt is excused on grounds of impossibility is essentially declaring that the defendant was incapable of compliance in spite of his or her best efforts. Substantial compliance evokes a standard somewhat less demanding"). That is the precise situation raised by the Fund. The Fund refuses to provide "the 9PG 2000/4000 plan design," which was in effect at that time of the Post-Gazette's implementation. [Lowe Decl. at ¶¶ 31-32]. Further, the Fund refuses to accept the status quo which existed before July 27, 2020 where the Post-Gazette was not subject to a participation agreement or the legal effects of its mere participation in the Fund as a result of the amendments to the January 1, 2022 Trust Agreement.

Board law involving the Post-Gazette is clear that a party may not be compelled to agree to a participation agreement. In fact, the Board has held that the Post-Gazette bargained in "good faith" on healthcare issues where it objected to a union's proposal that the Company agree to be bound by a participation agreement.[6]

Therefore, restoration of the "status quo" is an impossibility.

E.    The NLRB's Request for Contempt Without an Opportunity of Notice and Hearing Does Not Meet Due Process Requirements.

"Due process requires that a potential contemnor be given notice and a hearing regardless of whether the contempt is civil or criminal in nature." *Newton v. A.C. & S. Inc.*, 918 F.2d 1121, 1127 (3d Cir. 1990). "These customary procedural safeguards ensure that the parties or their attorneys have an opportunity to explain the conduct deemed deficient before the fine is imposed and that a record will be available to facilitate appellate review." *Id.* (party could not be held in civil contempt without being afforded due process rights of adequate notice and

---

[6]    *See Pg Publ'g Co., Inc. d/b/a Pittsburgh Post-Gazette & Pittsburgh Newspaper Printing Pressmens/paperhandlers Loc. Union No. 9n, a/w the Graphic Commc'ns Conf./international Bhd. of Teamsters Loc. 24m/9n*, No. 06-CA-259157, 2024 WL 5246001 (Dec. 27, 2024); *Pg Publ'g Co., Inc. d/b/a Pittsburgh Post-Gazette & Pittsburgh Mailers Union No. M-22, a/w Media Workers Sector of the Commc'ns Workers of Am., Afl-Cio, & Its Loc. 14842*, No. JD-71-24, 2024 WL 4869056 (Nov. 19, 2024); *Pg Publ'g Co., Inc. d/b/a Pittsburgh Post Gazette & Pittsburgh Typographical Union No. 7, a/w the Commc'ns Workers of Am., Afl-Cio, & Its Loc. 14827,* No. JD-41-24, 2024 WL 3355062 (July 9, 2024).

prior hearing); *see also Roe v. Operation Rescue*, 920 F.2d 213, 217 (3d Cir. 1990)

("Due process generally requires an opportunity granted at a meaningful time and

in a meaningful manner for a hearing appropriate to the nature of the case").  Here,

a contempt order is not appropriate because the Post-Gazette has not had an

opportunity to present evidence and argument demonstrating its understanding and

attempts to comply with the Order.

V.   CONCLUSION

The Motion should be denied.

Respectfully submitted
this 27th day of June 2025.

*/s/ Brian M. Hentosz*
Brian M. Hentosz (PA ID No. 317176)
bhentosz@littler.com
Morgan S. Dull (PA ID No. 322712)
mdull@littler.com

LITTLER MENDELSON, P.C.
One PPG Place, Suite 2400
Pittsburgh, PA 15222
Tel:  412.201.7676 / 7622
Fax: 412.291.1241

*Counsel for Petitioner/Cross-*
*Respondent PG Publishing Co., Inc.*
*d/b/a Pittsburgh Post-Gazette*

4929-6097-5681.1 / 105601.1009

## CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

I, Brian M. Hentosz, counsel for Petitioner PG Publishing Co, Inc. d/b/a Pittsburgh Post-Gazette, certify, pursuant to Local Appellate Rule 28.3(d) that I am a member in good standing of the Bar of the Court of Appeals for the Third Circuit. I further certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5)-(7), and Local Appellate Rules 31.1(c) and 32.1(c), that the foregoing Petitioner's Opposition to the Motion for Civil Contempt is proportionately spaced and has a typeface of 14-point Times New Roman, contains 4,289 words (not counting those portions excluded from the word count by Rule 32(a)(7)(B)(iii)), and that the text of the electronic brief is identical to the text of the paper copies. I further certify, pursuant to Local Appellate Rule 31.1(c), that Windows Defender has been run on this Brief before filing and that no virus was detected.

Dated: June 27, 2025

*/s/ Brian M. Hentosz*
Brian M. Hentosz (PA No. 317176)
Morgan S. Dull (PA No. 322712)

*Counsel for Petitioner/Cross-Respondent PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of June 2025, I electronically filed the foregoing PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette's Opposition to the Motion for Civil Contempt with the Clerk for the United States Court of Appeals for the Third Circuit by using the CM/ECF system which will send notification of such filing to all parties of record.

*/s/ Brian M. Hentosz*
Brian M. Hentosz

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
Case Nos. 24-2788 and 24-3057**

PG PUBLISHING CO., INC. d/b/a
PITTSBURGH POST-GAZETTE,

        Petitioner/Cross-
Respondent,

    v.

NATIONAL LABOR RELATIONS
BOARD,

        Respondent/Cross-
Petitioner,

    and

NEWSPAPER GUILD OF
PITTSBURGH/CWA LOCAL 38061,

    Intervenor.

## DECLARATION OF RICHARD C. LOWE, ESQ.

I, Richard C. Lowe, Esq., do hereby swear, affirm, and attest as follows, based upon my personal knowledge of the matters contained herein:

### BACKGROUND

1.     I am a partner with the law firm King & Ballow.  My office is located in Nashville, Tennessee.

2.    I have been a partner with King & Ballow since 1982 and have been practicing law for approximately 48 years.

3.    My practice is primarily dedicated to labor and employment law, including labor negotiations and practice before the National Labor Relations Board ("NLRB" or the "Board")).

4.    For the past 8 years, I have represented Respondent Pittsburgh Post-Gazette ("Post-Gazette" or the "Company") with respect to its labor relations matters.

5.    I represent the Post-Gazette with respect to labor negotiations with the Intervenor Newspaper Guild of Pittsburgh/CWA Local 38061 ("Guild").

6.    The Post-Gazette and the Guild were parties to a collective bargaining agreement ("Agreement") that expired on March 31, 2017.  A true and correct copy of the Agreement is attached at Ex. 1.

7.    Prior to the Agreement's expiration, the Post-Gazette and the Guild began negotiating a successor agreement.

8.    To date, the parties have not reached a successor collective bargaining agreement.

## HEALTHCARE CONTRIBUTIONS

9.    Under the Agreement, represented employees could receive healthcare coverage through the Employment Partners Benefits Fund ("Fund").

10.    The Agreement provided specific rates for the Post-Gazette's contributions into the Fund for calendar years 2015, 2016, and 2017.

11.    The Agreement contained no provisions for contribution rate increases after 2017.

12.    In the Fall of 2017, the Fund announced a unilateral 5% contribution rate increase, effective January 2018.

13.    The Post-Gazette refused to pay the increase because the Agreement included no language supporting it.

14.    In response, the Guild filed an unfair labor practice charge alleging that the Company's refusal to pay the 5% increase violated the National Labor Relations Act.  An administrative complaint was issued, which culminated in the Board's decision in *PG Publishing Co., Inc. d/b/a/ Pittsburgh Post-Gazette and Newspaper Guild of Pittsburgh, a/w Communications Workers of America, AFL-CIO, et al.*, 368 NLRB No. 41 (Aug. 22, 2019).

15.    On July 27, 2020, the Post-Gazette declared a bargaining impasse and transitioned the Guild-represented employees to the Company's healthcare plan. Between the expiration of the Agreement and the implementation on July 27, 2020, the Post-Gazette continued to contribute to the Fund at the rate called for in the Agreement.

16.    The Fund and the Guild unilaterally agreed that Guild-represented employees would receive different benefit levels after 2017.  The health plan provided to the Guild-represented employees in July 2020 was fundamentally different than what was in place during the Agreement in that the prior deductibles were substantially higher than in 2017.  The health plan deductibles in July 2020 were $2000 for an individual and $4000 for a family. The July 2020 plan was referred to as the "9PG 2000/4000 plan".

17.    The Post-Gazette's healthcare plan currently covers approximately 2,300 employees, including approximately 73 Guild-represented employees.

18.    Since transitioning the Guild-represented employees to the Company's healthcare plan, the Post-Gazette has not made any unilateral changes to its plan. The Post-Gazette has bargained with the Guild anytime there have been changes to the plan.  The Guild rejected the proposed changes, and the Company kept the implemented levels at the July 27, 2020 terms.

<u>CHANGES TO THE FUND'S TRUST AGREEMENT</u>

19.    On January 1, 2022, the Fund amended its trust agreement.  A true and correct copy of the Fund's amended trust agreement is attached at Ex. 2.

20.    Prior to the Post-Gazette's implementation of its healthcare plan in July 2020, the Company was never a signatory to the Fund's participation agreement, trust agreement, or any other agreement with the Fund.

## THE PARTIES' ACTIONS SINCE THE COURT'S MARCH 24, 2025 ORDER

21.    Ex. 3 is a true and correct copy of a letter from the Guild's counsel to the Post-Gazette.  The letter is dated March 26, 2025.

22.    Ex. 4 is a true and correct copy of a letter from myself, in my capacity as the Post-Gazette's counsel, to the Guild inviting the Guild to participate in "strike settlement" discussions.  The letter is dated March 27, 2025.

23.    Ex. 5 is a true and correct copy of a is a true and correct copy of a letter from myself, in my capacity as the Post-Gazette's counsel, to the Guild inviting the Guild to participate in "effects bargaining" discussions.  The letter is dated March 27, 2025.

24.    Ex. 6 is a true and correct copy of a letter from the Guild's counsel to the Post-Gazette.  The letter is dated March 31, 2025.

25.    Ex. 7 is a true and correct copy of a letter from the Guild's counsel to the Post-Gazette.  The letter is dated April 9, 2025.  The letter instructs the Post-Gazette that "employees actively employed will remain covered by the inferior benefits unilaterally implemented until the benefits set forth in the [Agreement] which are provided by the [Fund] are reinstated."  The Post-Gazette agreed to this instruction.

26.    The April 9, 2025 letter from the Guild's counsel (Ex. 7) also requested census information for the bargaining unit employees so that premium levels could

be established by the Fund.  The Company provided this information to the Guild on April 23, 2025.  The Guild provided this information to the Fund.

27.    Ex. 8 is a true and correct copy of a letter from the Fund's counsel to the Post-Gazette.  The letter is dated April 24, 2025.  The letter states that the Post-Gazette will be bound by an agreement if it participates in the Fund.

28.    Ex. 9 is a true and correct copy of a letter from myself, in my capacity as the Post-Gazette's counsel, to the Guild inviting the Guild to participate in "effects bargaining" discussions concerning the Fund's requirement that the Company enter into an agreement with the Fund.  The letter is dated April 28, 2025.

29.    Ex. 10 is a true and correct copy of a letter from the Guild's counsel to the Post-Gazette.  The letter is dated April 30, 2025.  In the letter, the Guild refuses to engage in "effects bargaining" and states that the Post-Gazette's objection to the Fund's participation/trust agreement requirement "is of no consequence."

30.    Ex. 11 is a true and correct copy of a letter from myself, in my capacity as the Post-Gazette's counsel, to the Fund requesting the "9PG 2000/4000 plan design" and informing the Fund that the Company has never been a signatory to the participation agreement or any other agreement with the Fund.  The letter is dated May 5, 2025.

31.    Ex. 12 is a true and correct copy of a letter from myself, in my capacity as the Post-Gazette's counsel, to the Fund again requesting the "9PG 2000/4000 plan

design" and contains a proposed agreement for the Company and the Fund to contribute to the Fund. The letter is dated May 9, 2025.

32.    Ex. 13 is a true and correct copy of a letter from the Fund's counsel to the Post-Gazette. The letter is dated May 28, 2025. In the letter the Fund refuses to provide the "9PG 2000/4000 plan design" and rejects the Post-Gazette's proposed agreement to contribute to the Fund.

<u>CONTRACT BARGAINING</u>

33.    The Post-Gazette and Guild engaged in contract bargaining on June 5, 2025.

34.    Ex. 14 is a summary of the bargaining session and was provided to the NLRB as the Post-Gazette's June 20, 2025 compliance letter.

35.    I reserve the right to supplement the facts set forth in this declaration, as necessary.

**PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed in Nashville, Tennessee on this 27th day of June 2025.

Richard C. Lowe, Esq.

# EXHIBIT 1

2014 – 2017

AGREEMENT BETWEEN

PITTSBURGH POST-GAZETTE

AND

THE NEWSPAPER GUILD OF PITTSBURGH

Effective: October 15, 2014

Expires:     March 31, 2017

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Adjustment of Disputes | 25 |
| Advancement, Promotion and Transfer | 21 |
| Checkoff | 3 |
| Classifications, Wages and Schedules of Minimums | 4 |
| Expenses | 17 |
| Guild Shop | 3 |
| Health Care Grid | Exhibit A |
| Holidays | 21 |
| Hours | 9 |
| Insurance, Health and Welfare, Pensions | 30 |
| Internships, Two-Year Associates | 18 |
| Leaves of Absence | 24 |
| Management Rights | 37 |
| Memorandum of Understanding - Photo Reprints | 48 |
| Memorandum of Understanding - Stringer Try Outs | 49 |
| Memorandum of Understanding - Bonus Payments to Part-Timers | 45 |
| Memorandum of Understanding - Exempt Employees | 46 |
| Memorandum of Understanding - Holidays | 47 |
| Memorandum of Understanding - KDKA Gathering Agreement | 42 |
| Memorandum of Understanding - Part-Time Employees | 44 |
| Memorandum of Understanding - PG Speakers Bureau Policy | 43 |
| Memorandum of Understanding - Employees Working Above Class | 50 |
| Memorandum of Understanding - Freelance Work by Buyout Takers | 52 |
| Memorandum of Understanding - PG Plus 2-Year Associates | 51 |
| Military Service | 26 |
| Miscellaneous | 27 |
| Overtime | 10 |
| Part-time, Temporary Employees and Two-Year Associates | 11 |
| Preferential Re-Employment | 26 |
| Privilege Against Disclosure | 37 |
| Security | 13 |
| Severance Pay | 23 |
| Sick Leave | 12 |
| Statement of Policy | 40 |
| Term and Renewal | 38 |
| Vacations | 19 |
| Guild Employees 401 (k) Plan | 58 |

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this October 15, 2014, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

## EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

### Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 12, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than 30 percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have 42 employees excluded, provided that they qualify as management personnel.

Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees can do bargaining unit work as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.

D. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news according to the following guidelines:

1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.

2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.

3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.

4. Community Journalism initiatives

Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

The company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors and is not intended to displace bargaining unit work.

## ARTICLE I
### Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

    (a) Name, address, minority group, sex, date of birth and Social Security number.

    (b) Date of hire.

    (c) Classification.

    (d) Experience rating and experience anniversary date.

    (e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
### Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

3

## ASSIGNMENT AND AUTHORIZATION
## TO CHECKOFF GUILD MEMBERSHIP DUES
## INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature _____

Date _____


Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

RTICLE III
Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. **Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year:**

| Content Providers | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| 2% pension | | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| Net wages | | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| 10% Wage Diversion | | 88.30 | 90.55 | 103.68 | 108.29 | 111.23 | 114.89 |
| Wage after diversion | | 794.68 | 814.97 | 933.16 | 974.61 | 1001.07 | 1034.02 |

Provides original content for print and electronic publications and products.

| Content Editors/Producers | Effective Date Wage | 1st 6 Mo. 913.00 | 2nd 6 Mo. 987.00 | 2nd Year 1097.00 | 3rd Year 1145.00 | 4th Year 1186.96 |
|---|---|---|---|---|---|---|
| 2% pension | | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| Net wages | | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| 10% Wage Diversion | | 89.47 | 96.73 | 107.51 | 112.21 | 116.32 |
| Wage after diversion | | 805.27 | 870.53 | 967.55 | 1009.89 | 1046.90 |

Edits and produces original content for print and electronic publications, products, and slot.

| Assignment Editors | Effective Date Wage | 3rd Year 1125.00 | 4th Year 1145.00 | 5th Year 1203.68 |
|---|---|---|---|---|
| 2% pension | | 22.50 | 22.90 | 24.07 |
| Net wages | | 1102.50 | 1122.10 | 1179.61 |
| 10% Wage | | 110.25 | 112.21 | 117.96 |

5

|  | Diversion Wage after diversion | 992.25 | 1009.89 | 1061.65 |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| Librarian | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
|  | wage | 892.00 | 906.00 | 922.00 |
|  | 2% pension | 17.84 | 18.12 | 18.44 |
|  | Net wages | 874.16 | 887.88 | 903.56 |
|  | 10% Wage Diversion | 87.42 | 88.79 | 90.36 |
|  | Wage after diversion | 786.74 | 799.09 | 813.20 |

Provides newsroom, library and photo support as necessary.

| News Assistant | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
|  | wage | 747.00 | 767.00 | 787.00 |
|  | 2% pension | 14.94 | 15.34 | 15.74 |
|  | Net wages | 732.06 | 751.66 | 771.26 |
|  | 10% Wage Diversion | 73.21 | 75.17 | 77.13 |
|  | Wage after diversion | 658.85 | 676.49 | 694.13 |

Provides newsroom, library and photo support as necessary.

| Editorial Clerks Administrative | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
|  | wage | 670.00 | 688.00 | 703.00 | 712.00 |
|  | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
|  | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
|  | 10% Wage Diversion | 65.66 | 67.42 | 68.89 | 69.78 |
|  | Wage after diversion | 590.94 | 606.82 | 620.05 | 627.98 |

Provides newsroom support as necessary

| Copy Messengers | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
|  | wage | 561.00 | 566.00 | 571.00 | 576.00 |
|  | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
|  | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |

6

| | | | | |
|---|---|---|---|---|
| 10% Wage Diversion | 54.98 | 55.47 | 55.96 | 56.45 |
| Wage after diversion | 494.80 | 499.21 | 503.62 | 508.03 |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 10% Wage Diversion | 55.86 | 61.25 |
| | Wage after diversion | 502.74 | 551.25 |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 10% Wage Diversion | 50.18 | 51.65 | 53.12 |
| | Wage after diversion | 451.58 | 464.81 | 478.04 |

Performs various newsroom assignments as necessary

1. Employees shall receive a salary increase provided in the schedule of wage minimums or increases according to the following schedule of general increases, whichever is greater, but not both:

2. The above wage minimums and the general increase need not apply to salaries of those who are on retirement or who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.

3. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.

4. In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within forty-five (45) days from start of employment, adjustment, if any, will be made retroactive to the start of employment. If such question is raised after forty-five (45) days from start of employment, adjustment, if any, will be effective on the date the Guild brought the question to the attention of the Company.

5. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his

7

former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

6. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only; individual merit shall be acknowledged by increases above the minimums.

7. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

8. (a) Effective January 1, 1982, an employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ........................................................................ minimum salary
differential
Copy messenger to reporter/editor ........................................................... minimum salary
differential
News assistant, clerk to reporter/editor.................................................minimum salary
differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

**Effective upon ratification of this Contract, when no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.**

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) Effective January 1, 2003, the Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

9. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

8

10. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating or until the top minimum is reached.

11. Effective January 1, 2003, a one-time service bonus of $250 for all employees with 10 or more years of service. Thereafter, the bonus will be paid when an employee completes his/her 10th year of service. Effective January 1, 2004, a one-time service bonus of $500 for all employees with 20 or more years of service. Thereafter, the bonus will be paid when an employee completes his/her 20th year of service. As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.

## ARTICLE IV
### Hours

1. No employee eligible for Guild membership shall work more than eight (8) hours per day within a nine (9) consecutive hour period, nor more than five days per week with the following exceptions:

(a) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

(b) Additionally, full-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

9

2. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

3. Wherever possible, days off shall be consecutive days.

4. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

5. A differential of $3 per shift will be paid to an employee who begins his shift on or after 2 p.m. As of Jan. 1, 2007, all night differentials will be diverted to the Guild Pension Plan for the life of the current contract.

This shall apply only so long as the employee is assigned to such shifts.

6. Time spent by employees traveling to and from assignments shall be considered as part of the working day.

7. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

8. By arrangement with the Company, employees who elect to reduce their work week to fewer than 40 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

Case 2:24-cv-00305-LPL Document 39 Filed 02/14/20 Page 14 of 53

## ARTICLE V
### Overtime

1. Overtime shall be defined as work beyond 40 hours in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. **Overtime work must be approved in advance by the Company.**

2. Overtime beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. **By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.**

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half, but not less than a day's pay in addition to his regular weekly salary.

5. Overtime shall be reported in writing to the Company or its representative within ten days after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

## ARTICLE VI
### Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences.

3. It shall be a policy of the Company to pay part-time employees who average individually less than 20 hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees

11

may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

5. Part-time and, or temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

## ARTICLE VII
### Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company can request that an employee furnish a doctor's certificate or other reasonable proof when absent for three (3) consecutive days or more.

2. An employee shall receive a normal week's salary for a period of his or her incapacitation. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability
(a) Employees can accumulate the above eight days per year during their employment to a maximum of 90 days per year. Only unused days during the year will be carried over to the maximum of 90 days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of five (5) days or longer. This benefit will begin on the 6th work day of disability. The five days will constitute a waiting period.
All employees on the payroll on 1/1/07 will be provided an initial bank of 7 days short term disability pay per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.
(b) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at 60 percent of the employee's negotiated rate of pay for those employees with two years or more of service. Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.
(c) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment – 20 percent of

12

maximum short-term disability schedule; two years of uninterrupted employment — 40 percent of maximum short-term disability schedule; three years of uninterrupted employment — 60 percent of maximum short-term disability schedule; **four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment – 100 percent of maximum short-term disability schedule.**

The maximum regeneration under this program will be 70 days. Unused individual sick days will continue to be accumulated into the bank until the 90-day maximum is reached.

Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.

4. This program will become effective as of the date of ratification. Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.

5. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

6. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

7. Sick leave payments shall terminate upon termination of employment or death of the employee.

8. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

9. An employee cannot accrue sick leave or use sick leave benefits for any purpose other than illness or injury.

10. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

11. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

12. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.

## ARTICLE VIII
### Security

1. There shall be no discharge as a result of putting this Agreement into effect.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force, which latter shall be construed as synonymous with discharges for economy.

3. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes. The Company's right to determine the size of the force is recognized and the right to reduce the force for economy (either permanently or temporarily) shall not be subject to review by the Board of Arbitration, provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and free lancers in no case will replace or displace bargaining unit employees.

4. A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild thirty (30) days in advance that such layoffs are necessary and that no reasonable alternative exists.

B. The Company shall notify the Guild of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), number of employees per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above.

C. In the event such layoffs are necessary, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.

(2) Eliminate thirty (30%) percent of the stringer budget and all intern programs, temporary and probationary employees.

(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:

> I.   Content providers in Local News and Business
> II.  Content providers in Features and Editorial
> III. Content providers in Sports
> IV. Content providers and Editors in Photography/Multimedia/Art
> V.   Content Editors and Assigning Editors
> VI. Clerical/Librarians/News Assistants

14

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

(5) In the event of recall, the recall shall be in reverse order of layoff. Such recall rights will last 12 months from the date of the employee's layoff.

(6) The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

D. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

E. An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of three (3) months under the same conditions that applied when he/she was on the payroll. Also, for an additional three (3) months, the Company shall pay fifty (50%) percent of whatever premium or health and life insurance benefits being paid for full time employees, for those laid off employees.

F. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twenty-four (24 months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(c)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within two years of their date of disability shall

15

have their benefits and seniority terminated. Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within three years of their date of disability shall have their benefits and seniority terminated. Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

5. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

6. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two

16

weeks' pay in lieu of notice may be given by mutual agreement between the Company and the Guild.

(b) In the event of discharge for gross misconduct, or in the case of misconduct after notice has been given said employee may be laid off immediately.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

8. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

9. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

10. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes shall be afforded the opportunity to transfer to other available positions.

11. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

### ARTICLE IX
#### Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the **Pittsburgh** AAA gas rate on January 1, **April 1,** July 1, and **October 1**. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
## INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.
   a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.
   b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.
   c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

18

3. The Company may hire two-year associates under the following conditions:

    A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. **Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.**
    B. The period of employment cannot exceed 24 months and will not be renewed or extended.
    C. The Company may offer regular employment to associates at any time during their period of employment.
    D. Associates may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they are excluded from the following classifications: news assistant, clerk, and messenger.
    E. There will be no assignment restrictions
    F. No vacation bonuses will be paid by the Company to two-year associates.

## ARTICLE XI
### Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service; four (4) weeks for eight (8) continuous years of service and five (5) weeks for 23 continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers. The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.

Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

Effective January 1, 1994:

All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.

All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January 1 and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees eligible for 5 weeks of vacation must take at least one week prior to March 31. Also, all employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

9. With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:

Less than 3 complete years of service ................................................... 0
3 to 6 complete years of service ........................................... 1 week's pay
7 to 11 complete years of service ........................................ 2 weeks' pay
12 to 15 complete years of service ...................................... 3 weeks' pay
16 or more years of service ................................................. 4 weeks' pay

Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild Pension Plan for the current contract.

10. Employees shall receive a $25 bonus for each year of service. For every year after 15 years, the employee will receive an additional $25 bonus for each year or service. For example, an employee with 25 years of service will receive $875 (25 x $25 = $625 + $250 (10 x $25) = $875). Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.

## ARTICLE XII
### Holidays

1. The following holidays, or days observed as such, shall be granted to all employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. An employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. An employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and an employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, an employee will receive 6-1/4 days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week.

3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.

4. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.

## ARTICLE XIII
### Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill

21

such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher, or be given the option of accepting his severance pay.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above, excepting that he shall not have the option of accepting his severance pay.

22

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

## ARTICLE XIV
### Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment:
One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 52 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

23

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
### Leaves of Absence

1. By arrangement with the Company, employees may be granted leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time.

2. If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewGuild. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3.(a) Any employee who has had five continuous years in the employ of the Company without a leave of absence shall be given at the employee's request a leave of absence not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed three months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

24

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7.  (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8.  Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9.  The parties agree to comply with the Family and Medical Leave Act of 1993.  An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act.  The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

### ARTICLE XVI
### Adjustment of Disputes

1.  It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes.  Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings.  A grievance shall be defined as a dispute over an alleged violation of this agreement.

2.  In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor.  Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3.  In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the **VP Human Resources**/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4.  The **VP Human Resources**/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance.  If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first

25

meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

### ARTICLE XVII
### Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

### ARTICLE XVIII
### Preferential Re-Employment

1. When the Company makes discharges or layoffs other than for cause, such discharged or laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(6)) unless same is exhausted with respect to the general type of work for which an additional employee is desired.

2. Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when

26

discharged for reasons other than cause, upon the return of the regular employee from war service, or when any temporary employee enters the armed services.

3. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

4. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
### Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance photographers may be retained for photo and video assignments to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work.

5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.

6. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

7. No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work

stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this agreement.

8.   The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.

9.   The Guild shall be notified within 24 hours of all resignations tendered. Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.

10. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

11. Employees will be free to engage in any **paid or volunteer** activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, **and must receive advance approval for such activities.**

(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, **or other entities that may be a conflict of interest as determined by the Company.**

(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.

(D) The Company shall notify the Guild of its decision in these matters.

(E) **No Company equipment will be used for outside activities.**

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

12. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

13. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

14. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

15. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

28

(A) Name, address, minority group, sex, date of birth, and Social Security number.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

16. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

17. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

29

18. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

   B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

19. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

20.   The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

21.   The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

22.   The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:
   a.   That such coverage is permissible within the State of Pennsylvania.
   b.   The parties agree on the cost of the program.
   c.   That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

## ARTICLE XX
### Insurance, Health and Welfare, Pensions

1. The Company shall make available non-contributory Group Life Insurance with an agreed-upon plan and under the terms and conditions of a Master Policy which contains the following provisions:

   A. 90-day waiting period.

   B. Insurance of one times annual salary with a maximum of $50,000.

   C. Employees age 70 and above will have insurance of 65 percent of annual salary but not less than the minimum described in Paragraph B above.
   D. **Effective January 1, 2015, the above provisions will expire and life insurance for active employees will be provided through the Western Pennsylvania Teamsters and Employers Welfare fund.**

30

E. Employees at retirement will have $4,000 of paid-up life insurance. However, retiree life insurance shall not be provided to employees who retire on or after January 1, 2015.

2. The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly earnings; waiting period, 60 days; maximum number of weeks, 52.

3. Effective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses and eligible dependents as follows:

A. Active Employees

All provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 Contract shall remain in effect through December 31, 2014. See Exhibit A grid.

(1)    Effective January 1, 2015, all eligible bargaining unit employees will participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). Participation in the plan is limited to employees averaging annually more than 30 hours per week. See Exhibit B.

(2)    The required PG contributions for the calendar year 2015 will be $1,229 per month for participating full-time bargaining unit employees (regardless of family size) and regardless of the option chosen.

(3)    The PG contributions for years 2016 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month set forth above for calendar year 2015. Any such increases must be based upon the plan design effective January 1, 2015. The PG will receive from the Fund at least 60 days notice of any such annual contribution increase prior to January 1. Increases in excess of 5% will be the responsibility of the covered bargaining unit members via direct billings from the Fund. If direct billing is not available, the PG will only assume responsibility for any withholding of any additional amounts after receiving the expressed written consent of each member and will not assume any other responsibility for collection of any other amounts, or be liable for any other payment to the Fund, other than as stated above.

(4)    The WPA Fund will establish all applicable rules and operations, including treatment of out-of-network benefits and administration of all claims issues.

(5)    Required employee contributions, if any, will be deemed as employee contributions for health care and are not related in any way to any prior or future wage deferrals.

(6)    Effective with bargaining unit participation in the Fund, any and all other PG sponsored benefit plans will terminate, including medical/Rx, life/AD&D, vision, and

31

dental, except for the life insurance program described in Exhibit B (Retiree Health and Welfare Programs) and paragraph 7 below.

(7) For any active employee who opts out of participation in the Fund, they shall receive $100 per month. However, the Employer shall be obligated to pay the premium of the employee's life insurance coverage at the same benefit level that existed under the prior contract.

(8) For all new hires, there is a thirty (30) day waiting period for all insurance coverage under this agreement.

(9) Dental/Optical insurance will be provided for active employees and their dependents through the Fund

(10) Spouses of employees who die prior to retirement will be covered with their dependent children by the active employee health plan. The spouse will be required to pay 30% of the composite premium as a condition for obtaining coverage. This coverage will end at the earlier of: after five (5) years of participation, attainment of Medicare Eligibility; or remarriage. Coverage for eligible dependent children ends at their 19th birthday, or earlier if the spouse's coverage ends

(11) For surviving spouses, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the surviving spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the surviving spouse's health care insurance.

(12) Surviving spouses (under age 65 or not Medicare eligible) of employees who die after retirement will be covered by the active employee health plan. The spouse will be required to pay the same percentage of the composite premium as the retiree. This coverage will end at the earlier of: after five (5) years of participation, attainment of Medicare Eligibility, or remarriage Coverage for surviving spouses 65 and older will cease 60 days after the employee's death.

(13) For surviving spouses, retiree health care contributions should, if possible, be made through deductions from the employee's pension. If not, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the retiree of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the health care insurance.

A.B.                                    Retiree healthcare

1.      The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

2.      Future Retiree Medical and Life Benefits - Any and all retiree medical benefits will be terminated as of the effective date of the agreement for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

        (a)     Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

        (b)     For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

3.      Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

4.      Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

        (a)     a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or

        (b)     a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

5.      Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

33

(a)    a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

## MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b)    A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

## MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

6.    Other Conditions Related To These Programs

(a)    A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b)    A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c)   "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(a)(d)   The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e)   In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

(f)   If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g)   Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h)   If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i)   Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

(j)   The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k)   Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

7.  a. Benefit accruals for all participants in the pension plan remain frozen. Each Employee's service will continue to be credited according to the terms of the pension plan for purposes of vesting and benefit eligibility.

b. **Until June 30, 2015,** the Employer will make weekly pension contributions of $75.70/active member. **As a result of the establishment of the Guild Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70.** Additionally, each Employee will divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.

c. The Board of Trustees is authorized and directed to adopt the following long-term funding policy immediately. The Fund co-consultants will produce with the annual actuarial valuations a seven-year actuarial projections with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

- Projections will take into account only negotiated contributions.

- Use of the assumptions in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.

- No unanticipated actuarial gains or losses during the projection time period.

If the annual projection indicates any future funding deficiencies during the seven-year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the Post-Gazette is required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the Post-Gazette will receive a dollar for dollar credit towards the next subsequent plan year's contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies they shall take into account that these contribution credits will be taken as a reduction in the negotiated contributions in the next plan year.

d. **Effective as soon as administratively practical following ratification of this Contract, all defined benefit (DB) pension plans sponsored by the Post-Gazette (excluding Teamsters #211) will be merged.**

36

e. Any deadlocked Trustee motion relating to a reduction in benefits required under the Long Term Funding Policy in numbered paragraph 3 above as well as any dispute between the parties regarding the provisions of this agreement shall be arbitrated on an expedited basis, with the arbitration to take place not later than sixty (60) days following the Trustees' meeting at which the deadlock occurs or the date that one party advises the other of a dispute regarding the interpretation or application of this agreement.

Details of the pension plan status and its benefits are outlined in a separate document signed by the Company and the Guild.

## ARTICLE XXI
### Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine reasonable standards of production; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease any department, operation or service; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce new or improved research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

## ARTICLE XXIII
## Term and Renewal

1. This Agreement shall commence on the **October 15, 2014** and expire on the thirty-first day of March **2017.**

2. Not less than 60 days prior to the expiration of this Agreement either party desiring to open negotiations for a new Agreement shall submit its proposals for such new Agreement in writing to the other party. The respondent party, if it desires to file a counter proposal of the conditions it will seek to establish, shall do so at the earliest practicable date, but in any event not longer than thirty (30) days from receipt of notice by the moving party. In the absence of such statement within the prescribed time limit, the existing Agreement becomes automatically the proposal of the respondent party. The terms and conditions of this Agreement shall remain in effect as long as negotiations continue, but in the event a new Agreement is arrived at within four (4) months of the submission of the new proposal, all the terms and conditions of the new Agreement shall be retroactive to the date of the expiration of this Agreement.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: _____  Date: _____
Michael A Fuoco

38

By: _____          Date: 1-22-15
       Jonathan D. Silver


PG PUBLISHING COMPANY

By: _____          Date: 1/23/15
      Stephan B. Spolar, Vice President of Human Resources

## Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

## Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

## Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

### Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

### Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

### Miscellaneous

Entertainment — Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships — Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games — Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block, Publisher and Editor-in-Chief

41

## Memorandum of Understanding

This Memorandum of Understanding, made this 30th day of January, 1998, shall be incorporated into the Labor Agreement, effective January 1, 1998, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh. The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.
6. This MOU recognizes the jurisdiction agreement-which is pending-between AFTRA and KDKA

FOR THE POST-GAZETTE:          FOR THE GUILD:

__Raymond N. Burnett__          __Harry Tkach__

DATE: ___Feb. 5, 1998___          DATE: ___Feb. 5, 1998___

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY
(March 2, 1995)

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at $25. Appearances scheduled during the staff member's non-working hours will be compensated at $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to Barbara Bogucki, assistant to the editor, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

Staffers who have already made their own arrangements to speak before groups in the community before March 3, 1995 would be free to meet those commitments. However, they must notify the company about these arrangements right away

Staffers interested in participating in the Speakers' Bureau should contact Barbara and let her know that they would like to participate as soon as possible.

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the current labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Union agree that part-time employees (employees working no more than 30 hours per week) can work a five-hour shift at straight time over and above their normal work week. It is understood that the part-time employee is guaranteed five hours of pay when called in on his/her off day.

This Memorandum of Understanding does not change the overtime provisions of the contract or the past practice of employees (part time and full time) functioning as stringers outside of their normally assigned duties.

One of the purposes of this Memorandum of Understanding is to resolve the grievance over a part-time employee functioning as a stringer on his off day.

FOR THE POST-GAZETTE                        FOR THE GUILD

_____                     _____

Raymond N. Burnett                          Mike Bucsko

DATE:   3/12/03                             DATE:  3/12/03

44

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Guild agree as follows:

- For the purpose of paying the negotiated Vacation and Service bonuses, part-time employees will be treated the same as full-time employees.
- Paragraph C of the Preamble will be amended as follows, "To cover possible special cases the Publisher shall have the right to designate exemption from Article I – Guild Shop – certain employees at the time of their employment, but not more than one such employee will be on the payroll at any given time."
- The Guild will relinquish all jurisdiction over the work formerly performed by one clerk and one news assistant assigned to the department often referred to as PG Store/Information Products.
- The Guild will withdraw the grievance of January 30, 2003 over the Company's decision to pay proportionate bonuses to part-time employees.
- Part-time employees who have already received proportionate bonuses will be made whole.

FOR THE POST-GAZETTE                    FOR THE GUILD

_____                    _____
Raymond N. Burnett                         Mike Bucsko

DATE:   3/12/03                            DATE: 3/12/03

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:

- One of the provisions of the agreement pertaining to the 10 exempt employees who became members of the Newspaper Guild of Pittsburgh in 2002 was that they would remain in the pension plan for non-bargaining unit employees.
- Implicit in that agreement was the recognition that the 10 former exempt employees would not be eligible for the Guild pension.

FOR THE POST-GAZETTE                FOR THE GUILD

_____          _____

Raymond N. Burnett                        Mike Bucsko

DATE:   7/29/03                           DATE:   8/13/03

46

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:

- The six paid holidays—New Year's Day, Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas—shall be treated the same as personal days for employees who individually average fewer than 20 hours per week and do not work the holiday. (See Article XII, Paragraph 5.)
- Employees who individually average more than 19-3/8 hours per week will receive another day off with pay if they do not work the holiday, which has been the past practice.
- Any part-time employee who works on one of the six recognized holidays will be paid at the premium holiday rate, which has been the past practice.

FOR THE POST-GAZETTE                    FOR THE GUILD

_____                 _____
Raymond N. Burnett                      Mike Bucsko

DATE:   8/14/03                         DATE:   8/18/03

47

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding effective January 28, 2004, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Guild agree as follows:

- The Company will assume jurisdiction over photo reprints. For clarification, this involves all work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.
- The Company will gain another exempted employee as described in Paragraph C of the Preamble (this will increase the number of such exemptions allowed to two), with the following provision: the Company will have until December 31, 2006, to name a current employee to this exempt status. If the Company does not exercise this option prior to the expiration of this Agreement, the right to name an exempted employee under Paragraph C will be limited to a new hire.

FOR THE COMPANY:                          FOR THE GUILD:

_____            _____
Raymond N. Burnett                        Mike Bucsko

DATE:  1/28/04                            DATE:  1/30/04

48

## MEMORANDUM OF AGREEMENT

THIS AGREEMENT made this 23rd day of November, 2007, by and between PITTSBURGH POST-GAZETTE and NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061, CWA.

1. On July 26, 2007, the Guild filed a grievance over the use of freelance writers to perform restaurant reviews.

2. The Pittsburgh Post-Gazette has denied the grievance, and by letter dated August 30, 2007, the Guild requested that the grievance proceed to arbitration.

3. The parties have reached an agreement as full and final settlement of the grievance, which settlement shall be considered a Memorandum of Understanding regarding the future use of stringer "tryouts". That agreement is as follows:

The Company may use stringers to "try out" for vacant Guild positions (which no Guild member has been awarded) under terms and conditions mutually agreed to between the parties. In the event the Employer intends to use a stringer to fill the vacant position as set forth above, the Company shall notify the Guild and the parties shall then mutually agree upon the various terms and conditions under which the "tryout" may be utilized.

PITTSBURGH POST-GAZETTE

NEWSPAPER GUILD OF
PITTSBURGH, LOCAL 38061

BY: Stephen B. Spolar

BY: R. J. Hufnagel

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

This MOU will be effective retroactively to September 1, 2008.

For the Company                          For the Union

_____                  _____
Stephen B. Spolar                         RJ Hufnagel

Date: 5/29/2009                           Date: 6/9/2009

## MEMORADUM OF UNDERSTANDING

This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accept the early-retirement buyout offer the company extended in October 2008. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.

Content providers who accept the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: Writers may complete a maximum of one freelance submission per week for the print edition, or one piece of web-based content per week for post-gazette.com. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.

Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.


_____          _____
Stephen B. Spolar                      Mike Fuoco


_____          _____
Date                                   Date

EXHIBIT A

MEDICAL/PRESCRIPTION DRUG - UNION GROUPS (ACTIVES, UNDER 65 RETIREES, COBRA) THROUGH DECEMBER 31, 2014

| Benefit | Current | | New Plan - 1/1/2011 (A) | |
|---|---|---|---|---|
| | Network | Out-of-Network | Network | Out-of-Network |
| Deductible (per benefit period) | | | | |
| Individual | $750 | $1,500 | $250 | $1,500 |
| Family | $1,500 | $3,000 | $500 | $3,000 |
| Out-of-Pocket Maximums (excludes deductible and copayments) | | | | |
| Individual | N/A | $3,000 | N/A | $3,000 |
| Family | N/A | $6,000 | N/A | $6,000 |
| Coinsurance | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| PCP/Specialist Office Visit Copay | $25 copay | 80% after deductible | $25 copay | 80% after deductible |
| Preventive Care | | | | |
| Routine physical exams | $25 copay | Not Covered | $25 copay | Not Covered |
| Immunizations | 100% | 80% | 100% | 80% |
| Routine gynecological exams, including PAP Test | $25 copay | 80% | $25 copay | 80% |
| Mammograms, annual routine and medically necessary | 100% | 80% | 100% | 80% |
| Emergency Room | $100 copay | $100 copay | $100 copay | $100 copay |
| Spinal Manipulations | $25 copay | 80% | $25 copay | 80% |
| Hospital Services | | | | |
| Inpatient | $50 copay/admission | 80% | $50 copay/admission | 80% |
| Outpatient | 100% | 80% | 100% | 80% |
| Mental Health/Substance Abuse | | | | |
| Inpatient | 100% | 80% | 100% | 80% |
| Outpatient | $25 copay | 80% | $25 copay | 80% |
| Prescription Drug | $0 Deductible | | $0 Deductible | |
| Retail – 31 day supply (Mandatory Generic) | $20 generic/$30 formulary brand/$50 non-formulary brand | | $20 generic/$30 formulary brand/$50 non-formulary brand | |
| Mail Order – 90 day supply (Mandatory Generic) | $40 generic/$60 formulary brand/$100 non-formulary brand | | $40 generic/$60 formulary brand/$100 non-formulary brand | |

A - As a result of national health care reform, certain benefit mandates will be implemented as of January 1, 2011, including but not limited to:

- Extension of health plan coverage for adult children to age 26
- Elimination of annual dollar limits on "essential" health benefit

These changes will be reflected in updated benefit grids prior to January 1, 2011 as additional guidance become available

Vision Benefits (active employees) - Davis Vision Plan will be upgraded to the top tier optical program

# EXHIBIT B

# SUMMARY OF PPOBLUE

On the chart below, you'll see what your plan pays for specific services. You may be responsible for a facility fee, clinic charge or similar fee or charge (in addition to any professional fees) if your office visit or service is provided at a location that qualifies as a hospital department or a satellite building of a hospital.

## Western PA Teamsters' and Employers' Welfare Fund
### 9PG

| Benefit | Current PG Plan | | | New Plan through WPA Teamsters | |
|---|---|---|---|---|---|
| | Network | Out-of-Network (7) | | Network | Out-of-Network (7) |
| **Benefit Period(1)** | **General Provisions** | | | | |
| Deductible (per benefit period) | | Calendar Year | | | |
| Individual | $250 | $500 | | $750 | $1,500 |
| Family | $500 | $1,000 | | $1,500 | $3,000 |
| Plan Pays – payment based on the plan allowance | 100% after deductible | 80% after deductible | | 100% after deductible | 80% after deductible |
| Out-of-Pocket Maximums (Once met, plan pays 100% for the rest of the benefit period. The deductible is excluded from the Out-of-Pocket) | | | | | |
| Individual | None | $3,000 | | None | $3,000 |
| Family | None | $6,000 | | None | $6,000 |
| Total Maximum Out of Pocket (6) (Includes deductible, coinsurance, copays and other qualified medical expenses, Network only)(6) Once met, plan pays 100% of covered services for the rest of the benefit period. | | | | | |
| Individual | $6,350 | Not Applicable | | $6,350 | Not Applicable |
| Family | $12,700 | | | $12,700 | |
| | **Office/Clinic/Urgent Care Visits** | | | | |
| Retail Clinic Visits | 100% after $25 copayment | 80% after deductible | | 100% after $25 copayment | 80% after deductible |
| Primary Care Provider Office Visits | 100% after $25 copayment | 80% after deductible | | 100% after $25 copayment | 80% after deductible |
| Specialist Office Visits | 100% after $25 copayment | 80% after deductible | | 100% after $35 copayment | 80% after deductible |
| Virtual Visit Originating Site Fee | 100% | 80% after deductible | | 100% | 80% after deductible |
| Urgent Care Center Visits | 100% after $25 copayment | 80% after deductible | | 100% after $35 copayment | 80% after deductible |

| Benefit | Current PG Plan | | New Plan through WEA Trust/Insurers | |
|---|---|---|---|---|
| | Network | Out-of-Network (1) / Preventive Care (2) | Network | Out-of-Network (1) |
| **Routine Adult** | | | | |
| Physical exams | 100% (deductible does not apply) | Not Covered | 100% (deductible does not apply) | Not Covered |
| Adult immunizations | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Colorectal cancer screening | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Routine gynecological exams, including a Pap Test | 100% (deductible does not apply) | 80% (deductible does not apply) | 100% (deductible does not apply) | 80% (deductible does not apply) |
| Mammograms, annual routine and medically necessary | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Diagnostic services and procedures | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| **Routine Pediatric** | | | | |
| Physical exams | 100% (deductible does not apply) | Not Covered | 100% (deductible does not apply) | Not Covered |
| Pediatric immunizations | 100% (deductible does not apply) | 80% (deductible does not apply) | 100% (deductible does not apply) | 80% (deductible does not apply) |
| Diagnostic services and procedures | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| **Hospital and Medical/Surgical Expenses (including maternity)** | | | | |
| Hospital Inpatient | | | | |
| Hospital Outpatient | | | | |
| Maternity (non-preventive facility & professional services) | 100% after deductible (and $50 inpatient copayment) | 80% after deductible | 100% after deductible | 80% after deductible |
| Medical/Surgical (except office visits) | | | | |
| **Emergency Services** | | | | |
| Emergency Room Services | 100% after $100 copayment (waived if admitted) | | 100% after $100 copayment (waived if admitted) | |
| Ambulance | 100% after deductible | | 100% after deductible | |
| **Therapy and Rehabilitation Services** | | | | |
| Physical Medicine | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment | 80% after deductible |

54

| Benefit: | Current PG Plan | | New Plan through WPA Teamsters | |
|---|---|---|---|---|
| | Network | Out-of-Network (7) | Network | Out-of-Network (7) |
| Respiratory Therapy | 100% after deductible Limit: 20 visits/ benefit period | 80% after deductible | Not applicable | 80% after deductible |
| Speech & Occupational Therapy | 100% after $25 copayment Limit: 20 visits/ benefit period | 80% after deductible | 100% after $35 copayment | 80% after deductible |
| Spinal Manipulations | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment Limit: 25 visits/ benefit period | Not Applicable |
| Other Therapy Services (Cardiac Rehab, Infusion Therapy, Chemotherapy, Radiation Therapy and Dialysis) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Inpatient | 100% after deductible/and $50 Inpatient copayment) | 80% after deductible | 100% after deductible | 80% after deductible |
| Inpatient Detoxification/Rehabilitation | | | | |
| Outpatient | 100% after $25 copayment | 80% after deductible | 100% after $25 copayment | 80% after deductible |
| Allergy Extracts and Injections | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Assisted Fertilization Procedures | Not Covered | | Not Covered | |
| Dental Services Related to Accidental Injury | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Diagnostic Services Advanced Imaging (MRI, CAT, PET scan, etc.) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Basic Diagnostic Services (standard imaging, diagnostic medical, lab/pathology, allergy testing) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Durable Medical Equipment, Orthotics and Prosthetics | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Home Health Care | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Hospice | 100% after deductible | 80% after deductible | 100% after deductible Limit: 50 days/ benefit period | 80% after deductible Limit: 50 days/ benefit period |
| Infertility Counseling, Testing and Treatment(3) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Private Duty Nursing | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible Limit: $5000/benefit period |
| Skilled Nursing Facility Care | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible Limit: 50 days/ benefit period |

Mental Health/Substance Abuse

Other Services

| Benefit | Current PG Plan | | New Plan (through WPA Transition) | |
|---|---|---|---|---|
| | **Network** | **Out-of-Network (7)** | **Network** | **Out-of-Network (7)** |
| Transplant Services | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Hearing Aid Exam | 100% after $25 copayment | Not Covered | 100% after $35 copayment | Not Covered |
| Hearing Aids | 100% (deductible does not apply) Limit: $500 per Hearing Aid, 1 aid per year every 3 years | Not Covered | 100% (deductible does not apply) Limit: $500 per Hearing Aid, 1 aid per ear every 3 years | Not Covered |
| Precertification Requirements(4) | | | Yes | |
| Prescription Drug Program(5) Mandatory Generic Defined by the Premier Pharmacy Network - Not Physician Network. Prescriptions filled at a non-network pharmacy are not covered. Your plan uses the Comprehensive Formulary. | Prescription Drugs | | | |
| | Retail Drugs (31-day Supply) $20 generic copayment $30 formulary brand copayment $ 50 non-formulary brand copayment Maintenance Drugs through Mall Order (90-day Supply) $40 generic copayment $60 formulary brand copayment $ 100 non-formulary brand copayment | | Retail Drugs (31-/60-/90-day Supply) generic copayment $5/$10/$15 formulary brand 25% coinsurance maximum $40/$80/$120 non-formulary brand 50% coinsurance maximum $80/$160/$240 Maintenance Drugs through Mall Order (90-day Supply) $10 generic copayment formulary brand 25% coinsurance maximum $80 non-formulary brand 50% coinsurance maximum $160 | |

(1) Your group's benefit period is based on a Calendar Year which runs from January 1 to December 31.

(2) Services are limited to those listed on the Highmark Preventive Schedule. Gender, age and frequency limits may apply.

(3) Treatment includes coverage for the correction of a physical or medical problem associated with infertility. Infertility drug therapy may or may not be covered depending on your group's prescription drug program.

(4) Highmark Medical Management & Policy (MM&P) must be contacted prior to a planned inpatient admission or within 48 hours of an emergency or maternity-related inpatient admission. Be sure to verify that your provider is contacting MM&P for precertification. If not, you are responsible for contacting MM&P. If this does not occur and is later determined that all or part of the inpatient stay was not medically necessary or appropriate, you will be responsible for payment of any costs not covered.

(5) The formulary is an extensive list of Food and Drug Administration (FDA) approved prescription drugs selected for their quality, safety and effectiveness. It includes products in every major therapeutic category. The formulary was developed by the Highmark Pharmacy and Therapeutics Committee made up of clinical pharmacists and physicians. Your program includes coverage for both formulary and non-formulary drugs at the specific copayment or coinsurance amounts listed above.You are responsible for the payment differential when a generic drug is authorized by your provider and you purchase a brand name drug. Your payment is the price difference between the brand name drug and generic drug in addition to the brand name drug copayment or coinsurance amounts, which may apply.

(6) Effective with plan years beginning on or after January 1,2014 the Network Total Maximum Out-of-Pocket as mandated by the federal government must include deductible, coinsurance, copays, and any qualified medical expenses.

(7) For out of network services, you may be responsible for paying any difference between the provider's actual charge and the PPO Blue allowable charge. Out of pocket limits do not apply to these types of member payments.

Exhibit 1

GUILD EMPLOYEES 401(K) PLAN

Effective July 1, 2015, PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a)    Through June 30, 2016, PG will make a matching contribution ("PG Matching Contributions") to the PG Publishing Company 401(k) Plan (the "Plan") equal to 50% of the first $20 per week deferred by any Eligible Full Time Employee; effective July 1, 2016, the PG Matching Contribution will be increased by applying the 50% match to the first $40 per week deferred by any Eligible Full Time Employee

(b)    Through June 30, 2016, the maximum amount of PG Matching Contribution will be $10 / week or the pro-rated equivalent for less than Eligible Full Time Employees; effective July 1, 2016, such maximum amount of PG Matching Contribution will be increased to $20/week or the pro-rated equivalent for less than Eligible Full Time Employees

(c)    The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d)    The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e)    The PG Matching Contribution will be subject to a vesting schedule as follows:

57

(i)     Less than 3 years of service – 0% Vested

(ii)    At least 3 years of service – 100% Vested

(iii)   Vesting Service is counted from original hire date

(f)     The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g)     "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h)     The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i)     All new employees will be automatically placed into the 401K plan with the ability to opt out.

**Pittsburgh Post-Gazette**

post-gazette.com

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accepted the early-retirement buyout offer the Company extended in 2008, 2010 and 2015. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.

All classifications under the collective bargaining agreement other than Content Providers (who are subject to a separate agreement) who accept or accepted the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: They will be allowed to perform duties under their classification or under other classifications for which they are qualified on a free-lance, independent contractor basis for a maximum of 450 hours annually pursuant to a freelance/independent contractor agreement entered into between the individual and the Company, provided that the Company decides to enter into such an arrangement with the individual. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.

Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.

_____          _____
Stephen B. Spolar                                      Michael A. Fuoco

_____          _____
Date   8/7/15                                              Date   8/12/15

Pittsburgh Post-Gazette

post-gazette.com

## MEMORANDUM OF UNDERSTANDING

Active monitoring of security cameras at the North Shore facility will be limited to monitoring people entering and exiting the facility through the doors and elevator. All other security cameras, including the security camera monitoring the snack bar area which shall be focused on snack bar dispensing equipment and payment apparatus at the North Shore facility, will not be actively monitored and will feed instead into a digital archive that will be used if necessary, for electronic data collection directly related to safety or accident investigations or incidents involving employee misconduct or equipment damage which first comes to the Company's attention independent of the use of security cameras. The digital archive will not otherwise be used to assess employee work performance or conduct

_____
Stephen B. Speier

_____
Michael A. Fuoco

_____
8/7/15
Date

_____
8/12/15
Date

# EXHIBIT 2

**EMPLOYMENT PARTNERS BENEFITS FUND**

**AMENDED AND RESTATED**
**AGREEMENT AND DECLARATION OF TRUST**

**AS OF JANUARY 1, 2022**

**EMPLOYMENT PARTNERS BENEFITS FUND**

**AMENDED AND RESTATED
AGREEMENT AND DECLARATION OF TRUST**

**AS OF JANUARY 1, 2022**

**PAGE**

**PREAMBLE** ....................................................1

**ARTICLE I**          **DEFINITIONS** ...............................4

Section 1.1          Act .......................................4
Section 1.2          Administrator .............................4
Section 1.3          Beneficiary ...............................4
Section 1.4          Collective Bargaining Agreement ...........4
Section 1.5          Employee ..................................4
Section 1.6          Employee Contribution .....................6
Section 1.7          Employer ..................................7
Section 1.8          Employer Contributions ....................8
Section 1.9          Employer Trustee ..........................9
Section 1.10         Fund ......................................9
Section 1.11         Investment Manager ........................9
Section 1.12         Participant ..............................10
Section 1.13         Participation Agreement ..................10
Section 1.14         Retiree ..................................10
Section 1.15         Trust Agreement ..........................10
Section 1.16         Trust Fund ...............................11
Section 1.17         Trustee ..................................11
Section 1.18         Union ....................................11
Section 1.19         Union Trustee ............................12
Section 1.20         Fund Director ............................12

**ARTICLE II**         **CREATION AND PURPOSES OF FUND** ............13

Section 2.1          Creation And Purposes Of Fund ............13

**ARTICLE III**        **BOARD OF TRUSTEES** ........................14

Section 3.1          Number; Appointment ......................14
Section 3.2          Employment; Term .........................14
Section 3.3          Resignation And Removal ..................14
Section 3.4          Successor Trustee; Appointment ...........16
Section 3.5          Successor Trustee; Assumption Of Office ...17
Section 3.6          Acceptance Of The Trust By The Trustees ...17
Section 3.7          Limitation Of Liability Of Trustees ......17
Section 3.8          Office Of The Fund .......................18
Section 3.9          Officers .................................18
Section 3.10         Power To Act In Case Of Vacancy ..........19
Section 3.11         Meetings; Notice .........................19
Section 3.12         Attendance At Meetings; Minutes ..........19
Section 3.13         Execution Of Instruments .................20

Section 3.14      Quorum; Proxy; Voting; Action Without
                  Meeting .......................................20
Section 3.15      Manner Of Acting In The Event Of
                  Deadlock ......................................21
Section 3.16      Removal Of Trustee (Violation Of Act) .....22

**ARTICLE IV**       **POWERS AND DUTIES OF TRUSTEES** .............23

Section 4.1       Conduct Of Trust Business .................23
Section 4.2       Use Of The Fund ...........................23
Section 4.3       Procurement Of Insurance ..................25
Section 4.4       Investments ...............................26
Section 4.5       Deposits And Disbursements ................28
Section 4.6       Fiduciary Responsibilities; Committees ....28
Section 4.7       Administrator .............................29
Section 4.8       Bylaws, Rules And Regulations .............30
Section 4.9       Additional Authority ......................31
Section 4.10      Bonds .....................................32
Section 4.11      Insurance .................................33
Section 4.12      Information To Participants and
                  Beneficiaries .............................33
Section 4.13      Accountants And Actuaries .................33
Section 4.14      Reports ...................................33
Section 4.15      Records Of Trustee Transactions ...........34
Section 4.16      Construction And Determinations By
                  Trustees ..................................34
Section 4.17      Liability .................................36
Section 4.18      Reliance On Written Instruments ...........36
Section 4.19      Reliance By Others ........................36

**ARTICLE V**        **CONTRIBUTIONS AND COLLECTIONS** .............37

Section 5.1       Payment Of Contributions ..................37
Section 5.2       Receipt Of Payment And Other Property
                  Of Trust ..................................38
Section 5.3       Collection And Enforcement Of Payments ....39
Section 5.4       Non-Payment Of Benefits ...................41
Section 5.5       Production Of Records .....................41
Section 5.6       Compliance Audit ..........................42
Section 5.7       Non-Payment Of Contributions By Employer ..42

**ARTICLE VI**       **CONTROVERSIES AND DISPUTES** ................44

Section 6.1       Reliance On Records .......................44
Section 6.2       Submission To Trustees ....................44
Section 6.3       Appeal Procedure ..........................45
Section 6.4       Settling Of Disputes ......................46

**ARTICLE VII**      **BENEFICIAL RIGHTS** ........................47

Section 7.1       No Rights, Title Or Interest Of Employers,
                  Unions And Employees ......................47
Section 7.2       Limitations Upon Beneficial Rights Of
                  Employees .................................47

**ARTICLE VIII**    **ADMISSION OF EMPLOYERS AND UNIONS** ........49

Section 8.1    Other Employers And Unions May Join .......49
Section 8.2    Reciprocity Agreements ....................49
Section 8.3    Merger ....................................49

**ARTICLE IX**    **TERMINATION OF TRUST** .....................50

Section 9.1    Conditions Of Termination .................50
Section 9.2    Procedures In Event Of Termination ........50

**ARTICLE X**    **MISCELLANEOUS** .............................51

Section 10.1    Law Applicable ...........................51
Section 10.2    Savings Clause ...........................51
Section 10.3    Refund Of Contributions ..................51
Section 10.4    Accounting And Judicial Settlements ......52
Section 10.5    Withholding Payment ......................52
Section 10.6    Gender ...................................53
Section 10.7    Amendment Of Trust Agreement .............53
Section 10.8    Article And Section Titles ...............54
Section 10.9    Notice ...................................54
Section 10.10    Protected Health Information ............55
Section 10.10    Electronic Protected Health Information ...59

**EXECUTION BY TRUSTEES** ........................................61

EMPLOYMENT PARTNERS BENEFITS FUND

AMENDED AND RESTATED
AGREEMENT AND DECLARATION OF TRUST

AS OF JANUARY 1, 2022

PREAMBLE

WHEREAS, this Agreement And Declaration Of Trust ("Trust Agreement") was originally made June 12, 1950, pursuant to the Labor Management Relations Act of 1947 (the "Taft-Hartley Act"), thereby creating an employee health care benefit trust fund then known as the Western Pennsylvania Teamsters and Motor Carriers Welfare Fund;

WHEREAS, the benefit fund was amended from time to time and became governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), and last amended and restated as of January 1, 2000, when known as the Western Pennsylvania Teamsters and Employers Welfare Fund;

WHEREAS, effective January 1, 2022, this employee benefit trust fund, has by action of its Trustees, changed its name to EMPLOYMENT PARTNERS BENEFITS FUND ("EPB Fund");

WHEREAS, the Employer and the Union settlors intent in creation of this benefit fund is to establish a trust under which monies paid for the exclusive purpose of providing health and welfare benefits and paying all lawful expenses and have therefore designated Trustees to receive, hold, administer and disburse said monies and other properties owned by the EPB Fund, and to define the powers, duties and responsibilities of the Trustees; and,

1

WHEREAS, the original settlors of this Trust Agreement have delegated full authority for administration of the benefit fund and amendment of the Trust Agreement to the undersigned Union Trustees and Employer Trustees, who together with the successor Trustees and additional Trustees designated in the manner hereinafter provided are hereinafter collectively referred to as the "Trustees;" and,

WHEREAS, certain Local Unions affiliated with Joint Council No. 40, International Brotherhood Of Teamsters, Chauffeurs, Warehousemen And Helpers Of America, or other local unions otherwise recognized as labor unions under federal labor laws, have now and will hereafter have in effect agreements with certain employers requiring payments by the employers into a welfare fund for the purpose of providing and maintaining health, welfare and other benefits for certain employees of the employers; and,

WHEREAS, each such Local Union, hereinafter called "Union," and each such employer, hereinafter called "Employer," which has notice of the terms of this Trust Agreement and by course of conduct has caused this benefit fund to provide benefit coverage to employees, is deemed to accept and be bound by this Agreement And Declaration Of Trust, including all rules, procedures, and provisions hereof shall be deemed a party to this Agreement And Declaration Of Trust; and,

WHEREAS, to effect the aforesaid purpose it is desired to establish and maintain an employee benefit fund which will conform to the applicable requirements of the Taft-Hartley Act and ERISA, and qualify as a trust and as an IRC Section 501(c)(9) tax exempt trust pursuant to the 1954 Internal Revenue Code, as amended; and,

2

WHEREAS, it is desired by the Employer and the Union that the employee-representatives and the employer-representatives, as Trustees, shall formulate the rules and regulations comprising the qualification and benefit provisions of the benefit fund for the benefit of the employees affected by this Agreement And Declaration Of Trust; and,

NOW, THEREFORE, in consideration of the provisions and mutual promises hereinafter made, and in order to establish and provide for the maintenance of the aforesaid welfare fund to be known as the Employment Partners Benefits Fund, it is understood and agreed that the undersigned do hereby amend and restate the previously established Agreement And Declaration Of Trust, together with subsequent Amendments thereto, by adopting as a replacement thereof the following, with the understanding that the prior Agreement And Declaration Of Trust and Amendments thereto are superseded by this Amended And Restated Agreement And Declaration of Trust.

## ARTICLE I

## DEFINITIONS

**Section 1.1.**   **Act.**   The term "Act" as used herein shall mean the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made thereto and any regulations promulgated pursuant to the provisions of the said Act.

**Section 1.2.**   **Administrator.**   The term "Administrator" as used herein shall mean individuals, firm(s) or corporation(s), if any, appointed from time to time by the Trustees to administer the office or offices of the EPB Fund in accordance with the provisions of Section 4.7 herein.   Until such time as an appointment is made, the term "Administrator" shall mean the Board of Trustees.

**Section 1.3.**   **Beneficiary.**   The term "Beneficiary" as used herein shall mean a person designated by a Participant or by the terms of the plan of benefits established pursuant to this Trust Agreement or by law, such as a dependent or member of the family of a Participant, who is or may become entitled to a benefit thereunder.

**Section 1.4.**   **Collective Bargaining Agreement.**   The term "Collective Bargaining Agreement" as used herein shall mean any written agreement between an Employer and a Union, and any supplement, amendment or continuation thereof which requires the Employer to make payments to the EPB Fund for its Employees.

**Section 1.5.**   **Employee.**   The term "Employee" as used herein shall mean:

4

(a)  Any person(s) who is employed by an Employer and whose primary occupation is in a classification in a collective bargaining unit represented by a Union, and covered by a collective bargaining agreement between an Employer and a Union, which agreement sets forth conditions as to wages, hours, working conditions and fringe benefits, and the Employer agrees in writing to make regular contributions to the EPB Fund and is deemed to be bound by the terms of this Trust Agreement for all such person(s).

(b)  Any person(s) who is employed by an Employer, which Employer also has Employees as defined in this Subsection (a) participating in the EPB Fund, and such person(s) is domiciled in the specified geographic area covered by the said collective bargaining agreement referred to in this Subsection A (a) but such person(s) is not covered under the said collective bargaining agreement, and the Employer agrees in writing to make regular contributions to the EPB Fund and is deemed to be bound by the terms of this Trust Agreement for all such person(s) not covered by a collective bargaining agreement.

(c)  Any full-time officers and other full-time employees of Unions which represent employees of contributing Employers, and which Union agrees in writing to make regular contributions to the EPB Fund for all of its full-time officers and other full-time employees.

(d)  Any full-time supervisory or other full-time employee of an employers' association, and which employers' association agrees in writing to make regular contributions to the EPB Fund and is deemed

5

to be bound by the terms of this Trust Agreement for all of its full-time supervisory and other full-time employees.

(e)  Any full-time supervisory or other full-time employee of the EPB Fund, and the EPB Fund agrees in writing to make regular contributions to the EPB Fund and is deemed to be bound by the terms of this Trust Agreement for all of its full-time supervisory and other full-time employees.

(f)  Any full-time employee of any credit union, the majority of whose members are members of a participating Union, and which agrees in writing to make regular contributions to the EPB Fund and is deemed to be bound by the terms of this Trust Agreement for all of its full-time employees.

(g)  Any person(s) who is employed by an Employer, and the Employer is required to make contributions to the EPB Fund for such person(s) pursuant to a Change Of Operations Committee decision; provided, however, that the said decision has been approved by the Trustees.

(h)  Any full-time employee of the Western Pennsylvania Teamsters and Employers Pension Fund and which agrees in writing to make regular contributions to the EPB Fund and is deemed to be bound by the terms of this Trust Agreement for all of its full-time employees.

**Section 1.6**.  **Employee Contributions**.  The term "Employee Contributions" as used herein shall mean elective payments actually made to the EPB Fund by an Employee, Participant, Beneficiary or Retiree, as provided under the Comprehensive Omnibus Budget

6

Reconciliation Act of 1985 ("COBRA") as permitted under the terms of the plan of benefits established pursuant to this Trust Agreement or by law. Notwithstanding language in a collective bargaining agreement which purports to allocate a portion of the required contribution to an employee, such language is deemed to be a payroll practice and is not interpreted as creating an employee obligation to contribute.

**Section 1.7.** **Employer**. The term "Employer" as used herein shall mean:

(a) Any Employer having a collective bargaining agreement with a Union, which agreement sets forth conditions as to wages, hours, working conditions and fringe benefits, including the establishment of a health and welfare plan for the benefit of its Employees, and which agrees to pay into the EPB Fund created by this Trust Agreement the contributions determined by the Trustees as provided for under this Trust Agreement, for all of its Employees who are included in the classifications in the collective bargaining units covered by the collective bargaining agreement.

(b) Any other person(s) who is employed by an Employer defined in this Subsection (a) and domiciled in the specified geographic area covered by the collective bargaining agreement referred to in this Subsection (a), and the Employer agrees in writing to make regular contributions and to be bound by the obligations of this Trust Agreement for all such person(s) who are employed by the Employer and are not covered by a collective bargaining agreement.

7

(c) Any Union which represents employees of contributing Employers and which agrees in writing to make regular contributions and to be bound by the obligations of this Trust Agreement for all of its employees who are eligible for the EPB Fund.

(d) Any employers association which is domiciled in Western Pennsylvania, and which represents contributing Employers and which agrees in writing to make regular contributions and to be bound by the obligations of this Trust Agreement for all of its employees who are eligible for the EPB Fund.

(e) The EPB Fund which agrees in writing to make regular contributions and to be bound by the obligations of this Trust Agreement for all of its employees who are eligible for the EPB Fund.

(f) Any credit union, the majority of whose members are members of a participating Union, and which agrees in writing to make regular contributions and to be bound by the terms of this Trust Agreement for all of its employees who are eligible for the EPB Fund.

(g) Any Employer which is required to make contributions to the EPB Fund pursuant to a Change Of Operations Committee decision; provided, however, that the said decision has been approved by the Trustees.

(h) The EPB Fund and which agrees in writing to make regular contributions and to be bound by the obligations of this Trust Agreement for all of its employees who are eligible for the EPB Fund.

**Section 1.8**. **Employer Contributions**. The term "Employer Contributions" as used herein shall mean payments required to be made to the EPB Fund by an Employer under a collective bargaining

agreement or participation agreements. Notwithstanding language in a collective bargaining agreement which purports to allocate a portion of the required contribution to an employee, such language is deemed to be a payroll practice and is not interpreted as reducing the employer's obligation to pay the full contribution as determined by the Trustees.

**Section 1.9**. **Employer Trustee**. The term "Employer Trustee" as used herein shall mean any Trustee designated to represent the Employers in accordance with the provisions of Section 3.1 herein.

**Section 1.10**. **Fund**. The terms "Fund" or "Funds" as used herein shall mean cash; credits; accounts receivable and all other assets; stocks; either common (with or without voting power) or preferred (with or without present or future voting rights in the event of the happening of a preference condition); bonds; notes; other property or securities or interests in property (real, personal or mixed) whether or not such funds meet the requirements of legal investments for trust funds in any state or jurisdiction; and any life insurance or health and accident contract or contracts issued by an insurance company, held in or forming a part of the Trust Fund.

**Section 1.11**. **Investment Manager**. The term "Investment Manager" as used herein shall mean the individuals, firm(s) or corporations, if any, appointed from time to time by the Trustees, responsible for the management, acquisition, disposition, investing and reinvesting of the assets of the EPB Fund in accordance with the provisions of Section 4.4 herein.

**Section 1.12**.  **Participant**.  The term "Participant" as used herein shall mean any Employee who is or may become entitled to participate in the benefits provided for in this Trust Agreement.

**Section 1.13**. **Participation Agreement**. The term "Participation Agreement" as used herein shall mean any agreement between the Employer and the EPB Fund, parties hereto, and any supplement, amendment or continuation thereof which requires the Employer to make payments to the EPB Fund for its Employees not covered under a collective bargaining agreement.  The Trustees shall establish the form of the participation agreement, and any such agreement not in the form established by the Trustees shall be subject to their approval.  All employers who contribute to the EPB Fund pursuant to collective bargaining agreements are considered to be participating employers and are bound by the terms of this Trust Agreement regardless of whether they have executed a Participation Agreement.

**Section 1.14**.  **Retiree**.  The term "Retiree" as used herein shall mean a person who is retired from employment, and under the terms of the plan of benefits established pursuant to this Trust Agreement or by law, is or may become entitled to a benefit thereunder.

**Section 1.15**.  **Trust Agreement**.  The terms "Agreement And Declaration of Trust" or "Trust Agreement" as used herein shall mean this instrument, including all amendments and modifications as may from time to time be made.

10

**Section 1.16**.  **Trust Fund**.  "Trust," "EPB Fund" and "Trust Fund" as used herein shall mean the entire trust estate of the Employment Partners Benefits Fund, including all contributions to the Trust Fund created hereunder received by the Trustees under the collective bargaining agreements or participation agreements and any additional contributions thereto that may hereafter be agreed upon by the parties under future collective bargaining agreements or participation agreements, or extensions thereof, and all other Employer Contributions and Employee Contributions, together with all income, increments, earnings and profits therefrom, and all other funds (as defined herein) received by the Trustees for the use, purposes and trusts set forth in this Trust Agreement and less any disbursements made in accordance with the provisions herein.

**Section 1.17**.  **Trustee**.  The term "Trustee" as used herein shall mean the Trustees designated in this Trust Agreement, together with their successors designated and appointed in accordance with the terms of this Trust Agreement.

**Section 1.18**.  **Union**.  The term "Union" as used herein shall mean any Local Union affiliated with Joint Council No. 40 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, or any other Union approved by the Trustees pursuant to Section 8.1 herein, which, at the time of reference, has a collective bargaining agreement or other such agreement approved by the Trustees in effect with an Employer.

11

**Section 1.19**.  **Union Trustee**.   The term "Union Trustee" as used herein shall mean any Trustee designated to represent the union in accordance with the provisions of Section 3.1 herein.

**Section 1.20**.  **Fund Director**.   The term "Fund Director" shall mean an employee and Officer of the EPB Fund appointed by the Trustees and delegated authority to perform such functions as the Trustees may delegate.

## **ARTICLE II**

### **CREATION AND PURPOSES OF FUND**

**Section 2.1**.    **Creation and Purposes of Fund**.    The EPB Fund is created, established and maintained, and the Trustees agree to receive, hold and administer the EPB Fund for the sole purpose of providing such health and welfare benefits as now are, or hereafter may be, authorized or permitted by law for Participants, Beneficiaries and Retirees, and in accordance with the provisions herein set forth.

13

**ARTICLE III**

**BOARD OF TRUSTEES**

**Section 3.1.** **Number; Appointment.** The EPB Fund shall be administered by ten (10) Trustees, five (5) of whom shall be Union Trustees, and five (5) of whom shall be Employer Trustees. The Employer Trustees shall consist of five (5) members appointed as provided by Section 3.4 herein. The Union Trustees shall consist of two (2) members appointed by the General Teamsters, Chauffeurs, Warehouseman and Helpers of America, Local Union No. 249, of Pittsburgh, Pennsylvania, and three (3) members appointed by Joint Council No. 40, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

**Section 3.2.** **Employment; Term.** The Trustees shall serve at the will of the appointing entity as provided in Section 3.1 herein, and they shall be reimbursed for all reasonable and necessary expenses as are properly and actually incurred by them in connection with the performance of their official duties, as permitted by law. The Union or the Employers shall select successor Trustees, as provided in Section 3.4 herein, whenever vacancies occur among the respective appointees. A vacancy shall occur whenever a Trustee resigns or when a Trustee is removed by the party which appointed that Trustee, or by reason of death or incapacity of a Trustee.

**Section 3.3.** **Resignation And Removal.**

(a) A Trustee may resign and become and remain fully discharged from all further duty or responsibility hereunder upon giving thirty (30) days' notice in writing to the remaining Trustees and to the

14

entity by whom he was appointed, or such shorter notice as the remaining Trustees, in their sole discretion, may accept as sufficient, in which notice there shall be stated a date on which such resignation shall take effect; and such resignation shall take effect on the date specified in the notice unless a successor Trustee shall have been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee.

(b) Any Union Trustee may be removed from office at any time by action of the entity which has the power to appoint a successor Trustee, and written notice of such action shall be delivered to the Chairman and Secretary of the Trustees. Any Employer Trustee may be removed from office at any time by action of three other Employer Trustees, and written notice of such action shall be delivered to the Chairman and the Secretary of the Trustees and to the Employers. The said written notice shall provide that the removed Trustee shall be considered removed effective at the expiration of thirty (30) days from the date of such notice, unless at least thirty (30%) percent of the Employers express objection, in writing, to the removal of the Trustee within the thirty (30) day period. If at least thirty (30%) percent of the Employers express objection, in writing, to the removal, such Trustee shall continue to serve.

(c) Any Trustee who resigns or is removed from office shall forthwith return to the Chairman or Secretary, at the EPB Fund's office, any and all records, books, documents, monies and other

15

property in his possession or under his control which belong to the EPB Fund and which were received by him in his capacity as a Trustee.

**Section 3.4.**   **Successor Trustee; Appointment.**

(a) If any Trustee shall die, become incapable of acting hereunder, resign, or be removed, a successor Trustee shall be appointed by the entity with the power to appoint such Trustee as provided in Section 3.4(b) and (c) herein.  Such appointment shall be in writing and be delivered to the Chairman and Secretary of the Trustees.  It is the intention hereof that the EPB Fund shall at all times be administered by an equal number of Employer Trustees and Union Trustees.  In the event of a vacancy, Employer Trustees and Union Trustees shall have equal voting strength, which may be accomplished by direct or implied proxies.  The written appointment shall state the term, if any, during which the Trustee is to serve, consistent with Section 3.2 herein.

(b) When a vacancy occurs as a result of death, incapacity, resignation or removal of an Employer Trustee, the successor Trustee shall be appointed by the Employers as defined in Section 1.7 herein, but excluding any Union Employer as defined in Section 1.7(c) herein and the EPB Fund as defined in Section 1.7(e) herein, by a written notice setting forth the name of the nominee Trustee selected by the remaining Employer Trustees.  The said written notice shall provide that the nominee Trustee shall be considered appointed at the expiration of thirty (30) days from the date of such notice unless at least thirty (30%) percent of the Employers express objection, in writing, to the appointment of the nominee Trustee within the

16

thirty (30) day period.  If at least thirty (30%) percent of the Employers express objection, in writing, to such nominee Trustee, a subsequent nominee Trustee shall be selected by the remaining Employer Trustees and the same procedure followed until a nominee Trustee is considered appointed.

(c)  When a vacancy occurs as a result of death, incapacity, resignation or removal of a Union Trustee, the successor Trustee shall be appointed by the Union as provided in Section 3.1 herein.

**Section 3.5.  Successor Trustee; Assumption Of Office.**  Any successor Trustee shall immediately upon his appointment as a successor Trustee and his acceptance of the Trusteeship in writing, as provided in Section 3.6 herein, become vested with all of the property rights, powers and duties of a Trustee hereunder with like effect as if originally named a Trustee without the necessity of any formal conveyance or other instrument of title.

**Section 3.6.  Acceptance Of The Trust By The Trustees.**  A Trustee shall execute a written acceptance in a form satisfactory to the Trustees and consistent with the Act and thereby shall be deemed to have accepted the Trust created and established by this Trust Agreement and to have consented to act as Trustee and to have agreed to administer the EPB Fund as provided herein.  Such written acceptance shall be maintained by the EPB Fund Office, which shall notify the remaining Trustees of the receipt of such acceptance.

**Section 3.7.  Limitation Of Liability Of Trustees.**  To the extent permitted by law, no successor Trustees shall in any way be liable or responsible for anything done or committed in the

17

administration of the EPB Fund prior to the date he became a Trustee and a Trustee shall not be liable for the acts or omissions of any administrator, director, employee, investment manager, attorney, enrolled actuary, independent qualified public accountant, or other consultant, agent or assistant employed by them in pursuance of this Trust Agreement, if such administrator, director, employee, investment manager, attorney, enrolled actuary, independent qualified public accountant, or other consultant, agent or assistant was selected pursuant to this Trust Agreement and such person's performance was periodically reviewed by the Trustees who found such performance to be satisfactory.

**Section 3.8**.   **Office Of The Fund**.   The principal office of the EPB Fund shall, so long as such location is feasible, be located and maintained in the County of Allegheny, Pennsylvania.   The location of the principal office shall be made known to the parties interested in the EPB Fund.   At such office, and at such other places as may be required by law, there shall be maintained the books and records pertaining to the EPB Fund and its administration.

**Section 3.9**.   **Officers**.   The Trustees may appoint an employee to serve as the Fund Director who shall have authority to perform such functions as the Trustees may delegate.   The Trustees shall elect from among themselves a Chairman and a Secretary to serve for a term of one (1) year commencing with such selection.   When the Chairman is elected from the Employer Trustees, then the Secretary shall be elected from the Union Trustees; and when the Chairman is elected from the Union Trustees, then the Secretary shall be elected

18

from the Employer Trustees.  At each election, the Chairmanship shall alternate, insofar as practicable or desirable, between the Employer Trustees and the Union Trustees.  The Secretary, or such other person as the Trustees may designate, shall keep minutes and records of all meetings, proceedings and acts of the Trustees and shall, with reasonable promptness, send copies of such minutes and records to all Trustees.  The Chairman shall preside at all meetings of the Trustees.  In his absence, the Secretary shall preside and shall appoint an Acting Secretary for the meeting.  If both the Chairman and the Secretary are absent, the Trustees in attendance, if a quorum is present, shall appoint an Acting Chairman and an Acting Secretary.

   **Section 3.10**.  **Power To Act In Case Of Vacancy**.  No vacancy or vacancies on the Board of Trustees shall impair the power of the remaining Trustees, acting in the manner provided by this Trust Agreement, to administer the affairs of the EPB Fund notwithstanding the existence of such vacancy or vacancies.

   **Section 3.11**.  **Meetings; Notice**.  The Trustees shall meet at such times as they deem it necessary to transact their business. The Chairman or the Secretary of the Trustees may, and upon the written request of any two (2) Trustees, call a meeting of the Trustees at any time by giving at least seven (7) days' written notice.  A meeting of the Trustees may be held at any time without notice if all of the Trustees consent thereto in writing.

   **Section 3.12**.  **Attendance At Meetings; Minutes**.  All official meetings of the Trustees shall be attended only by the Trustees and

19

shall not be open to the public, except that there may attend such other persons as may be designated by the Trustees or when invited so to do, and as may be otherwise required by law.  Attendance and voting at a meeting of the Trustees via telephone or via video conference shall be considered the same as attending the meeting in person.  Written minutes, a copy of which shall be furnished with reasonable promptness to each Trustee, shall be kept of all business transacted and of all matters upon which voting shall have occurred. Such minutes shall be approved by the signature of the Secretary or Acting Secretary.

**Section 3.13**.  **Execution Of Instruments**.  Any instrument in writing authorized in the ordinary course of business by the Trustees may be executed on behalf of the Trustees by the signatures of one (1) authorized Employer Trustee and one (1) authorized Union Trustee, or by the Fund Director or a person designated by the Trustees for such purpose, and all persons, partnerships, corporations and associations may rely upon the fact that such instrument has been duly authorized.  Any other instrument in writing shall be signed by all of the Trustees except as otherwise provided in Section 4.1 herein.

**Section 3.14**.  **Quorum; Proxy; Voting; Action Without Meeting**.

(a)  A majority of the Trustees in person, participating via telephone or video conference, or by proxy, at any meeting shall constitute a quorum for the transaction of business.

20

(b)   A Trustee may vote more than one (1) proxy at any meeting, but shall vote only the proxy votes of an absentee Trustee appointed by the same appointing power.

(c)   Action taken by the Trustees, except as herein otherwise provided, shall be by affirmative vote of a majority of the votes cast at a meeting; provided, however, that at all meetings, the Union Trustees and the Employer Trustees shall have equal voting strength, irrespective of whether one group of Trustees has more Trustees present in person and/or represented by proxy at the meeting than the other group of Trustees.   The Trustees must cast their votes in person, via telephone or video conference, or via proxy.   Each Trustee shall have one (1) vote in person and may vote proxy votes as hereinbefore provided.

(d)   Action by the Trustees on any proposition may also be taken without a meeting if all of the Trustees agree thereon in writing or via email.

**Section 3.15.**   **Manner Of Acting In The Event Of Deadlock.**

(a)   In the event of a deadlock arising, the Trustees may agree upon an impartial umpire to break such deadlock by deciding the dispute in question.   In the event of the inability of the Trustees to agree upon the selection of such impartial umpire within a reasonable period of time, then, either group of Trustees, or, in their failure to act, any Trustee, may petition the United States District Court for the Western District of Pennsylvania to appoint such impartial umpire.   Such impartial umpire shall immediately proceed to hear the dispute between the Trustees and decide such

21

dispute, and the decision and award of such umpire shall be final and binding upon the parties.  The reasonable compensation of such umpire and the costs and expenses, including, without limitation, reporter fees and Trustees' attorney fees, incidental to any proceedings instituted to break a deadlock shall be paid by the EPB Fund.

(b)  Any impartial umpire selected or designated to break a deadlock shall be required to enter his decision within a reasonable time fixed by the Trustees.  The scope of any such proceeding before such impartial umpire shall be limited to the provisions of this Trust Agreement and to the provisions of the rules, regulations and bylaws adopted by the Trustees and to the plan of benefits established by them.  The impartial umpire shall have no jurisdiction or authority to change or modify the provisions of this Trust Agreement or to decide any issue arising under or involving the interpretation of any collective bargaining agreements or participation agreements between the Union, the Association and other Employers, and such impartial umpire shall have no power or authority to change or modify any provisions of any such collective bargaining agreements or participation agreements, and such impartial umpire's review shall be limited to the issues out of which the deadlock arose.

**Section 3.16**.  **Removal Of Trustee (Violation Of Act)**.  The Board of Trustees shall initiate action to cause the removal of any fellow member Trustee who may be serving as a Trustee in violation of the Act.  The vacancy or vacancies caused by such removal shall be filled in accordance with Section 3.4 herein.

22

## ARTICLE IV

## POWERS AND DUTIES OF TRUSTEES

**Section 4.1**.  **Conduct Of Trust Business**.  The Trustees shall have general supervision of the operation of this Health and Welfare Fund and shall conduct the business and activities of the EPB Fund in accordance with this Trust Agreement and applicable law.  The Trustees shall hold, manage and protect the EPB Fund and collect the income therefrom and contributions thereto.  The Trustees may, in the course of conducting the ordinary business of the EPB Fund, execute all instruments in the name of the Employment Partners Benefits Fund, which instruments shall be signed by at least one (1) authorized Employer Trustee and one (1) authorized Union Trustee as provided in Section 3.13 herein.  The Trustees may delegate to the Administrator, or the Fund Director, the power to execute documents in the ordinary course of business, as determined by the Trustees in their sole discretion, in the name of the EPB Fund. All other instruments shall be signed by all of the Trustees.

**Section 4.2**.  **Use Of The Fund**.  The Trustees shall have the power and authority to use and apply the Trust Fund for the following purposes:

(a)  To pay or provide for the payment of all reasonable and necessary expenses (i) of collecting the Employer and Employee contributions and payments and other monies and property to which they may be entitled; (ii) of administering the affairs of the EPB Fund, including the employment of such administrative, legal, expert and clerical assistance, the purchase or lease of such premises,

23

materials, supplies and equipment and the performance of such other acts, as the Trustees, in their sole discretion, find necessary or appropriate in the performance of their duties; and (iii) of reimbursement for expenses and the payment of allowances properly and actually incurred in the performance of their duties with the EPB Fund, as permitted by law including, without limitation, attendance at meetings and other functions of the Board of Trustees or its committees or while on the business of the Board of Trustees, and attendance at institutes, seminars, conferences or workshops for or on behalf of the EPB Fund.

(b)   To provide health and welfare and related benefits to eligible Participants, Beneficiaries and Retirees in accordance with a plan of benefits provided through policies of insurance or other health programs and facilities in accordance with Section 4.3 herein or established and administered as provided this Subsection (e). Such health and welfare and related benefits shall be limited to those which can be financed from the Trust Fund after payment of authorized and accrued expenses.  The said plan of benefits, and the procedures required to implement the said plan, shall be stated and described from time to time in appropriate Summary Plan Descriptions.

(c)   To establish and accumulate such reserve funds as the Trustees, in their sole discretion, deem necessary and desirable for the proper execution of the Trust herein created.

(d)   To pay all other proper and necessary expenses incurred by any Trustee not specified above, including the cost of defense

in litigation arising out of the Trusteeship of the EPB Fund, to the extent permitted by law.

(e)  To provide for a plan of payment of authorized benefits out of the EPB Fund itself; provided, however, that such payments can be legally made and that the same are in full compliance with all statutory and legal requirements.

(f)  To pay or provide for the payment of premiums on the contracts or policies of insurance provided in Section 4.3 herein, which contracts or policies of insurance may be contracted for in the name of and issued to the Trustees, or to the EPB Fund, as they may determine.

**Section 4.3**.  **Procurement Of Insurance**.  The Trustees are expressly authorized to either self-insure coverage or negotiate for, obtain and maintain policies of group life, group accident, group health and group disability insurance, including group hospital, medical and surgical insurance or such other insurance coverage as may be determined by the Trustees, by an insurance company or companies licensed to transact business in the Commonwealth of Pennsylvania of such benefits as now or hereafter may be authorized or permitted by law and as the Trustees may, in their sole discretion, determine.  Such policies of insurance shall be in such forms and in such amounts and may contain such provisions and be subject to such limitations and conditions as the Trustees, in their sole discretion, may from time to time determine and shall cover such Participants; Beneficiaries and Retirees as the Trustees, in their sole discretion, and pursuant to the provisions hereof, shall from

25

time to time determine eligible for benefits as herein provided. The Trustees may exercise all rights and privileges granted to the policyholder by the provisions of each contract or policy of insurance, and may agree with the insurance carrier to any alteration, modification or amendment of such contract or policy, and the insurance provided thereunder. which they, in their sole discretion, may deem necessary or advisable and such insurance carrier shall not be required to inquire into the authority of the Trustees with regard to any dealings in connection with such contract or policy. The Trustees are expressly authorized to establish and maintain a plan or plans to provide any and all of the health and welfare benefits, as the Trustees in their sole discretion may determine, directly out of the EPB Fund in accordance and upon compliance with Section 4.2(e) herein, in lieu of, or in combination with, coverage provided by an insurance carrier or carriers.

**Section 4.4. Investments.**

(a) The Trustees shall have the power and authority, in their sole discretion, to invest and reinvest such funds as are not necessary for current expenditures or liquid reserves, as they may from time to time determine, in such investments as are legal investments under applicable State and Federal law relating to the investment by employee health and welfare trust funds, not limited, however, by any limitation restricting investments in common stocks to a percentage of the EPB Fund or to a percentage of the total market value of the EPB Fund. The Trustees may sell, exchange or otherwise dispose of such investments at any time and, from time to time, as

provided in Section 4.9(f) herein and the Act.  The Trustees shall also have the power and authority, in addition to, and not in limitation of, common law and statutory authority, to invest in any stocks, bonds or other property, real or personal, including improved or unimproved real estate and equity interests in real estate, where such an investment appears to the Trustees, in their sole discretion and consistent with their fiduciary obligations, to be in the best interest of the EPB Fund and its Participants, Beneficiaries and Retirees, judged by then prevailing business conditions and standards and the applicable provisions of the Act.  The Trustees shall have the authority, in respect to any stocks, bonds or other property, real or personal, held by them as Trustees, to exercise all such rights, powers and privileges as might be lawfully exercised by any person owning similar stocks, bonds or other property in his own right pursuant to the Act.

(b)  The Trustees may retain an Investment Advisor, who acknowledges it serves as an ERISA fiduciary, whose function is to monitor investment performance and to recommend retention or termination of Investment Managers.  The Trustees shall have the power and authority to appoint one (1) or more Investment Managers, who acknowledge they serve as ERISA fiduciaries, as defined in the Act, who shall be responsible for the management, acquisition, disposition, investing and reinvesting of such of the assets of the EPB Fund as the Trustees shall specify.  These responsibilities shall be provided for by the Trustees by written agreement, and the Investment Manager shall indicate acceptance of these

27

responsibilities in writing and such appointment may be terminated by the Trustees upon thirty (30) days' written notice.  The fees of such Investment Manager, and its expenses, to the extent permitted by law, shall be paid out of the Trust Fund.

(c)  In connection with any allocation or delegation of investment functions under this Subsection (b), the Trustees may, from time to time, adopt appropriate investment policies or guidelines.

**Section 4.5.**  **Deposits And Disbursements**.  All trust funds not invested shall be deposited by the Trustees in such depository or depositories as the Trustees shall from time to time select, and any such deposit or deposits, or disbursements therefrom, shall be made in the name of the EPB Fund in the manner designated by the Trustees and upon the signatures of the persons designated and authorized by the Trustees or by the Investment Manager appointed in accordance with Section 4.4 herein.

**Section 4.6.**  **Fiduciary Responsibilities; Committees**.

(a)  The Trustees may, by resolution or bylaw or by provisions of this Trust Agreement, allocate fiduciary responsibilities to committees or subcommittees of the Board of Trustees.  The Trustees may delegate such fiduciary responsibilities and duties to other individuals as they may deem appropriate or necessary in their sole discretion and consistent with the Act, and such delegation shall be by written agreement, which shall specify the delegated responsibilities.  Such individuals shall indicate acceptance of these responsibilities in writing.

28

(b)   Each committee shall consist of an equal number of Employer and Union Trustees.  A quorum of a committee shall be as provided in Section 3.14 herein.  If the Union Trustees and/or the Employer Trustees, respectively, nominate a Trustee of their group for membership on any committee, the Chairman shall appoint such nominee in filling any vacancy.  Appointment as a member of any committee shall be communicated to the appointee by the Administrator in writing.  Any resignation of a committee member shall be submitted, in writing, to the Administrator who shall promptly notify the Chairman thereof.

(c)   Any appointed member of any committee may be removed from membership in such committee by the group of Trustees appointing him at any time for any reason.

**Section 4.7**.  **Administrator**.  The Trustees may delegate some or all of the administrative functions listed below to a Fund Director, or employ or contract for the services of one or more individuals, firm(s) or corporations, to be known as the "Administrator(s)", who shall, under the direction of the Trustees or under the direction of any appropriate committee of the Trustees, administer some or all of the functions of the Fund Office or offices of the EPB Fund and of the Trustees; coordinate and administer the accounting, bookkeeping and clerical services; provide for the coordination of actuarial services furnished by the enrolled actuary and other consultants; prepare, in cooperation where appropriate with the enrolled actuary, the independent qualified public accountant and other consultants, all reports and other documents

29

to be prepared, filed or disseminated by or on behalf of the EPB Fund in accordance with law; assist in the collection of contributions required to be paid to the Trust Fund by Employers or Employees, Participants, Beneficiaries or Retirees; execute routine documents in the ordinary course of business on behalf of the EPB Fund as authorized by the Trustees pursuant to the provisions of Section 4.1 herein; and perform such other duties and furnish such other services as may be assigned, delegated or directed or as may be contracted by or on behalf of the Trustees, including claims administration for benefit plans, benefit payments, claim appeals and participant communications.  The Administrator shall be the custodian on behalf of the Trustees of all documents and other records of the Trustees and of the EPB Fund.  The responsibilities of the Administrator shall be provided for by the Trustees by written agreement, and the Administrator shall indicate acceptance of these responsibilities in writing.  Such appointment may be terminated by the Trustees upon thirty (30) days' written notice.

**Section 4.8.   Bylaws, Rules And Regulations.**

(a)   The Trustees are hereby empowered and authorized to adopt bylaws and to promulgate any and all necessary rules and regulations, including appropriate Summary Plan Descriptions, which they deem necessary or desirable to facilitate the proper administration of the EPB Fund, provided the same are not inconsistent with the terms of this Trust Agreement.  All bylaws, rules and regulations adopted by the action of the Trustees shall be binding upon all parties

hereto, all parties dealing with the EPB Fund, and all persons claiming any benefits hereunder.

(b)  No bylaw, regulation, rule, action or determination made or adopted by the Trustees, nor any decision or determination made by any impartial umpire appointed pursuant to Section 3.15 herein, shall in any manner conflict or be inconsistent (1) with any provision of an applicable current collective bargaining agreement in effect, or which may be made between the Employers and the Union, or any provision of an applicable current participation agreement between the Employers and the Trustees, provided that the provisions of such collective bargaining agreement or participation agreement are not inconsistent with any provision of this Trust Agreement, in which case, the terms of the Trust Agreement shall govern; (2) with this Trust Agreement; and (3) with any applicable Federal, State or local law.

**Section 4.9**.  **Additional Authority**.  The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law to use and apply the EPB Fund for the following purposes:

(a)  To enter into any and all contracts and agreements for carrying out the terms of this Trust Agreement and for the administration of the EPB Fund. and to do all acts as they, in their sole discretion, may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the Participants, Beneficiaries and Retirees involved.

31

(b)   To keep property and securities registered in the names of the Trustees or of the EPB Fund or in the name of any other individual or entity duly designated by the Trustees.

(c)   To establish and accumulate as part of the EPB Fund such reasonable reserve funds as the Trustees, in their sole discretion, deem necessary or desirable to carry out the purposes of the EPB Fund.

(d)   To pay out of the EPB Fund all real and personal property taxes, income taxes, and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the EPB Fund, or any money, property, or securities forming a part thereof.

(e)   To do all acts, whether or not expressly authorized herein, which the Trustees, in their sole discretion, may deem necessary or proper for the protection of the property held hereunder.

(f)   To sell, exchange, lease, convey, mortgage or dispose of any property, whether real or personal, at any time forming a part of the EPB Fund upon such terms as they, in their sole discretion, may deem proper, and to execute and deliver any and all instruments of conveyance, lease, mortgage and transfer in connection therewith.

**Section 4.10.**   **Bonds**.   The Trustees shall obtain from an authorized surety company such bonds as may be required by law, including fidelity bonds, covering such persons and in such amounts, but not less than required by law, as the Trustees, in their sole discretion, may determine. The cost of premiums for such bonds shall be paid out of the EPB Fund.

32

**Section 4.11**. **Insurance**. The Trustees may, in their sole discretion, obtain and maintain policies of insurance, including fiduciary liability insurance, to the extent permitted by law, to insure themselves, the EPB Fund as such, as well as employees or agents of the Trustees and of the EPB Fund, while engaged in business and related activities for and on behalf of the EPB Fund (a) with respect to liability to others as a result of acts, errors or omissions of such Trustee or Trustees, employees or agents, respectively, provided such insurance policy shall provide recourse by the insurer against the Trustees as may be required by law; and (b) with respect to injuries received or caused by such Trustee or Trustees, employees or agents, or property damage suffered or caused by such Trustee or Trustees, employees or agents. To the extent permitted by law, the cost of the premiums for such policies of insurance shall be paid out of the Trust Fund.

**Section 4.12**. **Information To Participants And Beneficiaries**. The Trustees shall provide Participants, Beneficiaries and Retirees such information as may be required by law.

**Section 4.13**. **Accountants And Actuaries**. The Trustees may engage one (1) or more independent qualified public accountants and one (1) or more enrolled actuaries or other such consultants to perform all services as may be required by applicable law and such other services as the Trustees may deem necessary.

**Section 4.14**. **Reports**. All reports required by law to be signed by one (1) or more Trustees shall be signed by all of the Trustees, provided that all of the Trustees may appoint in writing,

or by resolution adopted, two (2) or more of their members to sign such report on behalf of the Trustees, one (1) of whom shall be a Union Trustee and one (1) of whom shall be an Employer Trustee.

**Section 4.15**. **Records of Trustee Transactions**. The Trustees shall keep true and accurate books of account and a record of all of their transactions and meetings, including actions taken at such meetings and by informal action of the Trustees, which records and books shall be audited at least annually by an independent qualified public accountant. A copy of each audit report shall be furnished to each Trustee with reasonable promptness after completion and shall be made a part of the record and shall be available for inspection by interested persons at the office of the EPB Fund, and a copy of the said report shall be delivered to each Trustee.

**Section 4.16**. **Construction And Determinations By Trustees**.

(a) Subject to the stated purposes of the EPB Fund and the provisions of this Trust Agreement, the Trustees shall have full and exclusive discretionary authority to determine all questions or controversies of whatsoever character arising in any manner or between any parties or persons in connection with the EPB Fund or the operation thereof, whether as to any claim of coverage and eligibility, methods of providing or arranging for benefits, construction of the provisions of this Trust Agreement and the terms used herein, the plan of benefits, or the bylaws, regulations and the Summary Plan Descriptions issued thereunder, or as to any writing, decision, instrument or accounts in connection with the operation of the EPB Fund or otherwise. Such questions or

34

controversies shall be submitted to the Trustees, or where Trustee responsibility has been delegated to others, to such persons, for decision.  The Trustees, or where Trustee responsibility has been delegated to others, such other person, shall, subject to the requirements of law, be the sole judges of the standard of proof required in any case and the application and interpretation of this Trust Agreement, and the decisions of the Trustees or their delegates shall be final and binding.

(b)  In the event that any Participant, Beneficiary, or Retiree who applies for benefits under this Trust Agreement is adversely affected by any action of the Trustees, no lawsuit or other action may be filed by the said Participant, Beneficiary or Retiree until the matter is submitted for review under the appeal procedures provided in Section 6.3 herein and as provided in the Act.  The decision on review shall be binding upon all persons dealing with the EPB Fund or claiming any benefits hereunder, except to the extent that such decision may be determined to be arbitrary or capricious by a court or arbitrator having jurisdiction over such matter.

(c)  No matter in respect to the foregoing or any difference arising thereunder or any matter involved in or arising under this Trust Agreement shall be subject to the grievance or arbitration procedure established in any collective bargaining agreement between the Employers and the Union; provided, however, that this Section shall not affect the rights and liabilities of any of the parties under any of such collective bargaining agreements.

35

**Section 4.17**.   **Liability**.   The Trustees, to the extent permitted by applicable law, shall incur no liability in acting upon any instrument, application, notice, request, signed letter, telegram or other paper or document believed by them to be genuine and to contain a true statement of facts, and to be signed by the proper person.

**Section 4.18**.   **Reliance On Written Instruments**.   Any Trustee, to the extent permitted by applicable law, may rely upon any instrument in writing purporting to have been signed by a majority of the Trustees as conclusive evidence of the fact that a majority of the Trustees have taken the action stated to have been taken in such instrument.

**Section 4.19**.   **Reliance By Others**.   No party dealing with the Trustees shall be obligated (a) to see the application to the stated Trust purposes of any funds or property of the EPB Fund; or (b) to see that the terms of this Trust Agreement have been complied with; or (c) to inquire into the necessity or expediency of any act of the Trustees.   Every instrument executed by the Trustees as provided herein shall be conclusive evidence in favor of every person relying thereon (a) that at the time of the execution of the instrument, the Trust was in full force and effect; (b) that the instrument was executed in accordance with the terms and conditions of this Trust Agreement; and (c) that the Trustees were duly authorized and empowered to execute the instrument.

36

## ARTICLE V

## CONTRIBUTIONS AND COLLECTIONS

**Section 5.1**.   **Payment Of Contributions**.

(a)   Each Employer shall make prompt contributions or payments to the EPB Fund in such amount, as determined by the Trustees, and under the terms specified by the rules and regulations of the Trustees, for employee classifications specified in the applicable collective bargaining agreements or participation agreements in effect from time to time between the Employer or its bargaining representative, the Union, or the EPB Fund.   The Employer agrees that such contributions shall constitute an absolute obligation to the EPB Fund, and such obligation shall not be subject to set-off or counterclaim which the Employer may have for any liability of the Union or of an Employee.   Each Employer, at the time of payment, of required contributions, shall provide to the Union representative a copy of the notated monthly billing statement submitted to the EPB Fund.

(b)   Each Employee, Participant, Beneficiary or Retiree required to make Employee Contributions shall make such contributions in a prompt manner to the EPB Fund in such amount and under the terms stated in the applicable plan of benefits established pursuant to this Trust Agreement.   Such Employee, Participant, Beneficiary or Retiree agrees that such contributions shall constitute an absolute obligation to the EPB Fund, and such obligation shall not be subject to set-off or counterclaim which

37

the Employee, Participant, Beneficiary or Retiree may have for any liability of the Union or of an Employer.

(c)  Contributions to the EPB Fund shall be paid to the Trustees or to such depository as the Trustees shall designate, only by check, bank draft, money order, electronic funds transfer or other recognized written method of transmitting money or its equivalent, made payable to the order of the Employment Partners Benefits Fund. The payment of contributions shall be made by the 20th of each month or periodically at such times as the Trustees shall specify by rules and regulations.

(d)  Each Employer shall be responsible only for the contributions payable on account of Employees covered by the Employer, except as may be otherwise provided by the Trust Agreement or by law.  The Association or any other employers' association or groups shall not be responsible for the contributions, payments or other obligations of any other Employer, or otherwise.

**Section 5.2**.  **Receipt Of Payment And Other Property Of Trust**.

The Trustees, or such other person or entity designated or appointed by the Trustees in accordance with Section 4.7 herein, are hereby designated as the persons to receive the payments heretofore or hereafter made to the EPB Fund by the Employers or Employees, Participants, Beneficiaries or Retirees. The Trustees are hereby vested with all right, title and interest in and to such monies and all interest which may be accrued thereon, and are authorized to receive and be paid the same.

38

**Section 5.3.  Collection And Enforcement Of Payments.**

(a)  The Trustees, or such other person or entity designated in accordance with Section 4.7 herein, and when directed by the Board of Trustees, shall have the power to demand, collect and receive Employer Contributions, Employee Contributions, and all other money and property to which the Trustees may be entitled, and shall hold the same until applied to the purposes provided in this Trust Agreement.  The Trustees, in their sole discretion, may take such steps, including the termination of coverage under the EPB Fund of an Employee, Participant, Beneficiary or Retiree who fails to make required Employee Contributions, or the termination of coverage under the EPB Fund of an Employee, Participant, Beneficiary or Retiree for whom an Employer fails to make the required Employer Contributions, or the institution and prosecution of, or the intervention in, such legal or administrative proceedings as the Trustees, in their sole discretion, determine to be in the best interest of the EPB Fund for the purpose of collecting such contributions, payments, money and property, without prejudice, however, to the rights of the Union to take whatever steps it deems necessary and wishes to undertake for such purposes.  To the extent permitted by law, the cost of such legal or administrative proceedings incurred by the EPB Fund shall be paid out of the Trust Fund.

(b)  In the event of the failure to pay Employer Contributions or Employee Contributions when due and payable, the Employer or Employee, Participant, Beneficiary, or Retiree, respectively, shall

be considered delinquent and in breach of this Trust Agreement, and shall be subject to the provisions of the Act pertinent to the collection of delinquent contributions.  The Trustees may require the payment of delinquent contributions, and interest and liquidated damages in the amounts determined by the Trustees in their sole discretion, for each such failure to pay in full within the time provided, and of other costs and expenses and interest, such as without limitation, attorneys fees, filing fees and costs of service of papers, incurred by the Trustees and lawful under the Act and arising out of the collection of such delinquent contributions.

(c)  If an Employer shall fail to pay Employer Contributions when due and payable, and is in default for five (5) days, the Employer shall be considered delinquent and in breach of this Trust Agreement, and shall be subject to the provisions of the Act pertinent to the collection of delinquent contributions.  Such delinquent Employer shall be required to pay as liquidated damages an amount equal to twenty (20%) percent of the total principal amount of the delinquency, or such other amount as the Trustees, in their sole discretion, may determine.  In addition, such delinquent Employer shall be liable for the Trustees' reasonable expenses, including reasonable attorneys' fees and expenses actually incurred, interest at the rate of eight (8%) percent per annum, or such other rate as the Trustees may establish by rules and regulations, audit fees, court costs and other disbursements incurred in the collection of such delinquent Employer's Contributions.

40

**Section 5.4**. **Non-Payment Of Benefits**. To the extent permissible by law, the Trustees may, in their sole discretion, by rules and regulations or by other means, provide that no benefits will be payable to Participants, Beneficiaries, or Retirees during any period in which the Employer has failed to pay contributions when due, and benefits of such Participants, Beneficiaries, or Retirees may be terminated involuntarily if an Employer is delinquent in remitting contributions, liquidated damages, interest or other accrued costs and expenses to the EPB Fund. The Trustees may withhold processing any claim of a Participant, Beneficiary, or Retiree for benefits when the Employer is delinquent in the payment of contributions, liquidated damages, interest or other accrued costs and expenses. If an Employer enters into a state or federal bankruptcy, insolvency or receivership proceeding, and subsequently fails to adopt the pertinent portion of the collective bargaining agreement concerning contributions to the EPB Fund, benefit coverage of the Employer's Participants, Beneficiaries or Retirees shall be terminated involuntarily.

**Section 5.5**. **Production Of Records**. Notwithstanding the provisions of Section 5.6 herein, each Employer shall promptly furnish to the Trustees, on demand, the names of its Employees, their Social Security numbers, the hours worked and the initial date of employment of each Employee, and such other payroll records and information as the Trustees may reasonably require in connection with the administration of the EPB Fund and the undertaking of a compliance audit pursuant to Section 5.6 herein, and for no other

purpose. Each Employer shall also submit in writing to the Trustees, at such regular periodic intervals and in such form as the Trustees may establish, such of the above data as may be requested by the Trustees. The Trustees and the insurance carrier, when so authorized by the Trustees, may, by their respective representatives, examine the pertinent employment and payroll records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the EPB Fund and of the contracts or policies of insurance. The Union shall, upon the request of the Trustees, promptly furnish information in respect to an Employee's employment status.

**Section 5.6**. **Compliance Audit**. The Trustees, at their sole discretion, may institute such compliance audit programs as required by law, providing for the audit of each Employer, and the Trustees, or their representatives, shall have the right to examine and make copies of all or any part of the books and records of any Employer, including without limitation, ledgers, contracts, tax returns or reports and any other book or record which the Trustees deem necessary or desirable in connection with such compliance audit. The Trustees make take or institute such legal or administrative proceedings against Employers who refuse to permit such a compliance audit, and may require the payment of audit fees, attorneys' fees, interest and other costs arising out of such proceedings.

**Section 5.7**. **Non-Payment Of Contributions By Employer**. Non-payment, or non-conforming payment of contributions by any

42

Employer, shall not relieve any other Employer from its obligation to make required payments to the EPB Fund.

## ARTICLE VI

## CONTROVERSIES AND DISPUTES

**Section 6.1.**  **Reliance On Records**.  In any controversy, claim, demand, suit at law or other proceeding between any Participant, Beneficiary, Retiree or any other person and the Trustees, the Trustee shall be entitled to rely upon any facts appearing in the records of the Trustees, any facts certified to the Trustees by the Union or the Employers, any facts which are of public record, and any other evidence pertinent to the issue involved.

**Section 6.2.**  **Submission To Trustees**.  As provided in Section 4.16 herein, all questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the EPB Fund or the operation thereof, whether as to any claim for any benefits preferred by any Participant, Beneficiary, Retiree or any other person, or whether as to the construction of the language or meaning of the bylaws, rules and regulations adopted by the Trustees or this Trust Agreement, or as to any writing, decision, instrument or accounts in connection with the operation of the EPB Fund or otherwise, shall be submitted to the Trustees, or where Trustee responsibility has been delegated to a claims administrator or others, to such other persons for decision.  Discretionary authority is granted to the Trustees, or their claims administrator, to interpret the terms of coverage and determine the facts, and render a decision.  The decision of the Trustees or their delegates shall be binding upon all persons dealing with the EPB Fund or claiming benefits thereunder.  In the event

44

that any Participant, Beneficiary or Retiree who applies for benefits under the EPB Fund is adversely affected by any action of the Trustees, no lawsuit or other action may be filed by said Participant, Beneficiary or Retiree until the matter is submitted for review under the appeal procedures provided in Section 6.3 herein and as provided by the Act.   If the decision is challenged in a lawsuit, the decision is to be reviewed under a heightened "abuse of discretion" standard.

**Section 6.3.**   **Appeal Procedure**.

(a)   Any Participant, Beneficiary or Retiree who applies for benefits under this Trust Agreement and receives an adverse benefit determination or who believes he did not receive the full amount of benefits to which he is entitled, or who is otherwise adversely affected by any action of the Trustees, shall have the right, as provided in the Act, or applicable regulations, and by such procedures as shall be established by the Trustees and/or the Claims Administrator, to request an appeal with the Claims Administrator and/or the Board of Trustees.   If appeal comes before the Trustees, the Board or a designated Hearing Panel (to be composed of at least two (2) Trustees, one (1) of whom shall be a Union Trustee and one (1) of whom shall be an Employer Trustee) shall conduct a hearing in the matter, provided that the Participant, Beneficiary or Retiree makes such a request, in writing, within sixty (60) days after being apprised of, or learning of, the Board of Trustees' action.

(b)   The Claims Administrator or Hearing Panel shall then conduct a hearing, at which the Participant, Beneficiary or Retiree shall be entitled to present his position and any evidence in support

thereof.   The Participant, Beneficiary or Retiree may be represented at any such hearing by an attorney or by any other representative of his choosing at the Participant's, Beneficiary's or Retiree's own expense.   Thereafter, the Claims Administrator or the Trustees, in exercise of their discretionary authority to adjudicate the facts and interpret the terms of the plan, shall issue a written decision within sixty (60) days after such hearing affirming, modifying or setting aside their former action, as provided in the Act.

(c)   As provided in Section 4.16 herein, the decision on review shall be binding upon all persons dealing with the EPB Fund or claiming any benefit hereunder, except to the extent that such decision is challenged in a court or arbitrator having jurisdiction over the matter.

**Section 6.4**.   **Settling Of Disputes**.   The Trustees may, in their sole discretion, compromise or settle any claim or controversy in any such manner as they determine appropriate and in accordance with the applicable provisions of law.   Any majority decision made by the Trustees in compromise or settlement of the claim or controversy, or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties interested in the EPB Fund.

## ARTICLE VII

### BENEFICIAL RIGHTS

**Section 7.1.** **No Rights, Title Or Interest Of Employers, Unions And Employees.** No Employer, Union, Employees, or Participants, Beneficiaries, or Retirees shall have any right, title or interest in or to the EPB Fund or any part thereof.

**Section 7.2. Limitations Upon Beneficial Rights Of Employees.** No Employee, Participant, Beneficiary or Retiree, or any other person, shall have any right, title or interest in or to the EPB Fund or any part thereof; provided, however, that any Participant, Beneficiary or Retiree who shall be covered by an insurance plan, shall be entitled to the benefits in the forms and amounts and subject to the terms and conditions of such insurance plan and of this Trust Agreement; provided, further, however, that the benefits shall be free from the interference and control of any creditor, and no benefits shall be subject to any assignment or other anticipation, nor subject to seizure or to sale under any legal, equitable or any other process, and in the event that any claim or benefit shall, because of any debt incurred by or resulting from any other claim or liability against any Participant, Beneficiary or Retiree, by reason of any sale, assignment, transfer, encumbrance, anticipation or other disposition made or attempted by said Participant, Beneficiary or Retiree, or by reason of any seizure or sale or attempted sale under any legal, equitable or other process, or in any suit or proceeding, become payable, or be liable to become payable, to any person other than the Participant, Beneficiary or

47

Retiree for whom the same is intended, as provided herein, pursuant hereto, the Trustees, in their sole discretion, may withhold payment of such benefit to such Participant, Beneficiary or Retiree until such assignment, transfer, encumbrance, anticipation or other disposition, writ or legal process is cancelled or withdrawn in such manner as shall be satisfactory to the Trustees.  Until so cancelled or withdrawn, the Trustees shall have the right to use and apply the benefits, as the Trustees, in their sole discretion, may deem best, directly for the support and maintenance of such Participant, Beneficiary or Retiree.  Notwithstanding any provisions contained in this Section to the contrary, unless expressly agreed to by the Trustees, or the Claims Administrator, any Participant, Beneficiary or Retiree may not assign their right to dispute allowed plan benefits to a health care provider.  The only exception to this Section shall be a benefit payable pursuant to a Qualified Domestic Relations Order under the terms and conditions provided in the Act.

## **ARTICLE VIII**

## **ADMISSION OF EMPLOYERS AND UNIONS**

**Section 8.1.  Other Employers And Unions May Join**.  Employers and Unions may provide for coverage of eligible employees under a written agreement, conditioned upon such participation in the plan being accepted by the Trustees, subject to such conditions as the Trustees, in their sole discretion, may provide in their regulations or otherwise.

**Section 8.2.  Reciprocity Agreements**.  The Trustees, in their sole discretion, may enter into such reciprocity agreement or agreements with other health and welfare funds as they determine to be in the best interests of the EPB Fund, provided that any such reciprocity agreement or agreements shall not be inconsistent with the terms of this Trust Agreement or the collective bargaining agreements or participation agreements under which this Trust Agreement is maintained or to the applicable provisions of the Act.

**Section 8.3.  Merger**.  The Trustees shall have the power to merge with any other fund established for similar purposes as the EPB Fund under terms and conditions mutually agreeable to the respective Boards of Trustees and the applicable provisions of the Act.

## ARTICLE IX

## TERMINATION OF TRUST

**Section 9.1.** **Conditions Of Termination**.  This Trust Agreement shall cease and terminate upon the happening of any one or more of the following events:

(a)  In the event the EPB Fund shall, in the opinion of the Trustees, be inadequate to carry out the intent and purposes of this Trust Agreement, or be inadequate to meet the payments due or to become due under this Trust Agreement and under the plan of benefits to Participants, Beneficiaries and Retirees already receiving benefits; or

(b)  In the event there are no individuals living who can qualify as Employees hereunder; or

(c)  In the event of termination by action of the Union and the Employers; or

(d)  In the event of termination as may be otherwise provided by law.

**Section 9.2.** **Procedures In Event Of Termination**.  In the event of final termination, the Trustees shall make provision out of the EPB Fund for the payment of expenses incurred up to the date of termination of the Trust and the expenses incidental to such termination and distribute the remaining assets in accordance with the applicable provisions of this Trust Agreement and the Act.

50

## ARTICLE X

## MISCELLANEOUS

**Section 10.1**. **Law Applicable**.  This Trust is created and accepted in the Commonwealth of Pennsylvania and all issues pertaining to the validity or construction of this Trust Agreement and of the acts and transactions of the parties hereto shall be determined in accordance with the laws of the Commonwealth of Pennsylvania, except as to matters governed by Federal law.

**Section 10.2**. **Savings Clause**.  In the event any provision of this Trust Agreement is held to be unlawful, or unlawful as to any person or instance, such fact shall not adversely affect the other provisions herein contained or the application of the said provisions to any other person or instance, unless such illegality shall make impossible the functioning of the EPB Fund.

**Section 10.3**. **Refund Of Contributions**.  In no event shall any Employer or Employee, Participant, Beneficiary or Retiree, directly or indirectly, receive any refund on contributions made by them to the EPB Fund, except upon written request within 60 days, and only in the case of a bona fide erroneous payment or overpayment of contributions, to the extent permitted by law and as permitted by the Trustees in their sole discretion, nor shall an Employer directly or indirectly participate in the disposition of the EPB Fund or receive any benefits from the EPB Fund.  Upon payment of contributions to the Trustees, all responsibilities of the Employer or Employee, Participant, Beneficiary or Retiree for each contribution shall cease, and the Employer or Employee, Participant,

51

Beneficiary or Retiree shall have no responsibility for the acts of the Trustees, nor shall an Employer or Employee, Participant, Beneficiary or Retiree be obliged to see to the application of any funds or property of the Trust Fund or to see that the terms of this Trust Agreement have been complied with.

**Section 10.4.** **Accounting And Judicial Settlements.**

(a)  The Union or the Employers may, at any time, demand of the Trustees an accounting with respect to any and all accounts, provided that the party demanding such accounting agrees to pay the necessary expenses thereof.

(b)  The Trustees shall be entitled, at any time, and in their sole discretion, to have a judicial settlement of their accounts and to seek judicial protection by any action or proceeding they, in their sole discretion, determine necessary and, further, to obtain a judicial determination or declaratory judgment as to any question of construction of this Trust Agreement or for instructions as to any action thereunder and, further, as to any question relating to the discharge of their duties and obligations under, or in connection with, the administration of this Trust and as to the distribution of assets belonging to the EPB Fund.  Any such determination, decision or judgment shall be binding upon all parties to, or claiming under, this Trust Agreement.  To the extent permitted by law, the cost of such judicial settlements shall be paid out of the Trust Fund.

**Section 10.5.** **Withholding Payment.**  In the event any question or dispute shall arise as to the proper person or persons to whom

52

any payments shall be made hereunder, the Trustees may withhold such payment until there shall have been made an adjudication of such question or dispute which, in the Trustees' sole discretion, is satisfactory to them, or until the Trustees shall have been fully protected against loss by means of such indemnification agreement or bond as they, in their sole discretion, determine to be adequate.

Section 10.6. **Gender**. Whenever any words are used in this Trust Agreement in the masculine gender, they shall also be construed in a gender neutral fashion, in all situations where they would so apply; and whenever any words are used in the singular, they shall also be construed to include the plural in all situations where they would so apply; and whenever any words are used in the plural, they shall also be construed to include the singular.

Section 10.7. **Amendment Of Trust Agreement**.

(a)  The provisions of this Trust Agreement may be amended at any time by an instrument in writing executed by the Trustees, and approved by an affirmative vote of a majority of the Trustees, provided that no amendment shall divert or provide for the use of the Trust Fund from the purposes of the EPB Fund to provide benefits in the event of death, illness or accident to the Employees, Participants, Beneficiaries or Retirees as hereinabove set forth, or for the payment of such benefits as may be authorized herein. It is further provided that no amendment shall (1) provide for the use or application of the EPB Fund for any purpose other than those set forth herein; or (2) permit the return to, or payment of the EPB Fund, or any part thereof, to any Employer or Employee,

53

Participant, Beneficiary or Retiree, except a contribution or other payment made by mistake of fact to the extent permitted by law and as provided in Section 10.3 herein; or (3) so amend this Trust Agreement that there shall not be an equal number of Employer Trustees and of Union Trustees to administer the EPB Fund.

(b)  All amendments adopted by the Trustees shall be filed as part of the record and minutes of the Trustees, and a copy thereof shall be sent to each Union, each Employer, and to such other persons as required by law.

**Section 10.8**.  **Article And Section Titles**.  The Article and Section titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Trust Agreement or be construed as part thereof.

**Section 10.9**.  **Notice**.  Notice given to a Trustee, Union, Employer, Employee, or any other person shall, unless otherwise specified herein or by law, be sufficient if in writing and delivered in person to or sent by prepaid first class mail, express delivery service, email (provided a return receipt is actually returned) to the last postal address, or email address, as maintained by the Trustees or the Fund Office.  Except as herein otherwise provided, the delivery of any statement or document required hereunder to be made to a Trustee, Union, Employer, Employee, or any other person shall be sufficient if delivered in person or if sent by prepaid first class mail or email to the recipient's last known postal address, or email address, as filed with the Trustees, or the Fund Office.

54

**Section 10.10. Protected Health Information.** The Trustees are required to adopt and, therefore do adopt, certain policies and procedures regarding the protection, handling, security breach notification and disclosure of Protected Health Information ("PHI"). Pursuant to law and regulations, the Trustees have adopted, and may from time to time amend, procedures designed to ensure that all participants receive notice of the EPB Fund's Privacy Policies, adopted at the meeting of April 2, 2003, in furtherance of the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). For purposes of HIPAA privacy rules, all parties, including Trustees and Contributing Employers, to the extent those parties are included in the term "Plan Sponsor," and which are involved in the establishment or maintenance of the EPB Fund, or otherwise bound to the terms and conditions of this Trust Agreement, to the extent they may come into possession of PHI, are required to comply with the privacy obligations of the Plan Sponsor as outlined below:

(a) All employees who are participants in the EPB Fund shall be provided a copy of the EPB Fund's "Notice of Privacy Practices," or amendments thereto.

(b) Disclosure of PHI to Plan Sponsor. The EPB Fund shall only disclose PHI to the Plan Sponsor to the extent necessary to assist the Trustees in performing administrative functions, such

55

as the verification of eligibility, billing, or participation in a claims appeal procedure.

(c) Any party obligated to comply with the privacy duties imposed upon the EPB Fund and who comes into possession of PHI is bound to comply with the following requirements, but only to the extent it may come into possession of PHI:

(i)  Prohibition on Unauthorized Use or Disclosure of PHI. The Plan Sponsor will not use or disclose any PHI received from the EPB Fund, except as permitted in these documents or required by law.

(ii)  Subcontractors and Agents.  The Plan Sponsor will require each of its subcontractors or agents to whom the Plan Sponsor may provide PHI to agree to written contractual provisions that impose at least the same obligations to protect PHI as are imposed on the Plan Sponsor.

(iii)  Permitted Purposes.  The Plan Sponsor will not use or disclose PHI for employment-related actions and decisions or in connection with any other of Plan Sponsor's benefits or employee benefit plans.

(iv)  Reporting.  The Plan Sponsor will report to the EPB Fund any impermissible or improper use or disclosure of PHI not authorized by the Plan documents.

56

(v)  Access to PHI by Participants.  The Plan Sponsor will make PHI available to the EPB Fund to permit participants to inspect and copy their PHI contained in the designated record set.

(vi)  Correction of PHI.  The Plan Sponsor will make a participant's PHI available to the EPB Fund to permit participants to amend or correct PHI contained in the designated record set that is inaccurate or incomplete and Plan Sponsor will incorporate amendments provided by the Plan.

(vii)  Accounting of PHI.  The Plan Sponsor will make a participant's PHI available to permit the Plan to provide an accounting of disclosures.

(viii)  Disclosure to Government Agencies.  The Plan Sponsor will make its internal practices, books and records relating to the use and disclosure of PHI available to the EPB Fund and to the United States Department of Health and Human Services or its designee for the purpose of determining the EPB Fund's compliance with HIPAA.

(ix)  Return or Destruction of Health Information.  When PHI is no longer needed for the purpose for which disclosure was made, the Plan Sponsor must, if feasible, return to

the Plan or destroy all PHI that the Plan Sponsor received from or on behalf of the EPB Fund.  This includes all copies in any form, including any compilations derived from the PHI.  If return or destruction is not feasible, the Plan Sponsor agrees to restrict and limit further uses and disclosures to the purposes that make the return or destruction infeasible.

(x)  Minimum Necessary Requests.  The Plan Sponsor will use best efforts to request only the minimum necessary type and amount of PHI to carry out the functions for which the information is requested.

(d) Adequate Separation.  The Plan Sponsor represents that adequate separation exists between the EPB Fund and Plan Sponsor so that PHI will be used only for plan administration.  In the event employees or representatives of the Plan Sponsor (such as the individual Trustees of the EPB Fund) come into possession of PHI, Plan Sponsor represents that such individuals will be identified to the EPB Fund, that access and use of PHI will only occur in connection with the purposes set forth in sub-section (a) above, and, in the event Plan Sponsor suspects an improper use or disclosure of PHI, such incident shall be reported to the EPB Fund's Privacy Officer, as identified in the Fund's most recent Privacy Policy.

58

**Section 10.11.** **Electronic Protected Health Information.** The EPB Fund will comply with the HIPAA security regulations with respect to Electronic Protected Health Information ("ePHI") that is created, received, maintained or transmitted, except for ePHI: (1) it receives pursuant to an appropriate authorization (as described in 45 C.F.R. section 164.504(f)(1)(ii) or (iii)); or (2) that qualifies as Summary Health Information and that it receives for the purpose of either (a) obtaining premium bids for providing health insurance coverage under the Plan, or (b) modifying, amending or terminating the Plan (as authorized under 45 C.F.R. section 164.508). If other terms of the EPB Fund conflict with the following provisions, the following provisions shall control. The Security Regulations are incorporated herein by reference. The EPB Fund shall, in accordance with the Security Regulations:

(a) Implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the ePHI that it creates, receives, maintains or transmits on behalf of the Plan.

(b) Ensure that "adequate separation" is supported by reasonable and appropriate security measures. "Adequate separation" means the EPB Fund will use ePHI only for Plan administration activities and not for employment related actions or for any purpose unrelated to Plan administration. Any employee or fiduciary of the EPB Fund who uses or discloses ePHI in violation

59

of the Plan's security or privacy policies and procedures of this Plan provision shall be subject to the Plan's disciplinary procedure.

(c) Ensure that any agent or subcontractor to whom it provides ePHI agrees to implement reasonable and appropriate security measures to protect the information.

(d) Report to the Plan any Security Incident of which it becomes aware.

## EXECUTION BY TRUSTEES

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amended And Restated Agreement And Declaration Of Trust to be executed this 5th day of April, 2022, to be effective January 1, 2022, thereby amending and restating the Agreement And Declaration Of Trust between the parties previously amended and restated as of January 1, 2000, and subsequently amended thereafter.

_____     _____
Keith P. Frank                       M.E. Doutt

_____     _____
Charles M. Gaston                    Doug Longenette

_____     _____
Richard L. Keller                    Raymond J. Miller

_____     _____
Kevin M. Schmitt                     Jeffrey J. O'Hara

_____     _____
Scott J. Stanley                     Robert Perkins

Amended and Restated as of January 1, 2022

61

# EXHIBIT 3



**JUBELIRER, PASS & INTRIERI, P.C.**
*Attorneys-at-Law*

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon
J. Skye McCollum
Calder Buisch**

\* also admitted in Ohio
\*\* also admitted in Wisconsin

*of counsel*
Joseph M. Burns***
\*\*\* licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

March 26, 2025

VIA EMAIL & USPS
rlowe@kingballow.com

Richard Lowe
King & Ballow
26 Century Blvd, Suite NT 700
Nashville, Tennessee 37214

Re: Pittsburgh Post-Gazette 10(e) Injunction

Dear Richard:

Pursuant to the Third Circuit's Order dated March 24, 2025, the News Guild formally requests that the Post-Gazette rescind the changes in the terms and conditions of employment related to health insurance for the News Guild's bargaining unit that were unilaterally implemented on or about July 27, 2020, and restore the healthcare provisions set forth in the 2014-2017 contract as interpreted by Arbitrator Nadelbach in his 2019 decision and affirmed by the Third Circuit. *PG Publ'g Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308 (3d Cir. 2021). The Union requests that the applicable terms of the 2014-2017 contract be restored no later than April 1, 2025.

Although you have refused to utilize the services of the FMCS previously, the Union strongly suggests reconsidering. In light of the difficulties we have experienced in reaching a new agreement, employing the assistance of a professional mediator, provided without cost by the FMCS, would be very beneficial.

Please advise if you are agreeable to using FMCS, in which event we will contact them for available dates so that we can move forward in reaching an agreement between the parties.

We look forward to productive negotiations where the Post-Gazette complies with the Third Circuit's Order and bargains in good faith with the Union. We believe it would be very beneficial in facilitating bargaining if, prior to our next meeting, you could kindly share with us



an electronic copy of an updated proposal from the Post-Gazette, with clearly marked red-line changes.

Sincerely,

Joseph J. Pass, Esq.



# EXHIBIT 4

KING & BALLOW

LAW OFFICES

26 CENTURY BOULEVARD

SUITE NT 700

NASHVILLE, TENNESSEE 37214

TELEPHONE: 615/259-3456

FACSIMILE: 888/688-0482

www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

March 27, 2025

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA  15222

> Re:    Confidential Strike Settlement Discussions Pursuant to Rule 408 of the Federal
> Rules of Evidence and Newspaper Guild of Pittsburgh/CWA Local 38061 (the
> "Union")

Dear Joe:

As you are aware, the Post-Gazette and four (4) other unions at the Newspaper each reached a Labor Dispute Settlement Agreement ("Agreement") which settled its strike against the Company on an amicable basis.  The Teamsters, Pressmen, Mailers and the Advertising bargaining units all engaged in successful confidential settlement discussions under Rule 408 of the Federal Rules of Evidence to reach these Agreements.

The Agreements are fair to both parties.  For example, Administrative Law Judge Lisa Friedheim-Weis fully supported and endorsed the Labor Dispute Strike Settlement Agreement reached with Teamsters Local Union 211/205 in April 2024.  I have attached a copy of Judge Friedheim-Weis's Order approving the Labor Dispute Settlement Agreement to settle the strike. (Attachment 1).  The judge found the settlement agreement to be reasonable and that it satisfied the reasonableness standard set forth in *Independent Stave*, 287 NLRB 740 (1987).

In March 2025, the Mailers, Pressmen and Advertising unit unions each signed a substantially similar Labor Dispute Settlement Agreement amicably settling its strike against the Post-Gazette.

   The Company invites the Union to also participate in confidential strike settlement discussions under Rule 408 so that an amicable agreement to end the Union's strike can be reached. The Company is available next week, beginning Tuesday, April 1, 2025 to engage in Rule 408 discussions.  I look forward to a favorable response from the Union.

Sincerely,

Richard C. Lowe

Attachment

cc:   Rob Weber

**Attachment 1**

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

PG PUBLISHING CO., INC.,
d/b/a PITTSBURGH POST-GAZETTE

Respondent

Case  06–CA–302612

and

NEWSPAPER, NEWSPRINT, MAGAZINE
AND FILM DELIVERY DRIVERS,
HELPERS AND HANDLERS, A/W THE
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS AND ITS LOCAL UNION
NO. 211/205 OF ALLEGHENY CO.

Charging Party

## ORDER APPROVING SETTLEMENT AND CONDITIONALLY CLOSING TRIAL RECORD

Trial proceedings in this case were held before me at Region 6 from January 22-25, 2024. During trial, the parties presented evidence related to complaint allegations that Respondent violated Section 8(a)(5) and (1) of the National Labor Relations Act by failing to bargain with the Charging Party.

As of the issuance of this Order, post-trial briefs had been set for submission on April 19, 2024. However, on April 16, 2024, I received email communications from Counsels for the General Counsel, Respondent, and Union, along with a non-Board settlement of the litigated matter, and encapsulating the two open cases between the parties, which had not been part of the instant proceeding, and for which complaint has not issued. The parties have requested approval of the non-Board settlement and a conditional withdrawal of the charge with a 60-day maximum period to ensure compliance and allow for a waiver period.

Since the trial record is open and the case is under my jurisdiction, I must evaluate whether the settlement should be approved under the applicable legal standard.

### Applicable Legal Standard

In *UPMC*, 365 NLRB No. 153 (2017), the Board announced that it was returning to the practice of analyzing all settlement agreements under the reasonableness standard set forth in *Independent Stave*, 287 NLRB 740 (1987). The *Independent Stave* standard

requires the judge to examine all the surrounding circumstances to determine whether a proposed non-Board settlement agreement is reasonable, including considering the following factors:

(1) whether the charging party(ies), the respondent(s), and any of the individual discriminatee(s) have agreed to be bound, and the position taken by the General Counsel regarding the settlement;

(2) whether the settlement is reasonable in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of litigation;

(3) whether there has been any fraud, coercion, or duress by any of the parties in reaching the settlement; and

(4) whether the respondent has engaged in a history of violations of the Act or has breached previous settlement agreements resolving unfair labor practice disputes.

*UPMC*, 365 NLRB No. 153, slip op. at 7 (quoting *Independent Stave*).

### Discussion and Analysis – Is the Proposed Settlement Agreement Reasonable under *Independent Stave*?

I have reviewed the non-Board settlement that the parties have presented and executed.

#### *Independent Stave* Factor One

Respondent and Teamsters Local Union No. 211/205 (Charging Party) have agreed to be bound by the proposed non-Board settlement agreement. Counsel for the General Counsel has agreed in writing that it has no objection to the non-Board settlement agreement. Based on the parties' positions and in the absence of any objections, I find that the first *Independent Stave* factor weighs in favor of approving the proposed settlement.

#### *Independent Stave* Factor Two

The non-Board settlement provides an adequate measure of relief to the General Counsel, to the Union, and also to members of the bargaining unit at issue, for the alleged violations in the complaint, taking into account the nature of the alleged violations, the risks inherent in litigation, and the stage of litigation. Although the parties presented all their evidence on the matter, the merits of the complaint allegations still hang in the balance, pending the parties' post-trial briefs, and my decision based on the evidentiary record. Given those variables, I find that *Independent Stave* factor two favors approving the proposed settlement agreement.

2

*Independent Stave* Factor Three

I find that *Independent Stave* factor three favors approval of the proposed settlement agreement. There are no allegations or evidence of any fraud, coercion, or duress by any party in reaching the proposed settlement agreement.

*Independent Stave* Factor Four

I have not been advised of any prior unfair labor practice findings against Respondent concerning this Charging Party or this bargaining unit that would indicate that Respondent has engaged in a history of violations of the Act. I also have not been advised of any evidence that Respondent has breached previous settlement agreements resolving unfair labor practices. Accordingly, I find that *Independent Stave* factor four favors approving the proposed settlement agreement.

Conclusion

After considering the proposed settlement agreement, the surrounding circumstances, and each of the *Independent Stave* factors, I find that the proposed settlement agreement is reasonable and satisfies the *Independent Stave* standard for approval. Accordingly, I hereby approve the settlement in this case and enter the following:

**ORDER**

With good cause being shown, I hereby approve the non-Board settlement that the relevant parties have executed. As the settlement agreement resolves all complaint allegations, the trial record in this case is hereby conditionally closed until June 17, 2024, at such time, absent an objection made in writing by a party, the trial record shall be automatically and permanently closed. The briefing schedule for this matter shall be held in abeyance until such time that the trial record is permanently closed or there is a written objection filed during the conditional closing period.

IT IS SO ORDERED.

Dated: April 17, 2024
Washington, D.C.

Lisa Friedheim-Weis
Administrative Law Judge

3

# EXHIBIT 5

Case: 24-3057    Document: 82    Page: 169    Date Filed: 06/27/2025

### KING & BALLOW

LAW OFFICES
26 CENTURY BOULEVARD
SUITE NT 700
NASHVILLE, TENNESSEE 37214

TELEPHONE: 615/259-3456

FACSIMILE: 888/688-0482

www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

March 28, 2025

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

      Re:    Effects Bargaining with Newspaper Guild of Pittsburgh/CWA Local 38061 (the
             "Union")

Dear Joe:

    As you are aware, yesterday the Post-Gazette filed a Motion for Clarification of the Order Granting Injunctive Relief in Part. The Company is ready to negotiate over the effects of the Court's Order to "rescind the changes in the terms and conditions of employment related to healthcare."

    The Company is available next week, beginning Thursday, April 3, 2025 to bargain over the effects of the Court's Order on healthcare.

    Please let me know if that works for the Union and I will secure a meeting room at the Omni.

                        Sincerely,

                        Richard C. Lowe

cc:    Rob Weber

# EXHIBIT 6




## JUBELIRER, PASS & INTRIERI, P.C.
### Attorneys-at-Law

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon
J. Skye McCollum
Calder M. Buisch

*also licensed in Ohio

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

March 31, 2025

**VIA EMAIL**
**AND FIRST CLASS MAIL**
Richard C. Lowe, Esquire
King & Ballow
26 Century Boulevard
Suite NT 700
Nashville, TN 37214

Re:    Newspaper Guild of Pittsburgh and Post-Gazette

Dear Richard:

I received your correspondence of March 28, 2025, as well as your correspondence seeking the Guild's consent to engage in discussions pursuant to Rule 408. As to your request to negotiate pursuant to Rule 408, the production units were in a far different position than the News Guild. For the past eight (8) years you have been telling them the Post-Gazette was going to be a strictly digital newspaper, and subsequently the Post-Gazette sold its "printing press." A buyout to those unions was an alternative to bargaining for a contract when there would no longer be any print editions.

The News Guild on the other hand is in a far different position. The Newspaper Guild of Pittsburgh are journalists and love being journalists. Obviously, the Post-Gazette going to a digital newspaper has absolutely no impact on journalists except for the fact the Post-Gazette would most likely need more journalists. Therefore, the News Guild has no interest in selling the jobs of its members. Your request to bargain pursuant to Rule 408 is respectfully rejected.

As for your letter of March 28, 2025, wherein you request the Guild engage in "effects bargaining" you obviously suffer a misconception of the historically accepted standard that when an employer's illegally implemented terms are rescinded the employer restores the conditions that existed prior to their illegal implementation. Under your convoluted theory the PGs illegal activity is rewarded if the union requests the employer rescind the illegally imposed healthcare. Under your theory, considering the Post-Gazette's history of bad faith bargaining a new healthcare agreement may take years. In the meantime, the Post-Gazette will continue its bad faith bargaining and gain leverage when the illegally implemented healthcare is removed leaving the employees without any healthcare.

219 Fort Pitt Boulevard 1st Floor, Pittsburgh, PA 15222-1576  Ph: 412.281.3850 • 412.261.0147  F: 412.281.1985
facebook.com/jpilaw  www.jpilaw.com



The Motion for clarification which the PG filed is nothing more than another delay tactic-a tactic the Post-Gazette has engaged in for the past eight (8) years. We shall be filing a Response to that Motion and seeking sanctions. Once the healthcare contained in the recently expired agreement is reinstated we can begin bargaining for the terms and conditions of a new Agreement.

There is no "effects bargaining" when a Court Order allows the union to request illegally implemented terms be removed, because the expired agreement is put in its place. We urge the company to move forward as quickly as possible to reinstate the healthcare program set forth in the expired Collective Bargaining Agreement as interpreted by Arbitrator Nadelbach and enforced by the US Court of Appeals for the Third Circuit so that the PG can move forward with its obligation to engage in good faith bargaining for a new Collective Bargaining Agreement. If you have any questions please do not hesitate to contact me.

Very truly yours,

Joseph J. Pass

JJP/ae

cc:    Zack Tanner

# EXHIBIT 7



**JUBELIRER, PASS & INTRIERI, P.C.**
*Attorneys-at-Law*

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon
J. Skye McCollum
Calder M. Buisch

*also licensed in Ohio

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

April 9, 2025

**VIA EMAIL**
**AND FIRST CLASS MAIL**
Richard C. Lowe, Esquire
King & Ballow
26 Century Boulevard
Suite NT 700
Nashville, TN 37214

Re:    Pittsburgh Post-Gazette and Pittsburgh News Guild

Dear Richard:

As you are aware the Third Circuit entered an Order requiring the Post-Gazette, upon request of the union, rescind its illegal unilateral implemented healthcare. As a result, I forwarded you a letter requesting the Post-Gazette rescind the unilaterally imposed healthcare, and the healthcare provided by the Employment Partners Benefits Fund as set forth in exhibit B of the parties expired Agreement be reinstituted.

I had the opportunity to speak with William Parry, the executive director of the Fund and he assured me that the healthcare can be reinstituted. However, the Fund is in need of a census of all the employees in the bargaining unit be provided so that an appropriate premium for these individuals is established. Therefore, it is incumbent that you immediately provide Mr. Parry with a census of all current employees under the Guild's jurisdiction who are actively employed at the Post-Gazette as well as those individuals on strike be included in the census. It is incumbent that the information be provided to Mr. Parry as soon as possible so that the healthcare can be implemented consistent with the Order of the U.S. Court of Appeals for the Third Circuit.

In the meantime, employees actively employed will remain covered by the inferior benefits unilaterally implemented until the benefits set forth in the Collective Bargaining Agreement which are provided by the Employment Partners Benefits Fund are reinstituted. When the Post-Gazette provides the census information to the Employment Benefits Partners Fund please copy the undersigned so we are aware that the information is being transmitted.

Finally, as you are aware the fact that the Post-Gazette filed a "Motion for Clarification" does not operate as an automatic stay of the Court's Order. Although the PG requests for an en




banc hearing does stay the Court's Order we expect during the time the Third Circuit determines your motion, all of the necessary information will be provided to the Employment Benefits Partners Fund. As a result, the health insurance provided by the Employment Benefits Partners Fund will be in place upon the decision of the Third Circuit denying your application for an en banc hearing. Failure of the Post-Gazette to abide by the command of the Third Circuit will be dealt with accordingly.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Joseph J. Pass

JJP/ae

cc:    William Parry

# EXHIBIT 8

Case: 24-3057    Document: 82    Page: 177    Date Filed: 06/27/2025

## JUBELIRER, PASS & INTRIERI, P.C.
### *Attorneys-at-Law*

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass\*
Steven E. Winslow
Patrick K. Lemon
J. Skye McCollum
Calder M. Buisch

\*also licensed in Ohio

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

April 25, 2025

### VIA EMAIL AND FIRST CLASS MAIL

Richard C. Lowe, Esquire
King & Ballow
26 Century Boulevard
Suite NT 700
Nashville, TN 37214

Brian M. Hentosz, Esquire
Littler Mendelson P.C.
One PPG Place
Suite 2400
Pittsburgh, PA 15222

Re:    Guild Health Insurance

Dear Gentlemen:

The attached letter dated April 24, 2025, from the attorney representing the Employment Partners Benefits Fund confirms the Fund has no problem putting the Guild bargaining unit back into the Health and Welfare Fund and will provide the same coverage that was in place in 2017. Surely this letter should allay any of the fears or arguments you may have that the Fund would not be able to provide the same benefits. In my email to you yesterday I urged you as an officer of the Court to advise the Third Circuit that your previous filings indicating great doubt that the Employment Partners Benefit Fund would refuse to provide the same healthcare to the Guild's members with the same benefits that existed in 2017 was unfounded. Hopefully you will do so.

If you have any questions, please do not hesitate to contact me,

Very truly yours,

Joseph J. Pass

JJP/ae

cc:    William Parry
Zack Tanner

219 Fort Pitt Boulevard 1st Floor, Pittsburgh, PA 15222-1576  Ph: 412.281.3850 • 412.261.0147  F: 412.281.1985
facebook.com/jpilaw  www.jpilaw.com




Case: 24-3057     Document: 82     Page: 178     Date Filed: 06/27/2025



**LOGAN, METTLEY & NEWCOMER, PLC**

Levi K. Logan
5 Hot Metal Street, Suite 203
Pittsburgh, PA 15203
lkl@lmnlawgroup.com
(412) 417-5506

April 24, 2025

Joseph J. Pass
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Boulevard, 1st Floor
Pittsburgh, PA 15222-1576
Via email to: jjp@jpilaw.com

RE:     Employment Partners Benefits Fund (the "Fund") – Newspaper Guild of Pittsburgh/CWA
Local 38061 (the "Union")

Dear Attorney Pass:

I wanted to confirm that the letter you sent to the Post-Gazette's attorneys is for the most part accurate. I can confirm that the Fund would accept the Union members and provide health insurance coverage for those members. Our understanding is that the Court Order addressing the Post-Gazette's provision of insurance coverage for the Union's members requires coverage to be provided at the same level as what was in place in 2017. When these members left the Fund, the Post-Gazette was the only employer in the plan provided by the Fund at that time. Consequently, the Fund terminated that specific plan. However, the Fund will create the same plan for these incoming Union members as was in place when they left the Fund. This plan will provide coverage which will be the same as what was in place in 2017.

The Post-Gazette will be obligated to pay the current rates for coverage set by the Fund's Trustees, just as any other contributing employer would. If the Post-Gazette refuses to pay current rates, as they have tried to avoid in the past, the Fund will not provide coverage to the Post-Gazette's Union employees. The Post-Gazette will need to enter into an agreement with the fund, just as all other contributing employers are required to, obligating the Post-Gazette to submit contributions to the Fund at the rates set by the Trustees for the level of coverage provided to the Post-Gazette's Union employees.

If you have any questions, please feel free to contact me directly.

Sincerely,

*Levi K. Logan*

Levi K. Logan

cc:     William Parry, Jr. (via email)

# EXHIBIT 9

### KING & BALLOW

LAW OFFICES

26 CENTURY BOULEVARD

SUITE NT700

NASHVILLE, TENNESSEE 37214

TELEPHONE: 615/259-3456

FACSIMILE: 888/688-0482

www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

April 28, 2025

**<u>Via Email and U.S. Mail</u>**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA  15222

      Re:    Effects Bargaining with Newspaper Guild of Pittsburgh/CWA Local 38061 (the "Union")

Dear Joe:

On March 28, 2025, the Company reached out to you by letter and requested effects bargaining over the Third Circuit's Order to "rescind the changes in the terms and conditions of employment related to healthcare." You refused to engage in effects bargaining.

On April 25, 2025, you sent me a letter which included a letter from Levi K. Logan of the firm Logan, Mettley and Newcomer, PLC addressed to you dated April 24, 2025. Mr. Logan represented that when the Guild employees left the Employment Partners Benefit Fund (the "Fund") in 2020, the Fund terminated that plan. However, that plan as modified was terminated in 2022. Nevertheless, Mr. Logan stated the Fund would create the same plan for the Guild bargaining unit that was in place when they left the Fund in 2020. He further indicated that the Company would need to enter into an agreement with the Fund, which we assume would be a Participation Agreement.

As you know, the Company was never obligated to sign a Participation Agreement to participate in the Fund or any other type of agreement with the Fund as a condition of participation as a contributing employer. Moreover, several NLRB Administrative Law Judges have ruled that the Company is not legally required to sign a Participation Agreement in order to participate in a Taft-Hartley health and welfare fund, such as the Fund.

LOS ANGELES OFFICE:

2121 AVENUE OF THE STARS, SUITE 800 · LOS ANGELES, CALIFORNIA 90067 · TELEPHONE: 424/253-1255 · FACSIMILE: 888/688-0482

Again, the Company is ready to bargain over the effects of the Court's order on healthcare.

Sincerely,

Richard C. Lowe/by no

Richard C. Lowe

cc:     Rob Weber

Case: 24-3057     Document: 82     Page: 181     Date Filed: 06/27/2025

# EXHIBIT 10



# JUBELIRER, PASS & INTRIERI, P.C.
## Attorneys-at-Law



Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon
J. Skye McCollum
Calder M. Buisch

*also licensed in Ohio

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

April 30, 2025

**VIA EMAIL**
**AND FIRST CLASS MAIL**
Richard Lowe
King & Ballow
26 Century Boulevard
Suite NT 700
Nashville, TN 37214

Re:    Your Letter of April 28, 2025

Dear Richard:

As you are keenly aware the Court of Appeals has rejected the Post-Gazette's Motion for Clarification and the request for an En Banc hearing. As a result, there is absolutely no question that once the illegally imposed healthcare is rescinded the actual healthcare benefits as set forth in the expired Collective Bargaining Agreement is what goes in its place. Your argument that the Employer Partners Benefits Fund had terminated that plan is of no consequence because as noted they can and will recreate the plan with identical benefits that existed under that plan. Further your argument that the Post-Gazette was never obligated to sign a participation agreement or any other type of agreement is of no consequence. The Third Circuit Order is very clear. What you had done before has absolutely no impact on your compliance with the Court's Order. Finally, your observation that an Administrative Law Judge found the company was not required to sign a participation agreement dealt not only with a different fund but with a different union. As you have emphasized many times there is no coordinated bargaining and the cases you cite had nothing to do with the Guild and the Post-Gazette. Moreover, the US Court of Appeals has significantly more authority to compel enforcement than the "recommendations of an ALJ."

Very truly yours,

Joseph J. Pass

JJP/ae

Enclosure via email only
cc:    Nancy Wilson
       Jason Scherer
       Brian Hentosz
       David Seid
       Zack Tanner




Case: 24-3057     Document: 82     Page: 183     Date Filed: 06/27/2025

# EXHIBIT 11

# KING & BALLOW

### LAW OFFICES
### 26 CENTURY BOULEVARD
### SUITE NT 700
### NASHVILLE, TENNESSEE 37214

TELEPHONE: 615/259-3456

FACSIMILE: 888/688-0482

www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

May 5, 2025

**Via E-mail and U.S. Mail**
(lkl@lmnlawgroup.com)

Levi K. Logan
Logan, Mettley & Newcomer, PLC
5 Hot Metal Street, Suite 203
Pittsburgh, PA 15203

Re:   Employment Partners Benefits Fund (the "Fund") – Newspaper Guild of
       Pittsburgh/CWA Local 38061 (the "Union")

Dear Mr. Logan,

On April 28, 2025, the Post-Gazette made another request for Mr. Pass to engage in effects bargaining over the Court's Order on healthcare. The Union refused.

The Post-Gazette has provided the Union with the census information they requested and Mr. Pass stated in his April 24, 2025 letter that he forwarded Mr. Parry that census information.

You stated in your April 24, 2025 letter that the Fund will create the same Plan that was in effect when the Post-Gazette's Guild bargaining unit employees left the Fund and began coverage under the Post-Gazette's healthcare plan.

Please provide the Post-Gazette the 9PG 2000/4000 plan design which the Fund had in place immediately before the Guild participants were moved to coverage under the Company's Plan. Also provide the premium costs the Fund is proposing to charge for participation in the Plan design.

For your information, the Post-Gazette has never been a signatory to any Participation Agreement or other agreement with the Fund as a condition for participation.

Sincerely,


Richard C. Lowe

cc:   Brian M. Hentosz (via e-mail)
      Joseph J. Pass (via e-mail)

# EXHIBIT 12

Case: 24-3057    Document: 82    Page: 187    Date Filed: 06/27/2025

# KING & BALLOW

LAW OFFICES

26 CENTURY BOULEVARD

SUITE NT 700

NASHVILLE, TENNESSEE 37214

TELEPHONE: 615/259-3456

FACSIMILE: 888/688-0482

www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

May 9, 2025

**<u>Via E-mail and U.S. Mail</u>**
(lkl@lmnlawgroup.com)

Levi K. Logan
Logan, Mettley & Newcomer, PLC
5 Hot Metal Street, Suite 203
Pittsburgh, PA 15203

Re:     Employment Partners Benefits Fund (the "Fund") – Newspaper Guild of
        Pittsburgh/CWA Local 38061 (the "Union")

Dear Mr. Logan,

Thank you for your May 8, 2025 letter in which you attach the SPD for 2017 for the Guild bargaining unit at the Post-Gazette. The Company will promptly review this information.

In my May 5 letter, you were asked to provide the 9PG 2000/4000 plan design which the Fund had in place immediately before the Guild participants were moved to coverage under the Company's Plan. You were also asked to provide the premium costs the Fund is proposing to charge for participation in this Plan design. Please provide that information as soon as possible.

Finally, as you are aware, the Post-Gazette has never been a signatory to any Participation Agreement or other agreement with the Fund as a condition for participation.

The Company suggests the parties enter into the following written understanding as a condition of participation in the Fund:

The Fund agrees the employer is not a party to any Participation Agreement, Trust Agreement or any other agreement with the Fund. The employer's notice of the terms of the Trust Agreement and any course of conduct by the employer that is caused by the Fund to provide benefit coverage to employees, shall not be deemed an acceptance by the employer of any Trust Agreement, including all rules, procedures, and provisions thereof; Participation Agreement; or any other agreement with the Fund.

This will maintain the status quo which existed prior to the implementation of the Company's healthcare plan in July 2020.

Thank you for your assistance with this matter.

Sincerely,

Richard C. Lowe

cc:     Brian M. Hentosz (via e-mail)
        Rob Weber (via e-mail)

# EXHIBIT 13



**LOGAN, METTLEY & NEWCOMER, PLC**

Levi K. Logan
5 Hot Metal Street, Suite 203
Pittsburgh, PA  15203
lkl@lmnlawgroup.com
(412) 417-5506

May 28, 2025

Richard C. Lowe
King & Ballow
26 Century Boulevard
Suite NT 700
Nashville, TN 37214
Via email to: rlowe@kingballow.com

RE:    Employment Partners Benefits Fund (the "Fund") – Newspaper Guild of Pittsburgh/CWA
         Local 38061 (the "Union")

Dear Attorney Lowe:

After receiving your May 9, 2025 letter, Nancy Wilson from the National Labor Relations Board reached out to me to discuss the coverage to be obtained by the Post-Gazette for the Union members.  It was confirmed that the NLRB's position is that the coverage to be offered should match what was set forth in the 2013-2017 CBA.  This coverage included deductibles of $850/$1,700.  This also appears to be the position taken by the arbitrator and the Courts in the dispute between the Post-Gazette and the Union.  The Fund is not able to defy the stance held by the NLRB or the Courts which are dealing with the dispute.  Should the parties agree or the Courts decide otherwise, the Fund will provide the necessary information for any agreed upon or Court enforced change in plan design.

With regards to your claim that the Post-Gazette has never been a signatory, that is not accurate. The 2013-2017 CBA required contributions be made by the Post-Gazette to the Fund for the Union members' coverage.  The terms of the CBA will continue to apply until a new agreement is reached between the Post-Gazette and the Union.  Therefore, there is no need for the Fund to have a separate Participation Agreement with the Post-Gazette.  The Fund will also not agree to the written understanding you proposed in your May 9, 2025 letter.

If you have any questions, please feel free to contact me directly.

Sincerely,

*Levi K. Logan*

Levi K. Logan

cc:    William Parry, Jr. (via email)

# EXHIBIT 14

Case: 24-3057    Document: 82    Page: 192    Date Filed: 06/27/2025

KING & BALLOW

LAW OFFICES

26 CENTURY BOULEVARD
SUITE NT700
NASHVILLE, TENNESSEE 37214

TELEPHONE: 615/259-3456
FACSIMILE: 888/688-0482

www.kingballow.com

Direct Dial: (615) 726-5420
Direct Facsimile: (888) 688-0482
E-mail: rlowe@kingballow.com

June 20, 2025

**Via E-mail and U.S. Mail**
(Jason.scherer@nlrb.gov)

Jason S. Scherer, Compliance Officer
National Labor Relations Board
Region 06
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222-4111

> Re:    PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette
>        Case 06-CA-248017

Dear Mr. Scherer,

The Company and the Guild met in contract negotiations at the Omni Hotel on June 5, 2025. Initially, the Union asked questions about the pending NLRB and Court litigation. The Company stated that it would not spend time discussing the litigation as the meeting was reserved for contract negotiations. The Company's current contract proposal was the contract proposal the Company submitted to the Union on November 14, 2022.

At the previous contract negotiations held on November 13, 2024, the Company had asked the Union to initial tentative agreements on language which the parties were in agreement with. The Union refused. At the end of the meeting, the Union presented a comparison document which purported to set forth the Guild's contract proposals, the Company's contract proposals, the corresponding language from the expired collective bargaining agreement (CBA) and in a few cases, a brief summary. The Union asked the Company to review its comparison document. On June 5, 2025, the Company stated that it had reviewed the Guild's November 13, 2024 comparison document and was prepared to go through each contract proposal.

The Company initially offered to tentatively agree to the Preamble language in the CBA because both parties were proposing identical language. Guild spokesperson Ed Blazina announced that the Guild would not sign off on anything in negotiations until there was an agreement on the entire contract. The Union refused to tentatively agree to any language even where the parties were proposing identical language. Mr. Blazina then characterized any understanding reached in negotiations as "a meeting of the mind," not a tentative agreement. The

Company asked why a "meeting of the mind" was not also a tentative agreement. Mr. Blazina replied that one had a legal meaning.

The parties further discussed the Preamble language but the Union refused to tentatively agree to the language. Rather, the Union would only agree that the parties' Preamble language proposals were the same as the expired contract.

The Company offered to tentatively agree to the Guild's proposal on Recognition. The Union refused. The Union would only recognize that the Recognition proposal for the Company and the Union were the same as the expired CBA. After a caucus, Mr. Blazina suddenly announced that the Union would recognize where the parties' contract proposals were the same as TA's but still would not sign off on any tentative agreement.

The Company offered to tentatively agree to the list of exemptions in the Guild's proposal in the November 13, 2024 comparison document in Section B of the Preamble. The Company agreed to withdraw its proposal to add an Editorial Director to the list of exemptions. The Union incredulously stated the November 13, 2024 comparison document was not a proposal despite a dedicated column "GUILD PROPOSAL." The column set forth the Guild's contract proposals on each provision of the CBA. Guild representative Marian Noedham stated the comparison documents should not be relied upon for the Guild's proposals because they may not be accurate. Rather, the Guild's proposals were contained in its December 6, 2019 proposal despite handing the Company a second comparison document at the meeting.

The Company then tentatively agreed to the following Union proposals from the Guild's December 6, 2019 proposal:

B. Excepted from all provisions except Article XIX, Paragraph _____, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Editorial Director, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Case: 24-3057     Document: 82     Page: 194     Date Filed: 06/27/2025

The parties discussed the Company's proposed exceptions to the Guild's jurisdiction. The Company again stated its justifications for the proposed exceptions in Sections D(1), D(2) and D(3). No agreements were reached.

The parties discussed the Company's proposal on independent contractor stringers who historically performed work for the newspaper. The Company informed the Guild that the Union tentatively agreed to the Company's proposed language on stringers in Section D(4) of the Company's final offer on September 8, 2020. The Company pointed out that the tentative agreement on stringers was not reflected in the current Guild proposal. The Union stated it would review the discrepancy.

The parties also discussed Section D(5) of the Company's proposal. Agreement was reached on the following language in Section D(5):

> The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

> The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

The parties also tentatively agreed to Article I. Guild Shop and Article II, Checkoff with the exception of the Guild's proposal to retain the Indemnification language.

The parties next discussed Article III, Classifications, Wages and Schedule of Minimums. The Union refused to discuss the wage schedules, or its regressive retroactive wage proposal contained in its September 6, 2019 proposal at the meeting, but agreed to discuss other Sections of Article III.

The Company subsequently agreed to Section 3 of the Union's proposal in Article III as follows:

> In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within ninety (90) days from the start of employment, adjustments shall be made retroactive to the start of employment. If such question is raised after ninety (90) days from the start of employment, adjustments shall be effective on the date that Guild brought the question to the attention of the Company.

The Company also agreed to maintain an employee's wage rate even if permanently transferred by the Company into a lower rated classification.

Case: 24-3057     Document: 82     Page: 195     Date Filed: 06/27/2025

The Company also tentatively agreed to the Union's proposal in Article III, Section 4 as follows:

> Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

Additionally, tentative agreement was reached on the following language in the Company's proposal on Article III:

> 5. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

> 6.(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

> 6.(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week.

Finally, the Company offered to tentatively agree to the Union's Article III proposal authorizing merit increases. Despite the parties proposing identical merit increase language as the expired CBA, the Union would not agree to its own proposal. Section 8 states as follows:

> 8. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, until the top minimum is reached.

No further agreements were reached by the Company and the Guild. The Guild terminated the negotiations at 4:32 p.m. and stated they would get back to the Company regarding future meeting dates.

Sincerely,

Richard C. Lowe

cc:    Rob Weber
       Joe Pass