# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST-GAZETTE | ) ) | Nos. 24-2788 |
| | ) | 24-3057 |
| Petitioner/Cross-Respondent | ) ) | Board Case Nos. |
| v. | ) ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| NATIONAL LABOR RELATIONS BOARD | ) ) | 06-CA-269346 |
| Respondent/Cross-Petitioner | ) ) | |
| and | ) ) | |
| NEWSPAPER GUILD OF PITTSBURGH/ CWA LOCAL 38061 | ) ) ) | |
| Intervenor | ) | |

## REPLY OF THE NATIONAL LABOR RELATIONS BOARD TO THE COMPANY'S OPPOSITION TO THE BOARD'S MOTION FOR CIVIL CONTEMPT

On March 24, 2025, this Court issued a clear Order directing the Company to, "[o]n request by the Union, rescind the changes in the terms and conditions of employment related to health insurance for its unit employees that were unilaterally implemented on about July 27, 2020." (March 24, 2025 Order.) The changes consisted of removing employees from coverage under their collectively bargained Fund plan and moving them into a less-desirable company-sponsored plan. Two days after the Court's Order issued, the Union requested that the Company "rescind the changes" and return employees to the collectively bargained

Fund plan.

Over three months have passed. In that time, the Union has made extensive efforts to ease the Company's compliance by securing assurances from the Fund that it is able and willing to re-offer the appropriate plan. The Company, meanwhile, sought rehearing *en banc* and moved to "clarify" that the Order did not mean what it said. In the over two months since the Court denied both motions (Apr. 29, 2025 Order), the Company has not taken any meaningful steps to comply with the Order to rescind the healthcare changes. The excuses it manufactures at this belated stage are rejected repeats and legal nonstarters.

1.    First, the Company attempts to excuse its noncompliance by distorting the Order's command that it rescind the unilateral changes to employees' healthcare benefits. (Opp. to Emergency Mot. 14-15.) In the Company's view, the requirement that it "rescind the changes" meant only that it had to remove employees from the Company's unilaterally imposed healthcare plan, not that it had to restore them to their collectively bargained plan through the Fund. This strained distinction has no basis in law or logic, and the Court has already rejected it. (Apr. 29, 2025 Order (denying Company's contested motion for "clarification that the Court's Order allows the Company to continue the existing plan coverage for employees while negotiating for a replacement plan with the [Union]" (Mot. for Clarification, p. 2))).

As the Company is well aware, remedies under the National Labor Relations Act, including the interim remedy imposed by the Court's Order, are aimed at "undo[ing] the effects of the violations of the Act." *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346 (1953); *see also Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941) (Act's remedies seek the "restoration of the situation, as nearly as possible, to that which would have obtained but for" the violation). In the context of remedying an unlawful unilateral change, rescission of the change and restoration of the status quo ante are one and the same. As this Court has indicated, the authority under the Act to require an employer to rescind a unilateral change stems directly from the "power to order the restoration of the status quo ante." *St. John's General Hosp. of Allegheny-DR Ctr. v. NLRB*, 825 F.2d 740, 746 (3d Cir. 1987).

The Company's alternative reading of the Order is insupportable. The restoration of employees' prior benefits is essential "to prevent the wrongdoer from . . . gaining undue advantage at the bargaining table when he bargains about the benefits which he has already discontinued." *Daily News of L.A. v. NLRB*, 73 F.3d 406, 415 (D.C. Cir. 1996) (quoting *John Zink Co.*, 196 NLRB 942 (1972)). If the Court's Order meant only that the Company had to roll back its own healthcare plan, leaving employees in the lurch while the Union bargained with the Company over the terms of a new plan, the Company would be "enjoying the fruits" of its

unfair labor practice in the form of leverage that it had unlawfully obtained. *Id.*[1]

Contrary to the Company's claim (Opp. to Emergency Mot. 15-16), there is also no viable argument that the Court's Order was unclear. Again, no logical distinction exists between an order to rescind a change and an order to restore the status quo ante. To the extent there was any room for doubt, this Court definitively resolved it when it denied the Company's motion for clarification. Thus, since at least April 29, 2025, the Company has been operating in knowing defiance of this Court's straightforward Order.

2.　　Testing another route, the Company asserts that restoration of the contractual level of benefits does not represent the status quo ante to which employees should be restored. (Opp. to Emergency Mot. 16-17.) It offers two reasons. First, it contends that, because a higher-deductible plan ($2,000 for single coverage and $4,000 for family coverage) was in place on July 26, 2020 (the day before the unilateral change), it is not required to restore employees to the lower-deductible plan ($850 for single coverage and $1,700 for family coverage) to which employees were entitled under the collective-bargaining agreement. Second, it argues that, when it previously offered the contractual level of benefits,

---

[1] It is of no consequence that the Company has "adhered to the Guild's instruction to keep the Company's healthcare plan in place" until replaced. (Opp. to Emergency Mot. 15.) The Union remains at a disadvantage in negotiations so long as employees are enrolled in a less-favorable plan than the one to which they are entitled.

it was not required to be subject to a participation or trust agreement, so it can lawfully refuse to be subject to such an agreement now. Neither claim withstands scrutiny.

First, the higher-deductible plan that was in place on July 26, 2020, arose only as a stopgap solution in the wake of the Company's decision to limit its contributions to the Fund to the 2017 rate. *See PG Publishing, Inc. v. Newspaper Guild of Pittsburgh, Comm. Workers of America, AFL-CIO Local 38061*, 2020 WL 7211214, at *2 & n.6 (W.D. Pa. Sept. 14, 2020). Through 2017, the Company had increased its contributions each year in order to provide the level of benefits guaranteed in the contract. When the Company unilaterally stopped doing so, the Union agreed to a makeshift arrangement in which employees would be subject to higher deductibles rather than paying more upfront for coverage. *See id.* However, the Union challenged the Company's decision to limit its contributions in the first place, and the resulting arbitration award in the Union's favor was enforced and then upheld by this Court. *See PG Publishing, Inc. v. Newspaper Guild of Pittsburgh, Comm. Workers of America, AFL-CIO Local 38061*, 2020 WL 7065834, *1–*4 (W.D. Pa. Dec. 3, 2020) (enforcing the arbitration award); *PG Publishing, Inc. d/b/a Pittsburgh Post-Gazette v. Newspaper Guild of Pittsburgh, Comm. Workers of America, AFL-CIO Local 38061*, 19 F.4th 308 (3d Cir. 2021) (upholding the District Court's determination). The Company was obligated to

continue its contribution increases after 2017 to maintain the lower-deductible plan. Consequently, that plan is the one to which employees are entitled to be restored.

Second, it is irrelevant that, prior to its unlawful change, the Company was able to provide the contractual level of benefits without being subject to a participation or trust agreement. As an initial matter, it is not at all clear that the Company would have to be subject to such an agreement in order to restore employees to the appropriate plan. In a May 28, 2025 letter to the Company's attorney, the Fund's attorney explicitly stated the opposite, indicating that "there is no need for the Fund to have a separate Participation Agreement with the [Company]." (Opp. to Emergency Mot., Exh. 13.)

In any event, the status quo ante is measured by the level of benefits that employees received prior to the unlawful change, not the previous conditions or cost to the employer of providing those benefits. *See Sys. Mgmt., Inc. v. NLRB*, 901 F.2d 297 (3d Cir. 1990) (Board's remedy designed to "restore *these workers*" to the status quo ante (emphasis added)); *NLRB v. Keystone Steel & Wire*, 653 F.2d 304, 306, 308 (7th Cir. 1981) (requiring employer to restore same level of benefits employees received under an unlawfully revoked medical insurance plan). Restoration of the status quo ante can indeed be onerous. *See, e.g.*, *NLRB v. Jackson Farmers, Inc.*, 457 F.2d 516, 518 (10th Cir. 1972) (enforcing Board order

requiring employer to resume discontinued operations "in order to effectuate the status quo ante," even though the requirement was "severe"). But it is "the wrongdoer, rather than the innocent victim, [who] should bear the hardships of" remedying the unfair labor practice. *Mid-South Bottling Co. v NLRB*, 876 F.2d 458 (5th Cir. 1989); *see also Keystone*, 653 F.2d at 309 (inconvenience of restoring status quo ante "must be blamed on the [employer's] violation of the Act").

Moreover, to the extent that any requirement that the Company be subject to a participation or trust agreement is new as of 2022, as the Company claims (Opp. to Emergency Mot. 7-9), it would have become subject to that requirement had it not unlawfully changed healthcare plans. Consequently, it cannot complain that it would be subject to such a requirement now.

Based on its perverse construction of what restoration of the status quo ante requires, the Company argues that compliance is an impossibility because the Fund is unwilling to offer the higher-deductible plan or to exempt the Company from subjection to a participation or trust agreement. (Opp. to Emergency Mot. 17-18.) The Company has not met its burden to show "categorically and in detail" why it is impossible for it to comply with the Court's Order as that Order is properly understood. *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973) (potential contemnor bears the burden when asserting impossibility as a defense to a civil-contempt charge); *accord United States v. Apple MacPro*

*Computer*, 851 F.3d 238, 249 (3d Cir. 2017). As already established, the Order requires the Company to restore employees' healthcare benefits under the lower-deductible plan, which the Fund has confirmed that it is able and willing to offer. (Emergency Mot., Attach. F, G & H.) The Company has not met its burden of demonstrating that, in order to provide this plan, it would need to be subject to a participation or trust agreement. And, even if this were the case, subjection to an agreement might only make compliance with the Order undesirable. It would not make it impossible. *See FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 590 (3d Cir. 2010) (proper inquiry is whether compliance is a "physical impossibility beyond the control of the alleged contemnor").

 In response, the Company points to cases finding that a party does not engage in bad-faith bargaining when it rejects a proposal under which it would be bound by a participation agreement. (Opp. to Emergency Mot. 18.) Those cases arise in the liability context, where the Board asks whether employers have committed an unfair labor practice by failing to bargain in good faith. By contrast, the instant matter arises in the remedial context, where the question is whether an employer has complied with an order to rescind an unlawful unilateral change. To put employees in the position they would have been in but for its unlawful change, the Company might well have to accept conditions that it could have lawfully rejected in the normal course of bargaining.

3. Lastly, the Company claims that it is being deprived of due process in the very proceeding currently providing it. Due process is satisfied where a potential contemnor is given "notice" and "an opportunity to explain the conduct deemed deficient before the fine is imposed." *Newton v. A.C. & S., Inc.*, 918 F.2d 1121, 1127 (3d Cir. 1990). It "does not necessarily require a full evidentiary hearing." *Marks L. Offs., LLC v. Mireskandari*, 704 F. App'x 171, 178 (3d Cir. 2017). Where, as here, the question is not whether the noncompliant behavior occurred but whether it should be legally "excused," a "hearing on the issues presented would be a useless undertaking." *Reliance Mfg. Co. v. NLRB*, 143 F.2d 761, 762-63 (7th Cir. 1944). The Company was able to respond in writing to the Board's emergency motion and to therein explain the purported legal basis for its noncompliance. Due process requires no more. Nonetheless, the Court has also afforded the Company an upcoming opportunity to present its position at oral argument.

For these reasons, the Court should grant the Board's Emergency Motion.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570

Dated at Washington, DC
this 3rd day of July 2025

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. <br> d/b/a PITTSBURGH POST-GAZETTE <br><br> Petitioner/Cross-Respondent <br><br> v. <br><br> NATIONAL LABOR RELATIONS BOARD <br><br> Respondent/Cross-Petitioner <br><br> and <br><br> NEWSPAPER GUILD OF PITTSBURGH/ <br> CWA LOCAL 38061 <br><br> Intervenor | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Nos. 24-2788 <br> 24-3057 <br><br> Board Case Nos. <br> 06-CA-248017 <br> 06-CA-263791 <br> 06-CA-269346 |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), the Board certifies that its reply contains 2,135 words of proportionally spaced, 14-point type, the word processing system used was Microsoft Word for Office 365, and the PDF file submitted to the Court was scanned for viruses using Microsoft Defender, which found it to be virus-free.

/s/ Ruth E. Burdick  
Ruth E. Burdick  
Deputy Associate General Counsel  
NATIONAL LABOR RELATIONS BOARD  
1015 Half Street SE  
Washington, DC  20570-0001  
(202) 273-2960

Dated at Washington, DC  
this 3rd day of July 2025

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | |
|---|---|
| PG PUBLISHING CO., INC. <br> d/b/a PITTSBURGH POST-GAZETTE <br><br> Petitioner/Cross-Respondent <br><br> v. <br><br> NATIONAL LABOR RELATIONS BOARD <br><br> Respondent/Cross-Petitioner <br><br> and <br><br> NEWSPAPER GUILD OF PITTSBURGH/ <br> CWA LOCAL 38061 <br><br> Intervenor | Nos. 24-2788 <br>       24-3057 <br><br> Board Case Nos. <br> 06-CA-248017 <br> 06-CA-263791 <br> 06-CA-269346 |

## CERTIFICATE OF SERVICE

I certify that on July 3, 2025, the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit, and that all counsel are registered CM/ECF users.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC  20570-0001
(202) 273-2960

Dated at Washington, DC
this 3rd day of July 2025